1                  UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

3     _____

4     KATIE CAPPUCCIO,

5              Plaintiff,

6        v.                              Case No.

7     CALIFORNIA STATE UNIVERSITY,       8:23-cv-02026-FWS-DFM

8     FULLERTON and DAVID FORGUES,

9     in his individual capacity

10    and office capacity as Vice

11    President of Human Resources,

12             Defendants.

13    _____

14                   VIDEOTAPED DEPOSITION OF

15                  LIEUTENANT ROBERT MULLANEY

16    DATE:         Wednesday, February 12, 2025

17    TIME:         12:47 p.m.

18    LOCATION:     Remote Proceeding

19                  California State University, Fullerton

20                  800 North State College Boulevard

21                  Fullerton, CA 92831

22    OFFICIATED BY: Samantha Owens

23    JOB NO.:      7169684

24

25

                                                     Page 1

```
 1                 A P P E A R A N C E S

 2    ON BEHALF OF PLAINTIFF KATIE CAPPUCCIO:

 3         NICOLE C. PEARSON, ESQUIRE (by videoconference)

 4         Yoder Dreher Pearson, LLP

 5         5319 University Drive, Suite 503

 6         Irvine, CA 92612

 7         npearson@ydplaw.com

 8         (949) 200-9170

 9

10    ON BEHALF OF DEFENDANTS CALIFORNIA STATE UNIVERSITY,

11    FULLERTON AND DAVID FORGUES:

12         HEATHER DAVIS, ESQUIRE

13         Quarles & Brady LLP

14         101 West Broadway, Ninth Floor

15         San Diego, CA 92101

16         heather.davis@quarles.com

17         (619) 237-5200

18

19    ALSO PRESENT:

20         Ron Lazo, Videographer (by videoconference)

21         Katie Cappuccio, Plaintiff (by videoconference)

22

23

24

25
```

Page 2

1    choppy.  I don't know if that was my connection, but I

2    can just restate it.

3    BY MS. PEARSON:

4        Q    Did -- were you concerned that Ms. Cappuccio,

5    your subordinate and a police officer, was making public

6    statements on social media that were critical or

7    objecting to CSUF's COVID-19 mitigation measures?

8        A    I -- I was not concerned with her articulating

9    her viewpoints on social media.

10       Q    So based upon this information that you were

11   gleaning from other people, you did not speak to

12   Ms. Cappuccio regarding her noncompliance?  Is that

13   correct?

14       A    That's correct.

15       Q    And why was that?  I'm just having a hard time

16   understanding the connection.

17       A    Because I was held to enforce this policy.  I

18   thought it would not be profitable to engage in a

19   personal conversation, so I chose the email route.

20       Q    Prior to 2021, how long had Ms. Cappuccio been

21   employed with CSUF?

22       A    I believe it was approximately 11 years.

23       Q    Okay.  And prior to 2021, had she ever been

24   written up for any insubordination?

25       A    Not to my knowledge.  If there was any

Page 43

1      Q     And what do you mean by "really good on

2    policies and procedures"?

3      A     That she's a -- a detail-oriented type of a

4    person.  She -- and she knows a lot about employment law

5    and union rights and things of that nature.

6      Q     So do you think that she was or is it your

7    understanding that she was using this knowledge of

8    employment law and employee rights in voicing her

9    objections to the testing requirement?

10              MS. DAVIS:  Objection.  Lacks foundation.

11   Calls for speculation.

12   BY MS. PEARSON:

13     Q     You can answer the question.

14     A     I'm not sure the two are connected.

15     Q     You don't think that Ms. Cappuccio was

16   advocating for her rights as an employee in voicing her

17   objections to the COVID-19 testing policy?

18              MS. DAVIS:  Objection.  Argumentative.

19   Asked and answered.

20   BY MS. PEARSON:

21     Q     You can answer the question.

22     A     I -- I thought the bulk of her objection was

23   not necessarily employment law or rights and privileges

24   as a union member, it was more aligned with her faith.

25     Q     Okay.  So Ms. Cappuccio -- so it's your

Page 45

1    trying to understand what the difference was?

2                    MS. DAVIS:  Is there a question pending?

3                    MS. PEARSON:  I'm trying to understand

4    what the difference was.

5    BY MS. PEARSON:

6         Q    What's the difference?

7                    MS. DAVIS:  Objection.  Argumentative.

8    BY MS. PEARSON:

9         Q    What was the difference?

10        A    I believe I answered that question before,

11   which is I did it one time with the other employee

12   because I thought it might have been a -- some sort of

13   mistake, so I thought it would be helpful to talk to her

14   and find out if there was some alternative explanation

15   other than philosophically or religious or otherwise as

16   to why she didn't comply.  I believe I had a

17   understanding why Ms. Cappuccio was noncompliant, and

18   that I didn't see it being profitable to engage her in

19   person other than with email.

20        Q    If you didn't think that Ms. Cappuccio would,

21   you know, comply, why not just fire her?  Why didn't you

22   guys just fire her after one, two, three emails and no

23   compliance?

24                    MS. DAVIS:  Objection.  Mischaracterizes

25   evidence.  Incomplete hypothetical.

Page 49

1          A    Correct.

2          Q    And are there holding cells at the police

3    department?

4          A    Yes.

5          Q    How many holding cells are there?

6          A    Two.

7          Q    And how big are they approximately?

8          A    They're small, maybe 4 by 6.

9          Q    Okay.  And how many detainees can they hold?

10         A    Two.

11         Q    And, sorry.  That's two per cell?

12         A    One.

13         Q    Oh.  So one?  So there's two holding cells and

14    you can only have one in each cell?

15         A    That's correct.

16         Q    And these cells, these are temporary cells;

17    correct?  Until a police department or another agency

18    comes to pick up the detainees; correct?

19         A    Or -- or we book them into the county jail or

20    we cite them out.

21         Q    Cite them out?

22         A    Yes.  It goes --

23         Q    And how long is that process usually?

24         A    I think it -- it is supposed to be four hours

25    or less.

Page 58

1      Q    Was it -- I'm just envisioning during

2    lockdowns that that number was low.  Do you have a

3    number for an average number per month of individuals

4    that you were detaining?

5      A    I -- I really don't.  But I can share with you

6    that -- that proactive law enforcement activities for us

7    and all of us in -- in the county, the region, we -- we

8    were policing differently during that time and then how

9    we responded to.  In custodies, we would try to avoid,

10   if possible, bringing people into the station due to

11   COVID protocols.  So I don't have raw numbers for you,

12   but I can tell you that I -- the numbers have to be less

13   than prior to COVID.

14     Q    And we appreciate everything that you guys did

15   during COVID and now, so I understand that.  Okay.  Did

16   you -- when you would bring them in, would they ever

17   spend the night?

18     A    No.

19     Q    Okay.  And did you provide meals to detainees?

20     A    No.

21     Q    Showers?

22     A    No.

23     Q    Blankets, pillows, bedding?

24     A    No.

25     Q    Since you're beginning to work for CSUF, have

Page 60

1    you ever had, or not you, but has anyone ever had to

2    render medical treatment to a detainee that you have at

3    the department, police department?

4         A    I don't have direct knowledge of that.  I --

5    it could certainly happen.  We might have to have Fire

6    respond to a medical emergency in the holding facility,

7    but.

8         Q    I guess in your experience as an officer and

9    then working up the ranks, has that ever happened while

10   you were working but someone that you have in custody

11   needed emergency medical assistance or care?

12        A    Yes.

13        Q    What's an example of that?

14        A    Someone can have a cardiovascular event,

15   hyperventilation, they can have an anxiety attack, they

16   could have an asthmatic attack, they could have a

17   diabetic crisis.

18        Q    Okay.  So if you are, if the -- or, strike

19   that.  Do detainees ever spend the night in these

20   holding cells?

21        A    No.

22        Q    And do the police officers who are on duty

23   overnight, did they -- where do they stay?  Do they stay

24   at the police department?

25        A    Ideally, they're patrolling the campus in

Page 61

1    their police cars and -- or on foot and come back to the

2    station on occasion to file paperwork or do reports.

3         Q    Yeah.  That was a silly -- it's the end of a

4    -- actually, it's not the end of a long week, but we've,

5    Heather and I, have been working a lot on this case.

6    Okay.  So I understand you have officers in the day

7    shift.  How long is the daytime shift?

8         A    Shifts are equivalent day or night.  The --

9    they -- our department formally used a three 12 shift.

10   It's currently a little bit different.  They're doing

11   three 12 and a half, so.  But essentially it's a 12-hour

12   shift, so you're working 5:30, six in the morning to

13   5:30, six in the evening.

14        Q    And during in 2021, was that the model, the

15   shifts?

16        A    Yes.

17        Q    And how many days a week would the officers

18   work?

19        A    At the time, 2021, it was three days.  One

20   week is your short week, three 12s, and the next week

21   would be three 12s and an eight-hour payback shift, so.

22        Q    So they only work three days a week?

23        A    Three -- three days one week and four days the

24   following.  Barring overtime or other court appearances

25   or what have you.

Page 62

```
 1          Q     Okay.  Do you know if the CSUF Police

 2    Department is considered a residential facility?

 3                    MS. DAVIS:   Objection.  Calls for a legal

 4    conclusion and expert opinion.

 5    BY MS. PEARSON:

 6          Q     Do you know?

 7          A     What was the term that you used?

 8          Q     A residential facility?

 9          A     I don't think that term should be associated

10    with us.  I don't know what that is.

11          Q     Do you know if the police department is

12    considered a healthcare facility?

13                    MS. DAVIS:   Objection.  Calls for a legal

14    conclusion or expert opinion.

15    BY MS. PEARSON:

16          Q     I am just wondering if you know?

17                    MS. DAVIS:   Same objections.

18    BY MS. PEARSON:

19          Q     Do you have that understanding, that it's a

20    healthcare facility?

21          A     Not that I'm aware of.  We're not a healthcare

22    facility.

23          Q     Okay.  During -- earlier we talked about

24    having a minimum of two, at least two individuals at the

25    police department.  And I say individuals because I'm
```

Page 63

1    aware, like Ms. Davis just pointed out, that there's

2    officers, sergeants, lieutenants.  When you had -- like

3    how many officers were normally working per shift and

4    what were their titles, or did it change every shift?

5          A    You -- you might not have every rank

6    represented on each shift, but we do -- we do

7    deployments per six months at a time.  We have shift

8    sign-up.  Every shift has a sergeant, a corporal, and an

9    officer or two.  Ideally, sometimes with injuries and

10   things of that nature that doesn't work out that way,

11   but that's usually what you will find on any shift, day

12   or night.

13         Q    And but during COVID, you didn't?  You reduced

14   the number of individuals working during any given shift

15   to two unless more were needed?

16         A    Yes.

17         Q    And the officers that were on shift but

18   working remotely, what kind of tasks would they be

19   completing?

20         A    My understanding is there weren't tasks that

21   were required.  So they're not working remotely as is

22   commonly referred to right now in 2025.  They -- they

23   were available to respond to the campus in the event

24   that there was an emergency or one of the people that

25   were actually physically working on campus were --

Page 64

1    either came down with COVID or had some other reason

2    they couldn't work.

3         Q    Okay.  So they were on shift, not on campus,

4    and they were not necessarily providing, doing work for

5    CSUF Police Department?

6         A    Correct.

7         Q    Okay.  Were you aware that Ms. Cappuccio from

8    June 2021 to November of 2021 was working on a special

9    project with Chief Jones?

10        A    I don't recollect either that at all or what

11   that was.  I don't -- I don't know.

12        Q    Do you recall her preparing a business plan to

13   revitalize the community service program?  In between

14   June and November 2021 is when she was working on this

15   project.

16        A    Sounds vaguely familiar at best, but I don't

17   have any details.

18        Q    Do you recall Ms. Cappuccio in September of

19   2021 receiving a special assignment to some sort of a

20   car seat program?

21        A    Yeah.  That sounds familiar.  Yes.

22        Q    Actually, I will share my screen with so you

23   can -- so this is Exhibit 31.  It's dated September 13,

24   2021, and it's to Katie Cappuccio, University Police

25   Department from Carl Jones, the Chief of Police, and

Page 65