

**U.S. Equal Employment Opportunity Commission**

# Section 12: Religious Discrimination

This guidance document was issued upon approval by vote of the U.S. Equal Employment Opportunity Commission.

| | |
|---|---|
| **OLC Control Number:** | EEOC-CVG-2021-3 |
| **Concise Display Name:** | Section 12: Religious Discrimination |
| **Issue Date:** | 01-15-2021 |
| **General Topics:** | Religion |
| **Summary:** | This document addresses Title VII's prohibition against religious discrimination in employment, including topics such as religious harassment, and workplace accommodation of religious beliefs and practices. |
| **Citation:** | Title VII |
| **Document Applicant:** | Employers, Employees, Applicants, Attorneys and Practitioners, EEOC Staff |
| **Previous Revision:** | Yes. This document replaces previously existing guidance by the same title issued 7/22/08. |

The contents of this document do not have the force and effect of law and are not meant to bind the public in any way. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies.

| EEOC | DIRECTIVES TRANSMITTAL | Number |
|---|---|---|
| | | 915.063 |
| | | 1/15/21 |

| SUBJECT: | Compliance Manual on Religious Discrimination |
|---|---|
| PURPOSE: | This sub-regulatory document supersedes the Commission's Compliance Manual on Religious Discrimination issued on July 22, 2008. **The contents of this document do not have the force and effect of law and are not meant to bind the public in any way. Any final document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies.** |
| EFFECTIVE DATE: | Upon Publication. |
| EXPIRATION DATE: | Until rescinded. |
| ORIGINATOR: | Office of Legal Counsel |

_____

Janet Dhillon, Chair

# SECTION 12:  RELIGIOUS DISCRIMINATION

**OVERVIEW**

**12-I  COVERAGE**

**Types of Cases**

**NOTE TO EEOC INVESTIGATORS**

   **A. Definitions**

      **1. Religion**

1.  Religion

2.  Sincerely Held

3.  Employer Inquiries into Religious Nature or Sincerity of Belief

NOTE TO EEOC INVESTIGATORS

B. Covered Entities

C.  Exceptions

1. Religious Organizations

2. Ministerial Exception

3. Additional Interaction of Title VII with the First Amendment and the
Religious Freedom Restoration Act (RFRA)

12-II EMPLOYMENT DECISIONS

A.  General

1.   Recruitment, Hiring, and Promotion

2.   Discipline and Discharge

3.   Compensation and Other Terms, Conditions, or Privileges of
Employment

B. Customer Preference

C.  Security Requirements

D.  Bona Fide Occupational Qualification

Employer Best Practices

12 - III  HARASSMENT

A.  Prohibited Conduct

B. Types of Harassment Claims

1.  Religious Coercion

2. Hostile Work Environment

a.  Based on Religion

b. Unwelcome

c.  Severe or Pervasive

**C. Employer Liability**

    **1.  Harassment by Alter Ego**

    **2. Harassment by Supervisors or Managers**

    **3. Harassment by Coworkers**

    **4. Harassment by Non-Employees**

**D.  Special Considerations for Employers When Balancing Anti-Harassment and Accommodation Obligations with Respect to Religious Expression**

    **Employer Best Practices**

    **Employee Best Practices**

**12 - IV REASONABLE ACCOMMODATION**

    **A.  Religious Accommodation**

        **1.  Notice of the Conflict Between Religion and Work**

        **2. Discussion of Request**

        **3. What is a "Reasonable" Accommodation?**

    **B. Undue Hardship**

        **1.  Case-by-Case Determination**

        **2.  More than "*De Minimis*" Cost**

        **3.  Seniority Systems and Collectively Bargained Rights**

        **4.  Coworker Complaints**

        **5.  Security Considerations**

    **C.  Common Methods of Accommodation in the Workplace**

        **1.  Scheduling Changes**

        **2.  Voluntary Substitutes and Shift Swaps**

        **3.  Change of Job Tasks and Lateral Transfer**

        **4.  Modifying Workplace Practices, Policies and Procedures**

            **a.  Dress and Grooming Standards**

            **b. Use of Employer Facilities**

    c.  Tests and Other Selection Procedures

    d. Objections to Providing Social Security Numbers or Complying
with Employer Identification Procedures

    5. Excusing Union Dues or Agency Fees

    6. Permitting Prayer, Proselytizing, and Other Forms of Religious
Expression

    a. Effect on Workplace Rights of Coworkers

    b. Effect on Customers

    7.  Employer-Sponsored Programs

NOTE TO EEOC INVESTIGATORS

Employer Best Practices

Employee Best Practices. Error! Bookmark not defined.

12 - V RELATED FORMS OF DISCRIMINATION

A.  National Origin and Race

B. Retaliation

Employer Best Practices

Addendum on Executive Order Compliance

Addendum on Response to Comments

# SECTION 12:  RELIGIOUS DISCRIMINATION

## OVERVIEW[1]

This Section of the Compliance Manual focuses on religious discrimination
under Title VII

of the Civil Rights Act of 1964 (Title VII). Title VII protects workers from
employment discrimination based on their race, color, religion, sex (including
pregnancy, sexual orientation, and transgender status),[2] national origin, or
protected activity.  Under Title VII, an employer is prohibited from
discriminating because of religion in hiring, promotion, discharge,
compensation, or other "terms, conditions or privileges" of employment, and
also cannot "limit, segregate, or classify" applicants or employees based on
religion "in any way which would deprive or tend to deprive any individual of

religion" in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee."[3]  The statute defines "religion" as including "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that [it] is unable to reasonably accommodate . . . without undue hardship on the conduct of the employer's business."[4]  "Undue hardship" under Title VII is not defined in the statute but has been defined by the Supreme Court as "more than a de minimis cost"[5] – a lower standard for employers to satisfy than the "undue hardship" defense under the Americans with Disabilities Act (ADA), which is defined by statute as "significant difficulty or expense."[6]

These protections apply whether the religious beliefs or practices in question are common  or non-traditional, and regardless of whether they are recognized by any organized religion.[7]  The test under Title VII's definition of religion is whether the beliefs are, in the individual's "own scheme of things, religious." [8]  Belief in God or gods is not necessary; nontheistic beliefs can also be religious for purposes of the Title VII exemption as long as they "'occupy in the life of that individual "a place parallel to that filled by . . . God" in traditionally religious persons.'"[9]  The non-discrimination provisions of the statute also protect employees who do not possess religious beliefs or engage in religious practices.[10]  EEOC, as a federal government enforcement agency, and its staff, like all governmental entities, carries out its mission neutrally and without any hostility to any religion or related observances, practices, and beliefs, or lack thereof.[11]

The number of religious discrimination charges filed with EEOC has increased significantly from fiscal years 1997 to 2019, although the total number of such charges remains relatively small compared to charges filed on other bases.[12]  Many employers seek legal guidance in managing equal employment opportunity ("EEO") issues that arise from religious diversity as well as the demands of the modern American workplace.  This document is designed to be a practical resource for employers, employees, practitioners, and EEOC enforcement staff on Title VII's prohibition against religious discrimination.  It explains the variety of issues  considered in workplace-related religious discrimination claims, discusses typical scenarios that may arise, and provides guidance to employers on how to balance the rights of individuals in an environment that includes people of varying religious faiths, or no faith.[13]  **However, this document does not have the force and effect of law and is not meant to bind the public in any way.  It is intended to provide clarity to the public on existing requirements under the law and how the Commission will analyze these matters in performing its duties**.

For ease of reference this document is organized by the following topics:

> I – <u>Coverage issues</u>, **including the types of cases that arise, the definition of "religion" and "sincerely held," the religious organization**

exemption, and the ministerial exception.

II – **Employment decisions based on religion, including recruitment, hiring, segregation, promotion, discipline, and compensation,** as well as differential treatment with respect to religious expression; customer preference; security requirements; and bona fide occupational qualifications.

III – **Harassment,** including harassment based on religious belief or practice as a condition of employment or advancement, hostile work environment, and employer liability issues.

IV – **Reasonable accommodation,** including notice of the conflict between religion and work where applicable, scope of the accommodation requirement and "undue hardship" defense, and common methods of accommodation.

V – **Related forms of discrimination,** such as discrimination based on national origin, race, or color, as well as retaliation.

## 12-I  COVERAGE

**Types of Cases**

Title VII prohibits covered employers, employment agencies, and unions[**14**] from engaging in disparate treatment and from maintaining policies or practices that result in unjustified disparate impact based on religion. Historically, courts and the Commission characterized denial of accommodation as a separate cause of action.[**15**]  In *EEOC v. Abercrombie & Fitch Stores, Inc*., the Supreme Court stated that there are only two causes of action under Title VII:  "disparate treatment" (or "intentional discrimination") and "disparate impact."[**16**]  It treated a claim based on a failure to accommodate a religious belief, observance, or practice (absent undue hardship) as a form of disparate treatment.[**17**]  The Commission recognizes that harassment and denial of religious accommodation are typically forms of disparate treatment in the terms and conditions of employment.  Different types of fact patterns may arise in relation to Title VII religious discrimination, including:

- treating applicants or employees differently (disparate treatment) by taking an adverse action based on their religious beliefs, observances, or practices (or lack of religious beliefs, observances or practices) in any aspect of employment, including recruitment, hiring, assignments, discipline, promotion, discharge, and benefits;

- taking adverse action motivated by a desire to avoid accommodating a religious belief, observance, or practice that the employer knew or suspected may be needed and would not pose an undue hardship;

- denying a needed reasonable accommodation sought for an applicant's or employee's sincerely held religious beliefs, observances, or practices if

an accommodation will not impose an undue hardship on the conduct of the business;

- intentionally limiting, segregating or classifying employees based on the presence or absence of religious beliefs, observances, or practices (also a form of disparate treatment), or enforcing a neutral rule that has the effect of limiting, segregating, or classifying an applicant or employee based on religious beliefs, observances, or practices and that cannot be justified by business necessity (disparate impact);

- subjecting employees to harassment because of their religious beliefs, observances, or practices (or lack of religious beliefs, observances or practices) or because of a belief that someone of the employee's religion should not associate with someone else (e.g., discrimination because of an employee's religious inter-marriage, etc.);

- retaliating against an applicant or employee who has opposed discrimination on the basis of religion, or participated in any manner in an investigation, proceeding, or hearing regarding discrimination on the basis of religion, including by filing an equal employment opportunity (EEO) charge or testifying as a witness in someone else's EEO matter, or complaining to a human resources department about alleged religious discrimination.

Although more than one of these issues may be raised in a particular case, they are discussed in separate parts of this manual for ease of use.

---

**· NOTE TO EEOC INVESTIGATORS ·**

**Charges involving religion, like charges filed on other bases, may give rise to more than one theory of discrimination (e.g., termination, harassment, denial of reasonable accommodation, or other forms of disparate treatment, as well as retaliation). Therefore, these charges could be investigated and analyzed under all theories of liability to the extent applicable.**

---

## A. Definitions

**Overview:  Religion is very broadly defined for purposes of Title VII.  The presence of a deity or deities is not necessary for a religion to receive protection under Title VII.  Religious beliefs can include unique beliefs held by a few or even one individual; however, mere personal preferences are not religious beliefs.  Individuals who do not practice any religion are also protected from discrimination on the basis of religion**

> or lack thereof.  Title VII requires employers to accommodate religious beliefs, practices and observances if the beliefs are "sincerely held" and the reasonable accommodation poses no undue hardship on the employer.

## 1. Religion

Title VII defines "religion" to include "all aspects of religious observance and practice as well as belief," not just practices that are mandated or prohibited by a tenet of the individual's faith.[18]  Religion includes not only traditional, organized religions such as Christianity, Judaism, Islam, Hinduism, Sikhism,

and Buddhism, but also religious beliefs that are new, uncommon, not part of a formal church or sect, only subscribed to by a small number of people, or that seem illogical or unreasonable to others.[19]  Further, a person's religious beliefs "need not be confined in either source or content to traditional or parochial concepts of religion."[20]  A belief is "religious" for Title VII purposes if it is "religious" in the person's "own scheme of things," i.e., it is a "sincere and meaningful" belief that "occupies a place in the life of its possessor parallel to that filled by . . . God."[21]  The Supreme Court has made it clear that it is not a court's role to determine the reasonableness of an individual's religious beliefs, and that "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."[22]  An employee's belief, observance, or practice can be "religious" under Title VII even if the employee is affiliated with a religious group that does not espouse or recognize that individual's belief, observance, or practice, or if few – or no – other people adhere to it.[23]

Religious beliefs include theistic beliefs as well as non-theistic "moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views."[24]  Although courts generally resolve doubts about particular beliefs in favor of finding that they are religious,[25] beliefs are not protected merely because they are strongly held.  Rather, religion typically concerns "ultimate ideas" about "life, purpose, and death."[26]

Courts have looked for certain features to determine if an individual's beliefs can be considered religious.  As one court explained: "'First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters.  Second, a religion is comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching.  Third, a religion often can be recognized by the presence of certain formal and external signs.'"[27]

Social, political, or economic philosophies, as well as mere personal preferences, are not religious beliefs protected by Title VII.[28]  However, overlap between a religious and political view does not place it outside the scope of Title VII's religion protections, as long as that view is part of a

comprehensive religious belief system and is not simply an "isolated teaching." **[29]** Religious observances or practices include, for example, attending worship services, praying, wearing religious garb or symbols, displaying religious objects, adhering to certain dietary rules, proselytizing or other forms of religious expression, and refraining from certain activities. Determining whether a practice is religious turns not on the nature of the activity, but on the employee's motivation. The same practice might be engaged in by one person for religious reasons and by another person for purely secular reasons.**[30]** Whether the practice is religious is therefore a situational, case-by-case inquiry, focusing not on what the activity is but on whether the employee's participation in the activity is pursuant to a religious belief.**[31]** For example, one employee might observe certain dietary restrictions for religious reasons while another employee adheres to the very same dietary restrictions but for secular (e.g., health or environmental) reasons.**[32]** In that instance, the same practice in one case might be subject to reasonable accommodation under Title VII because an employee engages in the practice for religious reasons, and in another case might not be subject to reasonable accommodation because the practice is engaged in for secular reasons.**[33]** However, EEOC and courts must exercise a "light touch" in making this determination.**[34]**

 The following examples illustrate these concepts:

### EXAMPLE 1

### Employment Decisions Based on "Religion"

An otherwise qualified applicant is not hired because he is a self-described evangelical Christian. A qualified non-Jewish employee is denied promotion because the supervisor wishes to give a preference based on religion to a fellow Jewish employee. An employer terminates an employee based on his disclosure to the employer that he has recently converted to the Baha'i Faith. Each of these is an example of an employment decision based on the religious belief or practice of the applicant or employee, and

therefore is discrimination based on "religion" within the meaning of Title VII.

### EXAMPLE 2

### Religious Practice versus Secular Practice

A Seventh-day Adventist employee follows a vegetarian diet because she believes it is religiously prescribed by scripture. Her vegetarianism is a religious practice, even though not all Seventh-day Adventists share this belief or follow this practice, and even

day Adventists share this belief or follow this practice, and even
though many individuals adhere to a vegetarian diet for purely
secular reasons.

### EXAMPLE 3

#### Types of Religious Practice or Observance

A Catholic employee requests a schedule change so that he can
attend a church service on Good Friday.  A Muslim employee
requests an exception to the company's dress and grooming code
allowing her to wear her headscarf, or a Hindu employee requests
an exception allowing her to wear her bindi (religious forehead
marking).  An employee asks to be excused from the religious
invocation offered at the beginning of staff meetings because he
objects on religious grounds or does not ascribe to the religious
sentiments expressed.  An adherent to Native American spiritual
beliefs seeks unpaid leave to attend a ritual ceremony.  An
employee who identifies as Christian but is not affiliated with a
particular sect or denomination requests accommodation of his
religious belief that working on his Sabbath is prohibited.  Each of
these requests relates to a "religious" belief, observance, or
practice within the meaning of Title VII.  The question of whether

the employer is required to grant these requests is discussed in
the section below addressing religious accommodation.

### EXAMPLE 4

#### Supervisor Considers Belief Illogical

Morgan asks for time off on October 31 to attend the "Samhain
Sabbat," the New Year observance of Wicca, her religion.  Her
supervisor refuses, saying that Wicca is not a "real" religion but an
"illogical conglomeration" of "various aspects of the occult, such
as faith healing, self-hypnosis, tarot card reading, and spell
casting, which are not religious practices."  The supervisor's
refusal to accommodate her on the ground that he believes her
religion is illogical or not a "real religion" violates Title VII unless
the employer can show her request would impose an undue
hardship.  The law applies to religious beliefs even though others
may find them "incorrect" or "incomprehensible."**[35]**

### EXAMPLE 5

**Unique Belief Can Be Religious**

Edward practices the Kemetic religion, based on ancient Egyptian faith, and affiliates himself with a tribe numbering fewer than ten members. He states that he believes in various deities, and follows the faith's concept of Ma'at, a guiding principle regarding truth and order that represents physical and moral balance in the universe.  During a religious ceremony he received small tattoos encircling his wrist, written in the Coptic language, which express his servitude to Ra, the Egyptian god of the sun.  When his employer asks him to cover the tattoos, he explains that it is a sin to cover them intentionally because doing so would signify a

rejection of Ra.  These can be religious beliefs and practices even if no one else or few other people subscribe to them.**[36]**

**EXAMPLE 6**

**Personal Preference That Is Not a Religious Belief**

Sylvia's job has instituted a policy that employees cannot have visible tattoos while working.  Sylvia refuses to cover a tattoo on her arm that is the logo of her favorite band.  When her manager asks her to cover the tattoo, she states that she cannot and that she feels so passionately about the importance of the band to her life that it is essentially her religion.  However, the evidence demonstrates that her tattoos and her feelings do not relate to any "ultimate concerns" such as life, purpose, death, humanity's place in the universe, or right and wrong, and they are not part of a moral or ethical belief system.  Simply feeling passionately about something is not enough to give it the status of a religion in someone's life.  Therefore, her belief is a personal preference that is not religious in nature.**[37]**

**2.  Sincerely Held**

Title VII requires employers to accommodate those religious beliefs that are "sincerely held."**[38]** Whether or not a religious belief is sincerely held by an applicant or employee is rarely at issue in many types of Title VII religious claims.**[39]**  For example, with respect to an allegation of discriminatory discharge or harassment, it is the motivation of the discriminating official, not the actual beliefs of the individual alleging discrimination, that is relevant in determining if the discrimination that occurred was because of religion.  A detailed discussion of reasonable accommodation of sincerely held religious beliefs appears in § 12-IV, but the meaning of "sincerely held" is addressed here.

Like the religious nature of a belief, observance, or practice, the sincerity of an employee's stated religious belief is usually not in dispute and is "generally presumed or easily established."[**40**]  Further, the Commission and courts "are not and should not be in the business of deciding whether a person holds religious beliefs for the 'proper' reasons.  We thus restrict our inquiry to whether or not the religious belief system is sincerely held; we do not review the motives or reasons for holding the belief in the first place."[**41**]  The individual's sincerity in espousing a religious observance or practice is "largely a matter of individual credibility."[**42**]  Moreover, "a sincere religious believer doesn't forfeit his religious rights merely because he is not scrupulous in his observance,"[**43**] although "[e]vidence tending to show that an employee acted in a manner inconsistent with his professed religious belief is, of course, relevant to the factfinder's evaluation of sincerity."[**44**]  Factors that – either alone or in combination – might undermine an employee's credibility include:  whether the employee has behaved in a manner markedly inconsistent with the professed belief;[**45**] whether the accommodation sought is a particularly desirable benefit that is likely to be sought for secular reasons;[**46**] whether the timing of the request renders it suspect (e.g., it follows an earlier request by the employee for the same benefit for secular reasons);[**47**] and whether the employer otherwise has reason to believe the accommodation is not sought for religious reasons.

However, none of these factors is dispositive.  For example, although prior inconsistent conduct is relevant to the question of sincerity, an individual's beliefs – or degree of adherence – may change over time, and therefore an employee's newly adopted or inconsistently observed religious practice may nevertheless be sincerely held.[**48**]  Similarly, an individual's belief may be to adhere to a religious custom only at certain times, even though others may always adhere,[**49**] or, fearful of discrimination, he or she may have forgone his or her sincerely held religious practice during the application process and not revealed it to the employer until after he or she was hired or later in employment.[**50**]  An employer also should not assume that an employee is insincere simply because some of his or her practices deviate from the commonly followed tenets of his or her religion, or because the employee adheres to some common practices but not others.[**51**]  As noted, courts have held that "Title VII protects more than . . . practices specifically mandated by an employee's religion."[**52**]

### 3. Employer Inquiries into Religious Nature or Sincerity of Belief

Because the definition of religion is broad and protects beliefs, observances, and practices with which the employer may be unfamiliar, the employer should ordinarily assume that an employee's request for religious accommodation is based on a sincerely held religious belief.  If, however, an employee requests religious accommodation, and an employer has an objective basis for questioning either the religious nature or the sincerity of a particular belief, observance, or practice, the employer would be justified in seeking additional

observance, or practice, the employer would be justified in seeking additional supporting information.  *See infra* § 12-IV-A-2.


## · NOTE TO EEOC INVESTIGATORS ·

**If the Respondent (R) disputes that the Charging Party's ("CP's") belief is "religious," consider the following:**

⇒ **Begin with the CP's statements.**  What religious belief, observance, or practice does the CP claim to have that conflicts with an employment requirement?  In most cases, the CP's credible testimony regarding his belief, observance, or practice will be sufficient to demonstrate that it is religious.  In other cases, however, the investigator may need to ask follow-up questions about the nature and tenets of the asserted religious beliefs, and/or any associated practices, rituals, clergy, observances, etc., in order to identify a specific religious belief, observance, or practice or determine if one is at issue, which conflicts with an employment requirement.

⇒ **Since religious beliefs can be unique to an individual, evidence from others is not always necessary.**  However, if the CP believes such evidence will support his or her claim, the investigator could seek evidence such as oral statements, affidavits, or other documents from CP's religious leader(s) if applicable, or others whom CP identifies as knowledgeable regarding the religious belief, observance, or practice in question that conflicts with an employment requirement.

⇒ **Remember, where an alleged religious observance, practice, or belief is at issue, a case-by-case analysis is required.**  Investigators should not make assumptions about the nature of an observance, practice, or belief.  In determining whether CP's asserted observance, practice, or belief is "religious" as defined under Title VII, the investigator's general knowledge will often be sufficient; if additional objective information has to be obtained, the investigator should nevertheless recognize the intensely personal characteristics of adherence to a religious belief.

⇒ **If the Respondent disputes that CP's belief is "sincerely held," the following evidence may be relevant:**

⇨ Oral statements, an affidavit, or other documents from CP describing his or her beliefs and practices, including information regarding when CP embraced the belief, observance, or practice, as well as when, where, and how CP has adhered to the belief, observance, or

how CP has adhered to the belief, observance, or
practice; and/or,

⇒ Oral statements, affidavits, or other documents from
potential witnesses identified by CP or R as having
knowledge of whether CP adheres or does not adhere
to the belief, observance, or practice at issue (e.g., CP's
religious leader (if applicable), fellow adherents (if
applicable), family, friends, neighbors, managers, or
coworkers who may have observed his past adherence
or lack thereof, or discussed it with him).

## B.  Covered Entities

> **Overview:  Title VII coverage rules apply to all religious discrimination
> claims under the statute.  However, specially defined "religious
> organizations" and "religious educational institutions" are exempt from
> certain religious discrimination provisions, and the ministerial exception
> bars EEO claims by employees of religious institutions who perform vital
> religious duties at the core of the mission of the religious institution.**

Title VII's prohibitions apply to employers, employment agencies, and unions,
[**53**] subject to the statute's coverage.[**54**]  Those covered entities must carry
out their activities in a nondiscriminatory manner and provide reasonable
accommodation unless doing so would impose an undue hardship.[**55**]  Unions
also can be liable if they knowingly acquiesce in employment discrimination
against their members, join or tolerate employers' discriminatory practices, or
discriminatorily refuse to represent employees' interests, and employment
agencies can be liable for participating in the client-employer's discrimination.
[**56**]

## C.  Exceptions

### 1. Religious Organizations

What Entities are "Religious Organizations"?  Under sections 702(a) and 703(e)
(2) of Title VII, "a religious corporation, association, educational institution, or
society," including a religious "school, college, university, or educational
institution or institution of learning," is permitted  to hire and employ
individuals "of a particular religion . . . ."[**57**]  This "religious organization"
exemption applies only to those organizations whose "purpose and character
are primarily religious," but to determine whether this statutory exemption
applies, courts have looked at "all the facts," considering and weighing "the
religious and secular characteristics" of the entity.[**58**]  Courts have articulated
different factors to determine whether an entity is a religious organization,
including (1) whether the entity operates for a profit; (2) whether it produces a
secular product; (3) whether the entity's articles of incorporation or other
pertinent documents state a religious purpose; (4) whether it is owned,
affiliated with or financially supported by a formally religious entity such as a

church or synagogue; (5) whether a formally religious entity participates in the management, for instance by having representatives on the board of trustees; (6) whether the entity holds itself out to the public as secular or sectarian; (7) whether the entity regularly includes prayer or other forms of worship in its activities; (8) whether it includes religious instruction in its curriculum, to the extent it is an educational institution; and (9) whether its membership is made up of coreligionists.[**59**] Depending on the facts, courts have found that Title VII's religious organization exemption applies not only to churches and other houses of worship, but also to religious schools, hospitals, and charities.[**60**]

Courts have expressly recognized that engaging in secular activities does not disqualify an employer from being a "religious organization" within the meaning of the Title VII statutory exemption. "[R]eligious organizations may engage in secular activities without forfeiting protection" under the Title VII statutory exemption.[**61**] The Title VII statutory exemption provisions do not mention nonprofit and for-profit status.[**62**] Title VII case law has not definitively addressed whether a for-profit corporation that satisfies the other factors can constitute a religious corporation under Title VII.[**63**]

Where the religious organization exemption is asserted by a respondent employer, the Commission will consider the facts on a case-by-case basis; no one factor is dispositive in determining if a covered entity is a religious organization under Title VII's exemption.

Scope of Religious Organization Exemption. Section 702(a) states, "[t]his subchapter shall not apply to … a religious corporation, association, educational institution, or society . . . with respect to the employment of individuals of a particular religion to perform work connected with the carrying on . . . of its activities."[**64**] Religious organizations are subject to the Title VII prohibitions against discrimination on the basis of race, color, sex, national origin (as well as the anti-discrimination provisions of the other EEO laws such as the ADEA, ADA, and GINA), and may not engage in related retaliation.[**65**] However, sections 702(a) and 703(e)(2)[**66**] allow a qualifying religious organization to assert as a defense to a Title VII claim of discrimination or retaliation that it made the challenged employment decision on the basis of

religion.[**67**] The definition of "religion" found in section 701(j) is applicable to the use of the term in sections 702(a) and 703(e)(2), although the provision of the definition regarding reasonable accommodations is not relevant.[**68**]

Courts have held that the religious organization's assertion that the challenged employment decision was made on the basis of religion is subject to a pretext inquiry where the employee has the burden to prove pretext.[**69**] Courts also have held that any inquiry into the pretext of a religious organization's rationale for its decision must be limited to "sincerity" and cannot be used to challenge the validity or plausibility of the underlying religious doctrine.[**70**] For example, one court has held that a religious organization could not justify denying insurance benefits only to married women by asserting a religiously based view

insurance benefits only to married women by asserting a religiously based view that only men could be the head of a household when evidence of practice inconsistent with such a belief established "conclusive[ly]" that the employer's religious justification was "pretext" for sex discrimination.[71]

In *EEOC v. Mississippi College*, the court held that if a religious institution presents "convincing evidence" that the challenged employment practice resulted from discrimination on the basis of religion, section 702 "deprives the EEOC of jurisdiction to investigate further to determine whether the religious discrimination was a pretext for some other form of discrimination."[72] Despite the court's use of "jurisdiction" here, it has been held in light of the Supreme Court's decision in *Arbaugh v. Y & H Corp.*, that Title VII's religious organization exemptions are not jurisdictional.[73]

The religious organization exemption is not limited to jobs involved in the specifically religious activities of the organization.[74] Rather, "the explicit exemptions to Title VII . . . enable religious organizations to create and maintain communities composed solely of individuals faithful to their doctrinal practices, whether or not every individual plays a direct role in the organization's 'religious activities.'"[75] In addition, the exemption allows religious organizations to prefer to employ individuals who share their religion, defined not by the self-identified religious affiliation of the employee, but broadly by the employer's religious observances, practices, and beliefs.[76] Consistent with applicable EEO laws, the prerogative of a religious organization

to employ individuals "'of a particular religion' . . . has been interpreted to include the decision to terminate an employee whose conduct or religious beliefs are inconsistent with those of its employer."[77] Some courts have held that the religious organization exemption can still be established notwithstanding actions such as holding oneself out as an equal employment opportunity employer or hiring someone of a different religion for a position. [78]

## EXAMPLE 7

### Religious Organization Exemption Applies

Justina taught mathematics at a small Catholic college, which requires all employees to agree to adhere to Catholic doctrine. After she signed a pro-choice advertisement in the local newspaper, the college terminated her employment because of her public support of a position in violation of Church doctrine. Justina claimed sex discrimination, alleging that male professors were treated less harshly for other conduct that violated Church doctrine. Because the exemption to Title VII preserves the religious school's ability to maintain a community composed of individuals faithful to its doctrinal practices, and because

evaluating Justina's discipline compared to the male professors, who engaged in different behavior, would require the court to compare the relative severity of violations of religious doctrines, Title VII's religious organization exemption bars adjudication of the sex discrimination claim.[**79**]  The analysis would be different if a male professor at the school signed the same advertisement and was not terminated, because "[r]equiring a religious employer to explain why it has treated two employees who have committed essentially the same offense differently poses no threat to the employer's ability to create and maintain communities of the faithful."[**80**]

### 2. Ministerial Exception

In *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*,[**81**] the Supreme Court "unanimously recognized that the Religion Clauses [of the First Amendment] foreclose certain employment-discrimination claims brought against religious organizations."[**82**]  The Court held that the First Amendment safeguards the right of a religious organization, free from interference from civil authorities, to select those who will "personify its beliefs," "shape its  own faith and mission," or "minister to the faithful."[**83**]  This rule is known as the "ministerial exception," apparently because "the individuals involved in pioneering cases were described as 'ministers,'"[**84**] but as discussed below, the exception is not limited to "ministers" or members of the clergy.  The rule provides "an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar."[**85**]

The exception applies to discrimination claims involving selection, supervision, and removal against a religious institution by employees who "play certain key roles." [**86**]  "The constitutional foundation" of the Court's holding in *Hosanna-Tabor* was "the general principle of church autonomy."[**87**]  "Among other things, the Religion Clauses protect the right of churches and other religious institutions to decide matters 'of faith and doctrine' without government intrusion."[**88**]  The First Amendment "outlaws" such intrusion because "[s]tate interference in that sphere would obviously violate the free exercise of religion, and any attempt by government to dictate or even to influence such matters would constitute one of the central attributes of an establishment of religion." [**89**]  "This does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission." [**90**]

A "religious institution" for purposes of the ministerial exception is one whose "mission is marked by clear or obvious religious characteristics."[**91**]  Like Title VII's religious organization exemption, courts have applied the ministerial exception to religious employers beyond churches and other houses of worship.[**92**]  But unlike the statutory religious organization exemption, the

ministerial exception applies regardless of whether the challenged
employment decision was for "religious" reasons.[93]

As the Supreme Court stated in *Our Lady of Guadalupe School v. Morrissey-
Berru*, the ministerial exception applies to employees who perform "vital
religious duties" at the core of the mission of the religious institution.[94]  The
Supreme Court in *Hosanna-Tabor* declined to adopt a "rigid formula"[95] for
deciding when the ministerial exception applies.  Instead, in deciding whether a
Lutheran school teacher's retaliation claim was barred by the ministerial
exception, the Supreme Court looked to "all the circumstances of her
employment," recognizing four "considerations" or "circumstances that [it]
found relevant in that case":  (1) the employee's formal title; (2) education or
training; (3) the employee's own use of the title; and (4) the "important
religious functions" the employee performed.[96]  The Court further explained
that, while relevant, "a title, by itself, does not automatically ensure coverage,"
[97] and that the title "minister" is not "a necessary requirement," cautioning
against "attaching too much significance to titles."[98]  Relatedly, while
academic requirements are relevant, "insisting in every case on rigid academic
requirements could have a distorting effect" and "judges have no warrant to
second-guess [a religious institution's qualification] judgment or to impose
their own credentialing requirements."[99]  The Court rejected the view that the
ministerial exception "should be limited to those employees who perform
exclusively religious functions" and cautioned against placing too much
emphasis on the performance of secular duties or the time spent on those
duties.[100]

In *Our Lady of Guadalupe School,* the Court reiterated that the four
"considerations" relevant in *Hosanna-Tabor* are not intended to constitute a
four-factor test because "a variety of factors may be important."[101]  The Court
explained that *Hosanna-Tabor* directs "courts to take all relevant circumstances
into account and to determine whether each particular position implicated the
fundamental purpose of the exception."[102]  The circumstances that were
instructive in *Hosanna-Tabor* are not "inflexible requirements" and may have
"far less significance in some cases" because "[w]hat matters, at bottom, is
what an employee does."[103]

The religious institution's "definition and explanation" of an employee's role "in
the life of the religion in question is important."[104] The ministerial exception
is not limited to the head of a religious congregation, leaders, ministers, or
members of the clergy, and can apply to "lay" employees and even non-"co-
religionists" or those not "practicing" the faith.[105]  Courts have applied the
ministerial exception in cases involving parochial school teachers,[106] church
musicians,[107] and other employees who perform religious functions.[108]

In *Our Lady of Guadalupe*, the Court explained that for a private religious
school, "educating and forming students in the faith," "inculcating its
teachings, and training [students] to live their faith are responsibilities that lie

at the very core of the mission" and "the selection and supervision of the teachers" who do this work are necessarily core elements of achieving the mission.[109]  The Court declined to "draw a critical distinction between a person who "simply relay[s] religious tenets" and one who relays such tenets while also "minister[ing] to the faithful," but noted that a teacher of "world religions," "who merely provides a description of the beliefs and practices of a religion without making any effort to inculcate those beliefs could not qualify for the exception."[110]

In holding that the ministerial exception barred employment discrimination claims by two elementary school teachers in Roman Catholic schools in *Our Lady of Guadalupe*, the Court found abundant evidence that the teachers "performed vital religious duties," including: their employment contracts required them to carry out the schools' religious mission and specified "that their work would be evaluated to ensure that they were fulfilling that responsibility"; their job duties required them to teach all subjects, including religion; they prepared their students for participation in religious activities, prayed with them, and attended Mass with them; and, they were the staff members "entrusted most directly with the responsibility of educating their students in the faith," which included teaching them about the Catholic faith and guiding them "by word and deed, toward the goal of living their lives in accordance with the faith."[111]  Therefore, even though the teachers each lacked a religious title and the religious training possessed by the teacher in *Hosanna-Tabor*, their core responsibilities as teachers of religion were

essentially the same as hers, and "their schools expressly saw them as playing a vital role in carrying out the mission of the church."[112]

The ministerial exception is not just a legal defense that can be raised by religious  institutions, but a constitutionally-based guarantee that obligates the government and the courts to refrain from interfering or entangling themselves with religion.[113]  As such, it should be resolved at the earliest possible stage before reaching the underlying discrimination claim.[114]  Some courts have held that the ministerial exception is not waivable.[115]

### 3. Additional Interaction of Title VII with the First Amendment and the Religious Freedom Restoration Act (RFRA)

As noted above, the ministerial exception is based on the interaction between the workplace and the First Amendment.  The applicability and scope of other defenses based on Title VII's interaction with the First Amendment or the Religious Freedom Restoration Act (RFRA) is an evolving area of the law. [116] It is not within the scope of this document to define the parameters of the First Amendment or RFRA.  However, these provisions are referenced throughout this document to illustrate how they arise in Title VII cases and how courts have analyzed them.  For example:

- a private sector employer or a religious organization might argue that its rights under the First Amendment's Free Exercise or Free Speech Clauses

rights under the First Amendment's Free Exercise or Free Speech Clauses, or under RFRA, would be violated if it is compelled by Title VII to grant a particular accommodation or otherwise refrain from enforcing an employment policy;[**117**]

- a government employer might argue that granting a requested religious accommodation would pose an undue hardship because it would violate the Establishment Clause of the First Amendment;[**118**]

- some government employees might argue that their religious expression is protected by the First Amendment, RFRA, and/or Title VII;[**119**] and,

- some government employees raise claims under the First Amendment or RFRA parallel to their Title VII accommodation claims;[**120**] to date, appellate courts have uniformly held that Title VII preempts federal employees from bringing RFRA claims against their agency employer. [**121**]

Courts addressing the overlap between EEO laws and rights under RFRA and the Free Exercise Clause have stressed the importance of a nuanced balancing of potential burdens on religious expression, the governmental interests at issue, and how narrowly tailored the challenged government requirements are. [**122**]

*NOTE:  EEOC investigators must take great care in situations involving both (a) the statutory rights of employees to be free from discrimination at work, and (b) the rights of employers under the First Amendment and RFRA.  Although a resolution satisfactory to all may come from good faith on the part of the employer and employee through mutual efforts to reach a reasonable accommodation, on occasion the religious interests of the employer and employee may be in conflict.  EEOC personnel should seek the advice of the EEOC Legal Counsel in such a situation, and on occasion the Legal Counsel may consult as needed with the U.S. Department of Justice.*

# 12-II EMPLOYMENT DECISIONS

## A.  General

Title VII's prohibition against discrimination based on religion generally functions like its prohibition against discrimination based on race, color, sex, or national origin.  Absent a defense, disparate treatment violates the statute whether motivated by bias against or preference toward an applicant or employee due to his religious beliefs, practices, or observances – or lack thereof.  Thus, for example, except to the extent an exemption, exception, or defense applies, an employer may not refuse to recruit, hire or promote individuals of a certain religion, may not impose stricter promotion requirements for persons of a certain religion, and may not impose more or different work requirements on an employee because of that employee's religious beliefs or practices.[**123**]  The following subsections address work

scenarios that may lead to claims of religious discrimination.

### 1. Recruitment, Hiring, and Promotion

Employers that are not religious organizations may neither recruit indicating a preference for individuals of a particular religion nor adopt recruitment practices, such as word-of-mouth recruitment, that have the purpose or effect of discriminating based on religion.[**124**]  Title VII permits employers that are not religious organizations to recruit, hire and employ employees on the basis of religion only if religion is "a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." [**125**]

For example, other than as discussed above with respect to the religious organization and ministerial exceptions discussed above, an employer may not refuse to hire an applicant simply because the applicant does not share the employer's religious beliefs, and conversely may not select one applicant over another based on a preference for employees of a particular religion.[**126**] Similarly, employment agencies may not comply with requests from employers to engage in discriminatory recruitment or referral practices, for example by screening out applicants who have names often associated with a particular religion (e.g., Mohammed).[**127**]  Moreover, an employer may not exclude an applicant from hire merely because the applicant may need a reasonable accommodation for his or her religious beliefs, observances, or practices that could be provided absent undue hardship.[**128**]

### EXAMPLE 8

### Recruitment

Charles, the president of a company that owns several gas stations, needs managers for the new convenience stores he has decided to add to the stations.  He posts a job announcement at the Hindu Temple he attends expressing a preference for Hindu employees.  In doing so, Charles is engaging in unlawful discrimination.[**129**]

### EXAMPLE 9

### Hiring

A.  Mary is a human resources officer who is filling a vacant administrative position at her company.  During the application process, she performs an Internet search on the candidates and learns that one applicant, Jonathan, has written an article in which he describes himself as an Evangelical Christian and discusses how important his Christian faith is to all aspects of his

life. Although Mary believes he is the most qualified candidate, she does not hire him because she knows that the company prefers to have a "secular" work environment and she thinks that most of the company's employees will find working with someone so religious "weird." Therefore, Mary decides that it is best not to hire Jonathan. By not hiring Jonathan because of his religion, the company violated Title VII.

B. Aatma, an applicant for a rental car sales position who is an observant Sikh, wears a dastaar (religious headscarf) to her job interview. The interviewer does not advise her that there is a dress code prohibiting head coverings, and Aatma does not ask whether she would be permitted to wear the headscarf if she were hired. The manager knew or suspected the headscarf was a religious garment, presumed it would be worn at work, and refused to hire her because the company requires sales agents to wear a uniform with no additions or exceptions. Unless the employer can demonstrate that no reasonable accommodation was possible absent undue hardship, this refusal to hire violates Title VII, even though Aatma did not make a request for accommodation at the interview, because the employer believed her practice was religious and that she would need accommodation, and did not hire her for that reason.[**130**]

C. A company's policy bars any employees from working in customer contact positions if they have a beard or wear a headcovering, and requests for religious accommodations are always denied. As a result of this policy and practice, individuals who wear beards or headcoverings pursuant to a religious belief work in lower-paying positions or positions with less opportunity for advancement. This would constitute limiting, segregating, or classifying based on religion in violation of Title VII, and may also have an unlawful disparate impact based on religion if it is not job-related and consistent with business necessity.[**131**]

### EXAMPLE 10

### Promotion

Darpak, who practices Buddhism, holds a Ph.D. degree in engineering and applied for a managerial position at the research firm where he has worked for ten years. He was rejected in favor of a non-Buddhist candidate who was less qualified. The company vice president who made the promotion decision advised Darpak that he was not selected because "we decided to go in a different direction." However, the vice president confided

to coworkers at a social function that he did not select Darpak
because he thought a Christian manager could make better
personal connections with the firm's clients, many of whom are
Christian.  The vice president's statement, combined with the lack
of any legitimate non-discriminatory reason for selecting the less
qualified candidate, as well as the evidence that Darpak was the
best qualified candidate for the position, suggests that the
proffered reason was a pretext for discrimination against Darpak
because of his religion.[**132**]

### 2. Discipline and Discharge

Title VII also prohibits employers from disciplining or discharging employees
because of their religion.[**133**]

### EXAMPLE 11

### Discipline

Joanne, a retail store clerk, is frequently 10-15 minutes late for
her shift on several days per week when she attends Mass at a
Catholic church across town.  Her manager, Donald, has never
disciplined her for this tardiness, and instead filled in for her at
the cash register until she arrived, stating that he understood her
situation. On the other hand, Yusef, a newly hired clerk who is
Muslim, is disciplined by Donald for arriving 10 minutes late for
his shift even though Donald knows it is due to his attendance at
services at the local mosque.  While Donald can require all
similarly situated employees to be punctual, he is engaging in
disparate treatment based on religion by disciplining only Yusef
and not Joanne absent a legitimate nondiscriminatory reason for
treating them differently.

A charge alleging the above facts might involve denial of reasonable
accommodation if the employee had requested a schedule adjustment.  While
the employer may require employees to be punctual and request approval of
schedule changes in advance,[**134**] it may have to accommodate an employee
who seeks leave or a schedule change to resolve the conflict between religious
services and a work schedule, unless the accommodation would pose an
undue hardship.

### 3. Compensation and Other Terms, Conditions, or Privileges of Employment

Title VII prohibits discrimination on a protected basis "with respect to . . .
compensation, terms, conditions, or privileges of employment," for example,

setting or adjusting wages, granting benefits, and/or providing leave in a discriminatory fashion.**[135]**

## EXAMPLE 12

### Wages and Benefits

Janet, who practices Native American spirituality, is a newly hired social worker for an agency.  As a benefit to its employees, the agency provides tuition reimbursement for professional continuing education courses offered by selected providers.  Janet applied for tuition reimbursement for an approved course that was within the permitted cost limit.  Janet's supervisor denied her request for tuition reimbursement, stating that since Janet believes in "voodoo" she "won't make a very good caseworker."  By refusing, because of Janet's religious beliefs, to provide the tuition reimbursement to which Janet was otherwise entitled as a benefit of her employment, Janet's supervisor has discriminated against Janet on the basis of religion in violation of Title VII.

Title VII's prohibition on disparate treatment based on religious beliefs also can apply to disparate treatment of religious expression in the workplace.**[136]**

## EXAMPLE 13

### Religious Expression

Eve is a secretary who displays a Bible on her desk at work.  Xavier, a secretary in the same workplace, begins displaying a Quran on his desk at work.  Their supervisor allows Eve to retain the Bible but directs Xavier to put the Quran out of view because, he states, coworkers "will think you are making a political

statement, and with everything going on in the world right now we don't need that around here."  This differential treatment of similarly situated employees with respect to the display of a religious item at work constitutes religious discrimination.**[137]**

Charges involving religious expression may involve not only allegations of differential treatment but also of harassment and/or denial of reasonable accommodation.  Investigation of allegations of harassment and denial of reasonable accommodation are addressed respectively in §§ 12-III and 12-IV of this document.  As discussed in greater detail in those sections, Title VII requires employers to accommodate expression that is based on a sincerely

held religious practice or belief, unless it threatens to constitute harassment[**138**] or poses an "undue hardship" on the conduct of the business. [**139**]  An employer can thus restrict religious expression when it would disrupt customer service or the workplace, including when customers or coworkers would reasonably perceive it to express the employer's own message.[**140**]  *For further discussion of how to analyze when accommodation of religious expression would pose an undue hardship, refer to the sections on Harassment at § 12-III-C and Accommodation at § 12-IV-C-6.*

## B. Customer Preference

An employer's action based on the discriminatory preferences of others, including coworkers or customers, is unlawful.[**141**]

### EXAMPLE 14

### Employment Decision Based on Customer Preference

Harinder, who wears a turban as part of his Sikh religion, is hired to work at the counter in a coffee shop.  A few weeks after Harinder begins working, the manager notices that the work crew from the construction site near the shop no longer comes in for coffee in the mornings.  When he inquires, the crew complains

that Harinder, whom they mistakenly believe is Muslim, makes them uncomfortable in light of the September 11th attacks.  The manager tells Harinder that he has to let him go because the customers' discomfort is understandable.  The manager has subjected Harinder to unlawful religious discrimination by taking an adverse action based on customers' preference not to have a cashier of Harinder's perceived religion.  Harinder's termination based on customer preference would violate Title VII regardless of whether he was – or was misperceived to be -- Muslim, Sikh, or any other religion.

## C.  Security Requirements

In general, an employer may adopt security requirements for its employees or applicants, provided they are adopted for nondiscriminatory reasons and are applied in a nondiscriminatory manner.  For example, an employer may not require Muslim applicants to undergo a background investigation or more extensive security procedures because of their religion without imposing the same requirements on similarly situated applicants who are non-Muslim.[**142**]

## D.  Bona Fide Occupational Qualification

Title VII permits employers to hire and employ employees on the basis of

religion if religion is "a bona fide occupational qualification ["BFOQ"] reasonably necessary to the normal operation of that particular business or enterprise."[**143**]  Religious organizations do not typically need to rely on this BFOQ defense because the "religious organization" exemption in Title VII permits them to prefer employees of a particular religion.  *See supra* § 12-I-C-1. But for employers that are not religious organizations and seek to rely on the BFOQ defense to justify a religious preference, the defense is a narrow one and rarely successfully invoked.[**144**]

### · Employer Best Practices ·

- Employers can reduce the risk of discriminatory employment decisions by establishing written objective criteria for evaluating candidates for hire or promotion and applying those criteria consistently to all candidates.

- In conducting job interviews, employers can ensure nondiscriminatory treatment by asking the same questions of all applicants for a particular job or category of job and inquiring  about matters directly related to the position in question.

- Employers can reduce the risk of religious discrimination claims by carefully and timely recording the accurate business reasons for disciplinary or performance-related actions and sharing these reasons with the affected employees.

- When management decisions require the exercise of subjective judgment, employers can reduce the risk of discriminatory decisions by providing training to inexperienced managers and encouraging them to consult with more experienced managers or human resources personnel when addressing difficult issues.

- If an employer is confronted with customer biases, e.g., an adverse reaction to being served by an employee due to religious garb, the employer should consider engaging with and educating the customers regarding any misperceptions they may have and/or the equal employment opportunity laws.

## 12-III HARASSMENT

Overview: Religious harassment is analyzed and proved in the same manner as harassment based on other traits protected by Title VII— race, color, sex, and national origin.  However, the facts of religious harassment cases may present unique considerations, especially where the alleged harassment is based on another employee's religious practices. Such a situation may require an employer to reconcile its dual obligations to take prompt remedial action in response to alleged harassment and to accommodate certain

employee religious expression.

## A. Prohibited Conduct

As stated, Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."**[145]**  "[A]lthough [Title VII] mentions specific employment decisions with immediate consequences, the scope of the prohibition is not limited to economic or tangible discrimination" and "covers more than terms and conditions in the narrow contractual sense." **[146]**  Title VII covers "environmental claims" as well,**[147]** including "harassment leading to noneconomic injury,"**[148]** but the conduct must be "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'"**[149]**

## B. Types of Harassment Claims

The same Title VII principle applies whether the harassment is based on race, color, national origin, religion, or sex.**[150]** Like harassment based on other protected characteristics, religious harassment can take the form of (1) outright coercion, or an economic "quid pro quo," in which the employee is pressured or coerced to abandon, alter, or adopt a religious practice as a condition of employment;**[151]** or of (2) a hostile work environment, in which the employee is subjected to unwelcome, religiously based statements or conduct so severe or pervasive that the employee objectively and subjectively finds the work environment to be hostile or abusive.**[152]**  Employer liability for harassment is discussed below in § 12-III-B.

### 1. Religious Coercion

Title VII is violated when an employer or supervisor explicitly or implicitly coerces an employee to abandon, alter, or adopt a religious practice as a

condition of receiving a job benefit or privilege or avoiding an adverse employment action.**[153]**

### EXAMPLE 15

### Religious Conformance Required for Promotion

Wamiq was raised as a Muslim but no longer practices Islam.  His supervisor, Arif, is a very devout Muslim who tries to persuade Wamiq not to abandon Islam and advises him to follow the

teachings of the Quran.  Arif also says that if Wamiq expects to
advance in the company, he should join Arif and other Muslims for
weekly prayer sessions in Arif's office.  Notwithstanding this
pressure to conform his religious practices in order to be
promoted, Wamiq refuses to attend the weekly prayer sessions,
and is subsequently denied the promotion for which he applied
even though he is the most qualified.  Arif's conduct indicates that
the promotion would have been granted if Wamiq had
participated in the prayer sessions and had become an observant
Muslim.  Absent contrary evidence, the employer will be liable for
harassment for conditioning Wamiq's promotion on his
adherence to Arif's views of appropriate religious practice.[154]

Not promoting Wamiq would also be actionable as disparate
treatment based on religion, unless the employer could
demonstrate a non-religiously based, non-pretextual reason for
denying Wamiq the promotion.  In addition, if Arif had made the
prayer sessions mandatory and Wamiq had asked to be excused
on religious grounds, Arif would have been required to excuse
Wamiq from the prayer sessions as a reasonable accommodation.

A claim of harassment based on coerced religious participation or non-
participation, however, only arises where it was intended to make the
employee conform to or abandon a religious belief or practice.  By contrast, an

employer would not violate Title VII if it required an employee to participate in
a workplace activity that conflicts with the employee's sincerely held religious
belief if the employee does not request to be excused or if the employer
demonstrates that accommodating the employee's request to be excused
would pose an undue hardship.[155]  The same fact pattern may give rise to
allegations of disparate treatment, harassment, and/or denial of
accommodation.  For example, terminating rather than accommodating an
employee may give rise to allegations of both denial of accommodation and
discriminatory discharge.[156]  For discussion of the accommodation issue, *see*
§ 12-IV.

## 2. Hostile Work Environment

Title VII's prohibition against religious discrimination includes prohibiting a
hostile work environment because of religion.  An unlawful hostile environment
based on religion can take the form of physical or verbal harassment, which
would include the unwelcome imposition of beliefs or practices contrary to the
employee's religion or lack thereof.  A hostile work environment is created
"[w]hen the workplace is permeated with discriminatory intimidation, ridicule,
and insult that is sufficiently severe or pervasive to alter the conditions of the
victim's employment and create an abusive working environment."[157]  To
establish a case of religious hostile work environment harassment, an
employee must show: (1) that the harassment was based on his religion; (2)

employee must show: (2) that the harassment was based on the religion; (2) that the harassment was unwelcome; (3) that the harassment was sufficiently severe or pervasive to alter the conditions of employment by creating an objectively and subjectively hostile or abusive work environment; and (4) that there is a basis for employer liability.[158]

### a. Based on Religion

To support a religious harassment claim, the adverse treatment must be based on the employee's religion.[159]  While verbally harassing conduct clearly is based on religion if it has religious content, harassment can also be based on religion even if religion is not explicitly mentioned.[160]

### EXAMPLE 16

### Harassing Conduct Based on Religion – Religion Mentioned

Mohammed is an Indian-born Muslim employed at a car dealership.  Because he takes scheduled prayer breaks during the workday and observes Muslim dietary restrictions, his coworkers are aware of his religious beliefs.  Upset by the anniversary of the 9/11 terrorist attacks, his coworkers and managers began making mocking comments about his religious dietary restrictions and need to pray during the workday.  They repeatedly referred to him as "Taliban" or "Arab" and asked him "why don't you just go back where you came from since you believe what you believe?"  When Mohammed questioned why it was mandatory for all employees to attend a United Way meeting, his supervisor said: "This is America.  That's the way things work over here.  This is not the Islamic country where you come from."  After this confrontation, the supervisor issued Mohammed a written warning stating that he "was acting like a Muslim extremist" and that the supervisor could not work with him because of his "militant stance."  This harassment is based on religion and national origin.[161]

### EXAMPLE 17

### Harassing Conduct Based on Religion – Religion Not Mentioned

Shoshanna is a Seventh-day Adventist whose work schedule was adjusted to accommodate her Sabbath observance, which begins at sundown each Friday.  When Nicholas, the new head of Shoshanna's department, was informed that he must accommodate her, he told a colleague that "anybody who cannot

work regular hours should work elsewhere." Nicholas then moved the regular Monday morning staff meetings to late Friday afternoon, repeatedly scheduled staff and client meetings on Friday afternoons, and often marked Shoshanna AWOL when she was not scheduled to work. In addition, Nicholas treated her differently than her colleagues by, for example, denying her training opportunities and loudly berating her with little or no provocation. Although Nicholas did not mention Shoshanna's religion, the evidence shows that his conduct was because of Shoshanna's need for religious accommodation, and therefore was based on religion.[162]

### b. Unwelcome

Conduct is "unwelcome" when "it is uninvited and offensive or unwanted from the standpoint of the employee."[163] It is not necessary in every case for the harassed employee to explicitly voice objection to the conduct (e.g., to confront the alleged harasser contemporaneously) for the conduct to be deemed unwelcome. In addition, since 1993 when the Supreme Court decided *Harris v. Forklift Systems, Inc.*, and added "subjective hostility" to the hostile work environment analysis, some courts have found that the analysis of "unwelcomeness" and "subjective hostility" overlap.[164] For example, where an employee is visibly upset by repeated mocking use of derogatory terms or comments about his religious beliefs or observance by a colleague, it may be evident that the conduct is unwelcome and also subjectively hostile.[165] This would stand in contrast to a situation where the same two employees were engaged in a consensual conversation that involves a spirited debate of religious views, but neither employee indicates to the other, or to the employer, that he or she is upset by it. For a discussion on reporting to the employer, see *infra* § 12-III-B.

The distinction between welcome and unwelcome conduct is especially important in the religious context in situations involving proselytizing to employees who have not invited such conduct. Where a religious employee attempts to persuade another employee of the correctness of his or her belief, the conduct may or may not be welcome. When an employee expressly objects to particular religious expression, unwelcomeness is evident.[166]

### EXAMPLE 18

### Unwelcome Conduct

Beth's colleague, Bill, repeatedly talked to her at work about her prospects for salvation. For several months, she did not object and discussed the matter with him. When he persisted even after she told him that he had "crossed the line" and should stop

having non-work-related conversations with her, the conduct was clearly unwelcome.[167]

### c. Severe or Pervasive

Harassment is actionable if, as a whole, the conduct is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'"  As the Supreme Court explained with respect to Title VII in *Harris v. Forklift Systems, Inc.*, 510 U.S. at 21:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

Thus, harassing conduct based on the employee's religion is actionable when it is sufficiently severe or pervasive to create an objectively and subjectively hostile work environment.  A hostile work environment claim may encompass any hostile conduct that affects the complainant's work environment, including employer conduct that may be independently actionable.  Whether a reasonable person would perceive the conduct as abusive turns on common sense and context, looking at the totality of the circumstances.[168] All of the alleged incidents must be "considered cumulatively in order to obtain a realistic view of the work environment."[169]  Relevant factors "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or merely an offensive utterance; and whether it unreasonably interferes with an employee's work performance."[170]  But "no single factor is required."[171]

### EXAMPLE 19

### Reasonable Person Perceives Conduct to Be Hostile

The president of Printing Corp. regularly mocked and berated an employee who asked for Sundays off to attend Mass.  Although he granted the time off, the president teased the employee for refusing to look at a Playboy magazine, called him a "religious freak," and used vulgar sexual language when speaking to or about the employee.  He mocked him for "following the Pope around" and made sexual comments about the Virgin Mary.  A reasonable person could perceive this to be a religiously hostile work environment.[172]

To "alter the conditions of employment," conduct need not cause economic or

psychological harm.[173]  It also need not impair work performance, discourage employees from remaining on the job, or impede their advancement.[174]  The presence of one or more of these factors would buttress the claim, but is not required.[175]

However, Title VII is not a "'general civility code,'" and does not render all insensitive or offensive comments, petty slights, and annoyances illegal.[176]  Isolated incidents (unless extremely serious) will not rise to the level of illegality.[177]

### EXAMPLE 20

#### Insensitive Comments Not Enough to Constitute Hostile Environment

Marvin is an Orthodox Jew who was hired as a radio show host. When he started work, a coworker, Stacy, pointed to his yarmulke and asked, "Will your headset fit over that?"  On a few occasions, Stacy made other remarks about the yarmulke, such as: "Nice hat.  Is that a beanie?" and "Do they come in different colors?"  Although the coworker's comments about his yarmulke were insensitive, they were not, standing alone, sufficiently severe or pervasive to create a hostile work environment for Marvin.[178]

### EXAMPLE 21

#### Isolated Comments Not Enough to Constitute Hostile Environment

Bob, a supervisor, occasionally allowed spontaneous and voluntary prayers by employees during office meetings.  During one meeting, he referenced Bible passages related to "slothfulness" and "work ethics."  Amy complained that Bob's comments and the few instances of allowing voluntary prayers during office meetings created a hostile environment.  The comments did not create an actionable harassment claim.  They were not severe, and because they occurred infrequently, they were not sufficiently pervasive to state a claim.[179]

Severity and pervasiveness need not both be present, and they operate inversely.  The more severe the harassment, the less frequently the incidents need to recur.  At the same time, incidents that may not, individually, be severe may become unlawful if they occur frequently or in proximity.[180]

Although a single incident will seldom create an unlawfully hostile environment, it may do so if it is unusually severe, such as where it involves a

physical threat.[181]

## EXAMPLE 22

### One Instance of Physically Threatening Conduct Sufficiently Severe

Ihsaan is a Muslim.  Shortly after the terrorist attacks on September 11, 2001, Ihsaan came to work and found the words "I'm tired of you Muslims.  You're all terrorists!  We will avenge the victims!!  Your life is next!" scrawled in red marker on his office door.  Because of the timing of the statement and the direct physical threat, this incident, alone, is sufficiently severe to create an objectively hostile and/or abusive work environment.[**182**]

## EXAMPLE 23

### Isolated Practices Not Enough to Constitute Hostile Environment

Tran owns a restaurant serving Asian-fusion cuisine.  The restaurant is decorated with Vietnamese art depicting scenes from traditional religious stories.  Tran keeps a shrine of Buddha in the corner by the cash register and likes to play traditional Vietnamese music and chants. Linda has worked as a waitress in the restaurant for a few months and complains that she feels harassed by the religious symbols and music.  As long as Tran does not discriminate on the basis of religion in his hiring or supervision of employees, the religious expression would likely not amount to practices that are severe or pervasive enough to constitute a hostile work environment based on religion.

## EXAMPLE 24

### Persistent Offensive Remarks Constitute Hostile Environment

Betty is a Mormon.  During a disagreement regarding a joint project, a coworker, Julian, tells Betty that she doesn't know what she is talking about and that she should "go back to Salt Lake City."  When Betty subsequently proposes a different approach to the project, Julian tells her that her suggestions are as "flaky" as he would expect from "her kind."  When Betty tries to resolve the conflict, Julian tells her that if she is uncomfortable working with him, she can either ask to be transferred, or she can "just pray about it."  Over the next six months, Julian regularly makes

similar negative references to Betty's religion. His persistent offensive remarks create a hostile environment.

Religious expression that is directed at an employee can become severe or pervasive, whether or not the content is intended to be insulting or abusive. Thus, for example, persistently reiterating atheist views to a religious employee who has asked that it stop can create a hostile environment, just as persistently proselytizing to an atheist employee or an employee with different religious beliefs who has asked that it stop can create a hostile work environment. The extent to which the expression is directed at the employee bringing the Title VII claim can be relevant to determining whether or when a reasonable employee would have perceived it to be hostile.[183] That said, even conduct that is not directed at an employee can transform a work environment into a hostile or abusive one.[184]

A coworker having a difference of opinion with an employee's religious views does not establish a hostile work environment when there is no other evidence of harassment. This would include when a coworker disagrees with the religious views that an employee expresses outside of the workplace, for example on social media, when there is no evidence it is linked to the workplace.[185]

### EXAMPLE 25

**No Hostile Environment from Comments That Are Not Abusive and Not Directed at Complaining Employee**

While eating lunch in the company cafeteria, Clarence often overhears conversations between his coworkers Dharma and Khema. Dharma, a Buddhist, is discussing meditation techniques with Khema, who is interested in Buddhism. Clarence strongly believes that meditation is an occult practice that offends him, and he complains to their supervisor that Dharma and Khema are creating a hostile environment for him. Such conversations taking place in the cafeteria do not constitute severe or pervasive religious harassment of Clarence, particularly given that they do not insult other religions and they were not directed at him.

## C. Employer Liability

Overview: An employer is always liable for a supervisor's harassment if it results in a tangible employment action. If the supervisor's harassment does not result in tangible employment action, the employer may be able to avoid liability or limit damages by establishing an affirmative defense that includes two necessary elements: (a) the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) the employee

unreasonably failed to take advantage of any preventive or
corrective opportunities provided by the employer or to avoid harm
otherwise.  An employer is liable for a coworker's or non-
employee's harassment in two circumstances: (a) if it unreasonably
failed to prevent the harassment, or (b) if it knew or should have
known about the harassment and failed to take prompt and
appropriate corrective action.

An employer will be liable for a hostile work environment that an employee
endures if vicarious liability under common law agency principles is found to
apply.[186]  As explained more fully below, whether vicarious liability applies
depends on the employment status of the harasser (i.e., a manager or

coworker), whether a tangible employment action was the result of the
harassment, the employer's policies, whether the employer was aware or
should have been aware of the harassment, and what action, if any, the
employer took when it learned of the harassment.

### 1. Harassment by Alter-Ego

Under agency-law principles, an employer is automatically liable for religious
harassment by an agent, even if it does not result in a tangible employment
action, if "the agent's high rank in the company makes him or her the
employer's alter ego."[187]  If the harasser is of a sufficiently high rank to fall
"within that class of an employer organization's officials who may be treated as
the organization's proxy," which would include officials such as a company
president, owner, partner, or corporate officer, the harassment is automatically
imputed to the employer and the employer cannot assert the affirmative
defense.[188]

### 2. Harassment by Supervisors or Managers

Employers are automatically liable for religious harassment by a supervisor
with authority over a plaintiff when the harassment results in a tangible
employment action such as a denial of promotion, demotion, discharge, or
undesirable reassignment.[189]  If the harassment by such a supervisor does not
result in a tangible employment action, the employer can attempt to prove, as
an affirmative defense to liability, that: (1) the employer exercised reasonable
care to prevent and promptly correct any harassing behavior, and (2) the
employee unreasonably failed to take advantage of any preventive or corrective
opportunities provided by the employer or to otherwise avoid harm.[190]

### EXAMPLE 26

### Supervisory Harassment with Tangible Employment Action

George, a manager in an accounting firm, is an atheist who has

frequently been heard to say that he thinks anyone who is deeply religious is a zealot with his own agenda and cannot be trusted to act in the best interests of the clients. George particularly ridicules Debra, a devoutly observant Jehovah's Witness, and consistently withholds the most desirable assignments from her. He denies her request for a promotion to a more prestigious job in another division, saying that he can't let her "spread that religious poppycock any further." Debra files a religious harassment charge. The firm asserts in its position statement that it is not liable because Debra never made a complaint under its internal anti-harassment policy and complaint procedures. Because the harassment was by a supervisor of Debra's and culminated in a tangible employment action (failure to promote), the employer is liable for the harassment even if it has an effective anti-harassment policy, and even if Debra never complained. If George is a "proxy" of the firm, then the firm is also liable for the harassment even in the absence of a tangible employment action. Additionally, the denial of promotion would be actionable as disparate treatment based on religion.

EXAMPLE 27

**Supervisory Harassment Without Tangible Employment Action**

Jennifer's employer, XYZ, had an anti-harassment policy and complaint procedure that covered religious harassment. All employees were aware of it because XYZ widely and regularly publicized it. Despite his knowledge of the policy, Jennifer's supervisor frequently mocked her religious beliefs. When Jennifer told him that his comments bothered her, he told her that he was just kidding and she should not take everything so seriously. Jennifer never reported the supervisor's conduct. When one of Jennifer's coworkers eventually reported the supervisor's harassing conduct under the employer's antiharassment procedure, the employer promptly investigated and acted effectively to stop the supervisor's conduct. Jennifer then filed a religious harassment charge. Because the harassment of Jennifer did not culminate in a tangible employment action, XYZ will not be liable for the harassment if it can show both that Jennifer's failure to utilize XYZ's available complaint mechanisms was unreasonable, and that XYZ exercised reasonable care to prevent and promptly correct the harassment. The employer should be able to make the "promptly correct" showing, because it took prompt and reasonable corrective

showing, because it took prompt and reasonable corrective measures once it did learn of the harassment.[191]

### 3. Harassment by Coworkers

An employer is liable for harassment by coworkers where the employer: (1) unreasonably failed to prevent the harassment;[192] or (2) knew or should have known about the harassment, and failed to take prompt and appropriate corrective action.[193]

### EXAMPLE 28

### Harassment by Coworkers

John, who is a Christian Scientist, shares an office with Rick, a Mormon. Rick repeatedly tells John that he is practicing a false religion, and that he should study Mormon literature. Despite John's protestations that he is very happy with his religion and has no desire to convert, Rick regularly leaves religious pamphlets on John's desk and tries to talk to him about religion. After asking Rick to stop the behavior to no avail, John complains to their immediate supervisor, who dismisses John's complaint on the ground that Rick is a nice person who believes that he is just being helpful. If the harassment continues, the employer is liable because it knew, through the supervisor, about Rick's harassing conduct but failed to take prompt and appropriate corrective action.[194]

### 4. Harassment by Non-Employees

An employer is liable for harassment by non-employees where the employer: (1) unreasonably failed to prevent the harassment; or (2) knew or should have known about the harassment and failed to take prompt and appropriate corrective action.[195]

### EXAMPLE 29

### Harassment by a Contractor

Tristan works for XYZ, a contractor that manages Crossroads Corporation's mail room. When Tristan delivers the mail to Julia, the Crossroads receptionist, he gives her religious tracts, attempts to convert her to his religion, tells her that her current religious beliefs will lead her to Hell, and persists even after she tells him to stop. Julia reports Tristan's conduct to her supervisor, who tells her that he cannot do anything because Tristan does not work for

nor that he cannot do anything because Tristan is a stranger to
Crossroads.  If the harassment continues, the supervisor's failure
to act is likely to subject Crossroads to liability because Tristan's
conduct is severe or pervasive and based on religion, and
Crossroads failed to take corrective action within its control after
Julia reported the harassment.  Options available to Julia's
supervisor or the appropriate individual in the supervisor's chain
of command might include initiating a meeting with Tristan and
XYZ management regarding the harassment and demanding that
it cease, that appropriate disciplinary action be taken if it
continues, and/or that a different mail carrier be assigned to
Julia's route.

## D.  Special Considerations for Employers When Balancing Anti-Harassment and Accommodation Obligations With Respect to Religious Expression

While some employees believe that religion is intensely personal and private,
others are open about sharing or outwardly expressing their religion.  In
addition, there are employees who may believe that they have a religious
obligation to share their views and to try to persuade coworkers of the truth of
their religious beliefs, i.e., to proselytize.  Certain private employers, too,
whether or not they are religious organizations, may wish to express their
religious views and share their religion with their employees.[196]  As noted
above, however, some employees may perceive proselytizing or other religious
expression as unwelcome based on their own religious beliefs and
observances, or lack thereof.  In an increasingly pluralistic society, the mix of
divergent beliefs and practices can give rise to conflicts requiring employers to
balance the rights of employers and employees who wish to express their
religious beliefs with the rights of other employees to be free from religious
harassment under the foregoing Title VII harassment standards.

As discussed in more detail in § IV-C-6 of this document, an employer never has
to accommodate expression of a religious belief in the workplace where such
an accommodation could potentially constitute harassment of coworkers,
because that would pose an undue hardship for the employer.[197]  Nor does
Title VII require an employer to accommodate an employee's desire to impose
his religious beliefs upon his coworkers.[198]  Therefore, while Title VII requires
employers to accommodate an employee's sincerely held religious belief in
engaging in religious expression (e.g. proselytizing) in the workplace, an
employer does not have to allow such expression if it imposes an undue
hardship on the operation of the business.  For example, it would be an undue
hardship for an employer to accommodate proselytizing by an employee if the
proselytizing had adverse effects on employee morale or workplace
productivity.

Because employers are responsible for maintaining a nondiscriminatory work

environment, they can be held liable for perpetrating or tolerating religious harassment of their employees.  An employer can reduce the chance that employees will engage in conduct that rises to the level of unlawful harassment by implementing an anti-harassment policy and an effective procedure for reporting, investigating, and correcting harassing conduct.[199]  Even if the policy does not prevent all such conduct, it could limit the employer's liability where the employee does not report conduct rising to the level of illegal harassment.

However, "[d]iscussion of religion in the workplace is not illegal."[200]  In fact, Title VII violations may result if an employer tries to avoid potential coworker objections to employee religious expression by preemptively banning all religious communications in the workplace or discriminating against unpopular religious views, since Title VII requires that employers  not discriminate based on religion and that they reasonably accommodate employees' sincerely held religious observances, practices, and beliefs as long as accommodation poses no undue hardship.[201]

## · Employer Best Practices ·

- Employers should have a well-publicized and consistently applied anti-harassment policy that: (1) covers religious harassment; (2) clearly explains what is prohibited; (3) describes procedures for bringing harassment to management's attention; and (4) contains an assurance that complainants will be protected against retaliation.  The procedures should include a complaint mechanism that includes multiple avenues for complaint; prompt, thorough, and impartial investigations; and prompt and appropriate corrective action.

- Employers should encourage managers to intervene proactively and discuss whether particular religious expression is welcome if the manager believes the expression is likely to be construed as unwelcome to a reasonable person.

- Employers should allow religious expression among employees at least to

  the same extent that they allow other types of personal expression that are not harassing or disruptive to the operation of the business.[202]

- Once an employer is on notice that religious expression by an employee is unwelcome to another employee, the employer should investigate and, if appropriate, take steps to ensure that the expression in question does not become sufficiently severe or pervasive to create a hostile work environment.

- If harassment is perpetrated by a non-employee assigned by a contractor, vendor, or client, the supervisor or other appropriate individual in the impacted employee's chain of command should initiate a meeting with

impacted employee's chain of command should initiate a meeting with the contractor, vendor, or client regarding the harassment and require that it cease, that appropriate disciplinary action be taken if it continues, and/or that a different individual be assigned.

- To prevent conflicts from escalating to the level of a Title VII violation, employers should immediately intervene when they become aware of objectively abusive or insulting conduct, even absent a complaint.

- While supervisors are permitted to engage in certain religious expression, they should avoid expression that might – due to their supervisory authority – reasonably be perceived by subordinates as coercive, even when not so intended.

### · Employee Best Practices ·

- Where they feel comfortable doing so, employees who find harassing workplace religious conduct directed at them unwelcome should inform the individual engaging in the conduct that they wish it to stop.  If the conduct does not stop, employees should report it to their supervisor or other appropriate company official in accordance with the procedures established in the company's anti-harassment policy.

- Employees who do not wish personally to confront an individual who is engaging in unwelcome religious or anti-religious conduct should report the conduct to their supervisor or other appropriate company official in accordance with the company's anti-harassment policy.

## 12-IV REASONABLE ACCOMMODATION

Overview: Title VII requires an employer, once on notice, to reasonably accommodate an employee whose sincerely held religious belief, practice, or observance conflicts with a work requirement, unless providing the accommodation would create an undue hardship.[203]  The Title VII "undue hardship" defense is defined differently than the "undue hardship" defense for disability accommodation under the Americans with Disabilities Act (ADA). Title VII's undue hardship defense to providing religious accommodation has been defined by the Supreme Court as requiring a showing that the proposed accommodation in a particular case poses "more than a *de minimis*" cost or burden.  This is a lower standard for an employer to meet than undue hardship under the ADA, which is defined in that statute as "an action requiring significant difficulty or expense."[204]

"Title VII requires otherwise-neutral policies to give way to the need for an accommodation."[205]  An individual alleging the denial of a religious accommodation is generally seeking an adjustment to a neutral work rule that infringes on the employee's ability to practice his religion.[206]  "The accommodation requirement is 'plainly intended to relieve individuals of the

burden of choosing between their jobs and their religious convictions, where such relief will not unduly burden others.'"[207]

## A. Religious Accommodation

A religious accommodation is an adjustment to the work environment that will allow the employee to comply with his or her religious beliefs.  An employer need not provide a reasonable accommodation if doing so would cause undue hardship on the conduct of the employer's business, which the Supreme Court has interpreted to mean an accommodation that would require the employer to bear more than a *de minimis* cost or burden.[208]  The employer's duty to accommodate will usually entail making a special exception from, or adjustment to, the particular  requirement that creates a conflict so that the employee or applicant will be able to observe or practice his or her religion.  Accommodation requests often relate to work schedules, dress and grooming, or religious expression or practice while at work.[209]  The Commission's position is that the denial of reasonable religious accommodation absent undue hardship is actionable even if the employee has not separately suffered an independent adverse employment action, such as being disciplined, demoted, or discharged as a consequence of being denied accommodation. [210]  This is because requiring him to work without religious accommodation where a work rule conflicts with his religious beliefs necessarily alters the terms and conditions of his employment for the worse.[211]  However, the courts are split on this question.[212]

### 1. Notice of the Conflict Between Religion and Work

Employers need not provide an accommodation unless they are on notice that one is needed for religious purposes.[213]  Typically, the employer will advise the applicant or employee of its policies or a particular work requirement, and in response the applicant or employee will indicate that an accommodation is needed for religious reasons.  In some instances, even absent an applicant's or employee's request, the employer will be on notice that the observance or practice is religious and conflicts with a work policy, and therefore that accommodation is or could be needed.[214]  In such circumstances, it would violate Title VII for an employer to fail to provide a reasonable accommodation unless it proves that doing so would pose an undue hardship.[215]

In addition, even in the absence of any notice that a religious accommodation is needed, an employer violates Title VII if it takes an adverse action against an applicant or employee (such as failing to hire) based on its belief that the applicant or employee might need a reasonable religious accommodation, unless the employer proves that such an accommodation would have imposed an undue hardship.[216]

 When requesting accommodation, the applicant or employee need not use any "magic words," such as "religious accommodation" or "Title VII."  The employer must have enough information to make the employer aware that

there exists a conflict between the applicant's or employee's religious observance, practice, or belief and a requirement for applying for or performing the job.[217]  If the employer reasonably needs more information, the employer and the applicant or employee should discuss the request.  The applicant or employee may need to explain the religious nature of the belief, observance, or practice at issue, and cannot assume that the employer will already know or understand it.[218]  Similarly, the employer should not assume that a request is invalid simply because it is based on religious beliefs or practices with which the employer is unfamiliar, but should ask the applicant or employee to explain the religious nature of the practice and the way in which it conflicts with a work requirement.  In determining if a conflict exists, it is irrelevant that the employer does not view the work requirement as implicating a religious belief, or that most people of the applicant's or employee's faith would not; it is the applicant's or employee's own religious beliefs that are relevant.[219]

### EXAMPLE 30

### Failure to Advise Employer That Request Is Due to Religious Practice or Belief

Jim agreed to take his employer's drug test but was terminated because he refused to sign the accompanying consent form.  After his termination, Jim filed a charge alleging that the employer failed to accommodate his religious objection to swearing an oath.  Until it received notice of the charge, the employer did not know that Jim's refusal to sign the form was based on his religious beliefs.  Because the employer was not notified of the conflict at the time Jim refused to sign the form, or at any time prior to Jim's termination, it did not have an opportunity to offer to accommodate him.  The employer has not violated Title VII. [220]

### 2. Discussion of Request

Although an employer is not required by Title VII to conduct a discussion with an employee before making a determination on an accommodation request, as a practical matter it can be important to do so.  Both the employer and the employee have roles to play in resolving an accommodation request.  In addition to placing the employer on notice of the need for accommodation, the employee should cooperate with the employer's efforts to determine whether a reasonable accommodation can be granted.  Once the employer becomes aware of the employee's religious conflict, the employer should obtain promptly whatever additional information is needed to determine whether a reasonable accommodation is available without posing an undue hardship on the operation of the employer's business.[221]  This typically involves the

the operation of the employer's business." ─── This typically involves the employer and employee mutually sharing information necessary to process the accommodation request.  Employer-employee cooperation and flexibility are key to the search for a reasonable accommodation.  If the accommodation solution is not immediately apparent, the employer should discuss the request with the employee to determine what accommodations might be effective.  If the employer requests additional information reasonably needed to evaluate the request, the employee should provide it.

Failure to confer with the employee is not an independent violation of Title VII.  But as a practical matter, such failure can have adverse legal consequences.  For example, in some cases where an employer has made no effort to act on an accommodation request, courts have found that the employer lacked the evidence needed to meet its burden of proof to establish that the plaintiff's proposed accommodation would actually have posed an undue hardship.[222]

Likewise, employees should cooperate with an employer's requests for reasonable information.  For example, if an employee requested a schedule change to accommodate daily prayers, the employer might need to ask for information about the religious observance, such as the time and duration of the daily prayers, in order to determine if accommodation can be granted without posing an undue hardship on the operation of the employer's business.  Moreover, even if the employer does not grant the employee's preferred accommodation but instead provides a reasonable alternative accommodation, the employee must cooperate by attempting to meet his

religious needs through the employer's proposed accommodation if possible.[223]

Where the accommodation request itself does not provide enough information to enable the employer to make a determination, and the employer has a bona fide doubt as to the basis for the accommodation request, it is entitled to make a limited inquiry into the facts and circumstances of the employee's claim that the belief or practice at issue is religious and sincerely held, and that the belief or practice gives rise to the need for the accommodation.[224]  Whether an employer has a reasonable basis for seeking to verify the employee's stated beliefs will depend on the facts of a particular case.

## EXAMPLE 31

### Sincerity of Religious Belief Questioned

Bob, who had been a dues-paying member of the CDF union for fourteen years, had a work-related dispute with a union official and one week later asserted that union activities were contrary to his religion and that he could no longer pay union dues.  The union doubted whether Bob's request was based on a sincerely held religious belief, given that it appeared to be precipitated by

held religious belief, given that it appeared to be precipitated by an unrelated dispute with the union, and he had not sought this accommodation in his prior fourteen years of employment. In this situation, the union can require him to provide additional information to support his assertion that he sincerely holds a religious conviction that precludes him from belonging to – or financially supporting – a union.[225]

When an employer requests additional information, employees should provide information that addresses the employer's reasonable doubts. That information need not, however, take any specific form. For example, written materials or the employee's own first-hand explanation may be sufficient to alleviate the employer's doubts about the sincerity or religious nature of the

employee's professed belief such that third-party verification is unnecessary. Further, since idiosyncratic beliefs can be sincerely held and religious, even when third-party verification is requested, it does not have to come from a clergy member or fellow congregant, but rather could be provided by others who are aware of the employee's religious practice or belief.[226]

An employee who fails to cooperate with an employer's reasonable request for verification of the sincerity or religious nature of a professed belief risks losing any subsequent claim that the employer improperly denied an accommodation. By the same token, employers who unreasonably request unnecessary or excessive corroborating evidence risk being held liable for denying a reasonable accommodation request, and having their actions challenged as retaliatory or as part of a pattern of harassment.

### EXAMPLE 32

### Clarifying a Request

Diane requests that her employer schedule her for "fewer hours" so that she can "attend church more frequently." The employer denies the request because it is not clear what schedule Diane is requesting or whether the change is sought due to a religious belief or practice. While Diane's request lacked sufficient detail for the employer to make a final decision, it was sufficient to constitute a religious accommodation request. Rather than denying the request outright, the employer should have obtained the information from Diane that it needed to make a decision. The employer could have inquired of Diane precisely what schedule change was sought and for what purpose, and how her current schedule conflicted with her religious practices or beliefs. Diane would then have had an obligation to provide sufficient information to permit her employer to make a reasonable assessment of whether her request was based on a sincerely held

religious belief, the precise conflict that existed between her work

schedule and church schedule, and whether granting an
accommodation would pose an undue hardship on the
employer's business.

### 3. What is a "Reasonable" Accommodation?

Although an employer never has to provide an accommodation that would
pose an undue hardship, *see infra* § 12-IV-B, it discharges its accommodation
duty if it provides a "reasonable" accommodation.  An adjustment offered by
an employer is not a "reasonable" accommodation if it merely lessens rather
than eliminates the conflict between religion and work, provided that
eliminating the conflict would not impose an undue hardship.[227]  If all
accommodations eliminating such a conflict would impose an undue hardship
on an employer, the employer must reasonably accommodate the employee's
religious practice to the extent that it can without suffering an undue hardship,
even though such an accommodation would be "partial" in nature.[228]  To
qualify as a reasonable accommodation, an adjustment also must not
discriminate against the employee or unnecessarily disadvantage the
employee's terms, conditions, or privileges of employment.[229]

Where there is more than one reasonable accommodation that would not pose
an undue hardship, the employer is not obliged to provide the accommodation
preferred by the employee.[230]  However, an employer's proposed
accommodation will not be "reasonable" if a more favorable accommodation is
provided to other employees for non-religious purposes,[231] or, for example, if
it requires the employee to accept a reduction in pay rate or some other loss of
a benefit or privilege of employment and there is an alternative
accommodation that does not do so.[232]

Ultimately, reasonableness is a fact-specific determination.  "The
reasonableness of an employer's attempt at accommodation cannot be
determined in a vacuum.  Instead, it must be determined on a case-by-case
basis; what may be a reasonable accommodation for one employee may not be
reasonable for another . . . .  'The term "reasonable accommodation" is a
relative term and cannot be given a hard and fast meaning.  Each case . . .

necessarily depends upon its own facts and circumstances, and comes down to
a determination of "reasonableness" under the unique circumstances of the
individual employer-employee relationship.'"[233]

**EXAMPLE 33**

**Employer Violates Title VII if it Offers Only Partial
Accommodation Where Full Accommodation Would Not Pose
an Undue Hardship**

Rachel, who worked as a ticket agent at a sports arena, asked not to be scheduled for any Friday night or Saturday shifts, to permit her to observe the Jewish Sabbath from sunset on Friday through sunset on Saturday. The arena wanted to give Rachel this time off only every other week. The arena's proposed adjustment does not fully eliminate the religious conflict and therefore cannot be deemed a reasonable accommodation in the absence of a showing that giving Rachel the requested time off every week poses an undue hardship for the arena. If the arena makes that showing, it must still accommodate Rachel's religious practice to the extent it can without suffering an undue hardship, which could include granting some, but not all, Friday evenings and/or Saturdays off.[234]

### EXAMPLE 34

### Employer Not Obligated to Provide Employee's Preferred Accommodation

Tina, a newly hired part-time store cashier whose sincerely held religious belief is that she should refrain from work on Sunday as part of her Sabbath observance, asked her supervisor never to schedule her to work on Sundays. Tina specifically asked to be

scheduled to work Saturdays instead. In response, her employer offered to allow her to work on Thursdays, which she found inconvenient because she takes a college class on that day. Even if Tina preferred a different schedule, the employer is not required to grant Tina's preferred accommodation.[235]

### EXAMPLE 35

### Accommodation by Transfer

Yvonne, a member of the Pentecostal faith, was employed as a nurse at a hospital. When she was assigned to the Labor and Delivery Unit, she advised the nurse manager that her faith forbids her from participating directly or indirectly in ending a life, and that this proscription prevents her from assisting with abortions. She asked the hospital to accommodate her religious beliefs by allowing her to trade assignments with other nurses in the Labor and Delivery Unit as needed. The hospital concluded that, due to staffing cuts and risks to patients' safety, it could not accommodate Yvonne within the Labor and Delivery Unit because there were not enough staff members able and willing to trade

with her.  The hospital instead offered to permit Yvonne to
transfer, without a reduction in pay or benefits, to a vacant
nursing position in the Newborn Intensive Care Unit, which did
not perform abortion procedures.  As described below,[**236**] an
employee should be accommodated in his or her current position
absent an undue hardship.  Here, the hospital could not
accommodate Yvonne in her current position due to staffing cuts
and risks to patient safety, so the hospital's solution of a lateral
transfer complies with Title VII.[**237**]  If the hospital is government
run or receives federal funds, it could also have obligations to
accommodate Yvonne under federal laws protecting conscience
rights of its health care employees.[**238**]

Title VII is violated by an employer's failure to reasonably accommodate even if,
to avoid adverse consequences, an employee continues to work after his or her
accommodation request is denied.  "[A]n employee who temporarily gives up
his [or her] religious practice to submit to employment requirements [does not]
waive[] his [or her] discrimination claim."[**239**]  Thus, the fact that an employee
acquiesces to the employer's work rule, continuing to work without an
accommodation after the employer has denied the request, should not defeat
the employee's legal claim.[**240**]

In addition, the obligation to provide reasonable accommodation absent
undue hardship is a continuing obligation.  Employers should be aware that an
employee's religious beliefs and practices may evolve or change over time, and
that this may result in requests for additional or different accommodations.
[**241**]  Similarly, the employer has the right to discontinue a previously granted
accommodation that is no longer utilized for religious purposes or
subsequently poses an undue hardship.

## B.  Undue Hardship

An employer can refuse to provide a reasonable accommodation if it would
pose an undue hardship.  The Supreme Court has defined "undue hardship" for
purposes of Title VII as imposing "more than a *de minimis* cost" on the
operation of the employer's business.[**242**]  The concept of "more than *de
minimis* cost" is discussed below in sub-section 2.  Although the employer's
showing of undue hardship under Title VII is easier than under the ADA, the
burden of persuasion is still on the employer.[**243**]  If an employee's proposed
accommodation would pose an undue hardship, the employer should explore
alternative accommodations.

### 1.  Case-by-Case Determination

The determination of whether a particular proposed accommodation imposes
an undue hardship "must be made by considering the particular factual context
of each case."[**244**]  Relevant factors may include the type of workplace, the

nature of the employee's duties, the identifiable cost of the accommodation in relation to the size and operating costs of the employer, and the number of employees who will in fact need a particular accommodation.[245]  For example, an employer with multiple facilities might be better able than another employer to accommodate a Muslim employee who seeks a transfer to a location with a nearby mosque that he can attend during his lunch break.

To prove undue hardship, the employer will need to demonstrate how much cost or disruption the employee's proposed accommodation would involve.[246]  An employer cannot rely on hypothetical hardship when faced with an employee's religious obligation that conflicts with scheduled work, but rather should rely on objective information.[247]  A mere assumption that many more people with the same religious practices as the individual being accommodated may also seek accommodation is not evidence of undue hardship.

### 2. More than "*De Minimis* Cost"

To establish undue hardship, the employer must demonstrate that the accommodation would require the employer "to bear more than a *de minimis* cost."[248]  However, "'[u]ndue hardship is something greater than hardship.'"[249]  Factors to be considered include "the identifiable cost in relation to the size and operating costs of the employer, and the number of individuals who will in fact need a particular accommodation."[250]  Generally, the payment of administrative costs necessary for an accommodation, such as costs associated with rearranging schedules and recording substitutions for payroll purposes, or infrequent or temporary payment of premium wages (e.g., overtime rates) while a more permanent accommodation is sought, will not constitute more than a *de minimis* cost, whereas the regular payment of premium wages or the hiring of additional employees to provide an accommodation will generally require more than *de minimis* cost to the employer.[251]

Costs to be considered include not only direct monetary costs but also the burden on the conduct of the employer's business.  For example, courts have found undue hardship where the accommodation diminishes efficiency in other jobs,[252] infringes on other employees' job rights or benefits,[253] impairs workplace safety,[254] or causes coworkers to carry the accommodated employee's share of potentially hazardous or burdensome work.[255]  Whether the proposed accommodation conflicts with another law will also be considered.[256]

### EXAMPLE 36

### Religious Need Can Be Accommodated

David wears long hair pursuant to his Native American religious

David wears long hair pursuant to his Native American religious beliefs. David applies for a job as a server at a restaurant which requires its male employees to wear their hair "short and neat," in order to provide a certain image to its customers. When the restaurant manager informs David that if offered the position he will have to cut his hair, David explains that he keeps his hair long based on his religious beliefs and offers to wear it held up with a clip or under a hair net. The manager refuses this accommodation and denies David the position based on his long hair. Since the evidence indicated that David could have been accommodated, without undue hardship, by wearing his hair in a ponytail or held up with a clip, the employer will be liable for denial of reasonable accommodation and discriminatory failure to hire.

### EXAMPLE 37

### Safety Risk Poses Undue Hardship

Patricia alleges she was terminated from her job as a steel mill laborer because of her religion (Pentecostal) after she notified her supervisor that her faith prohibits her from wearing pants, as required by the mill's dress code, and requested as an accommodation to be permitted to wear a skirt. Management

contends that the dress code is essential to the safe and efficient operation of the mill and has evidence that it was imposed following several accidents in which skirts worn by employees were caught in the same type of mill machinery that Patricia operates. Because the evidence establishes that wearing pants is truly necessary for safety reasons, the accommodation requested by Patricia poses an undue hardship.[257]

### 3. Seniority Systems and Collectively Bargained Rights

A proposed religious accommodation poses an undue hardship if it would deprive another employee of a job preference or other benefit guaranteed by a bona fide seniority system or collective bargaining agreement (CBA).[258] Of course, the mere existence of a conflict between the requested accommodation and a seniority system or CBA does not relieve the employer of the duty to attempt reasonable accommodation of its employees' religious practices; the question is whether an accommodation can be provided without violating the seniority system or CBA.[259] Allowing voluntary substitutes and swaps does not constitute an undue hardship to the extent the arrangements do not violate a bona fide seniority system or CBA.[260] Employer and employee arrangements regarding voluntary substitutes and swaps are discussed in more detail in section 12-IV-C-2.

## EXAMPLE 38

### Schedules Based on a Seniority System or Collectively Bargained Rights

Susan, an employee of Quick Corp., asks not to work on her Sabbath. Quick Corp. and its employees' union have negotiated a CBA which provides that weekend shifts will rotate evenly among employees. If Susan can find qualified coworkers voluntarily willing to swap her shifts to accommodate her sincerely held religious beliefs, the employer could be found liable for denial of

reasonable accommodation if it refuses to permit the swap to occur. The existence of the collectively bargained system for determining weekend shifts should not result in the denial of accommodation if a voluntary swap can be arranged by the employee without violating the system or otherwise posing an undue hardship. The result would be the same if Quick Corp. had a unilaterally imposed bona fide seniority system (rather than a CBA) pursuant to which weekend shifts are determined.

However, if other employees were unwilling to swap shifts or were otherwise harmed by not requiring Susan to work on the shift in question, or the employer would be subject to other operational costs that were more than *de minimis* by allowing Susan to swap shifts, then the employer can demonstrate undue hardship.[261]

### 4. Coworker Complaints

Although infringing on coworkers' abilities to perform their duties[262] or subjecting coworkers to a hostile work environment[263] will generally constitute undue hardship, the general disgruntlement, resentment, or jealousy of coworkers will not.[264] Undue hardship requires more than proof that some coworkers complained or are offended by an unpopular religious belief or by alleged "special treatment" afforded to the employee requesting religious accommodation; a showing of undue hardship based on coworker interests generally requires evidence that the accommodation would actually infringe on the rights of coworkers or cause disruption of work.[265] Applying this standard, it would be an undue hardship for an employer to accommodate religious expression that is unwelcome potential harassment based on race, color, sex, national origin, religion, age, disability, or genetic information, or based on its own internal anti-harassment policy, and it may take action consistent with its obligations under Title VII and the other EEO laws. *See also* §§ 12-III-C, *supra*, and 12-IV-C-6, *infra* (discussing complaints regarding proselytizing and other forms of religious expression).

### 5. Security Considerations

If a religious practice conflicts with a legally mandated federal, state, or local security requirement, an employer need not accommodate the practice because doing so would create an undue hardship. If a security requirement has been unilaterally imposed by the employer and is not required by law or regulation, courts will engage in a fact-specific inquiry to decide whether it would be an undue hardship to modify or eliminate the requirement to accommodate an employee who has a religious conflict.

### EXAMPLE 39

### Accommodation Implicating Security Concerns

Patrick is employed as a correctional officer at a state prison, and his brother William is employed as a grocery store manager. Both Patrick and William seek permission from their respective employers to wear a fez at work as an act of faith on a particular holy day as part of their religious expression. Both employers deny the request, citing a uniformly applied workplace policy prohibiting employees from wearing any type of head covering. The prison's policy is based on security concerns, supported by evidence, that head coverings may be used to conceal drugs, weapons, or other contraband, and may spark internal violence among prisoners. The grocery store's policy is based on a stated desire that all employees wear uniform clothing so that they can be readily identified by customers. If both brothers file EEOC charges challenging the denials of their accommodation requests, the EEOC likely will not find reasonable cause in Patrick's case because the prison's denial of his request was based on legitimate, evidence-based security considerations posed by the particular religious garb sought to be worn. The EEOC likely will find cause in William's case because there is no indication it would pose an undue hardship for the grocery store to modify its policy with respect to his request.[266]

### EXAMPLE 40

### Kirpan

Harvinder, a Sikh who works in a hospital, wears a small sheathed kirpan (religious article of faith resembling a knife) strapped and hidden underneath her clothing, as a symbol of her religious commitment to defend truth and moral values. When Harvinder's supervisor, Bill, learned about her kirpan from a coworker, he

instructed Harvinder not to wear it at work because it violated the hospital policy against weapons in the workplace. Harvinder explained to Bill that her faith requires her to wear a kirpan in order to comply with the Sikh Code of Conduct and gave him literature explaining that the kirpan is a religious article of faith, not a weapon. She also showed him the kirpan, allowing him to see that it was no sharper than scissors, box cutters, cake knives, paper cutters, and other secular objects in the workplace. Nevertheless, Bill told her that she would be terminated if she continued to wear the kirpan at work. Absent evidence that allowing Harvinder to wear the kirpan would pose an undue hardship in the factual circumstances of this case, the hospital is liable for denial of accommodation.

## C.  Common Methods of Accommodation in the Workplace

Under Title VII, an employer or other covered entity may use a variety of methods to provide reasonable accommodations to its employees. The most common methods are: (1) flexible scheduling; (2) voluntary substitutes or swaps of shifts and assignments; (3) lateral transfers or changes in job assignment; and (4) modifying workplace practices, policies, or procedures.

### 1. Scheduling Changes

An employer may be able to reasonably accommodate an employee by allowing flexible arrival and departure times, floating or optional holidays, flexible work breaks, use of lunch time in exchange for early departure, staggered work hours, and other means to enable an employee to make up time lost due to the observance of religious practices.[267] However, EEOC's position is that it is insufficient merely to eliminate part of the conflict, unless eliminating the conflict in its entirety poses an undue hardship.[268]

### EXAMPLE 41

### Break Schedules/Prayer at Work

Rashid, a janitor, tells his employer on his first day of work that he practices Islam and will need to pray at several prescribed times during the workday in order to adhere to his religious practice of praying at five times each day, for several minutes, with hand washing beforehand. The employer objects because its written policy allows one fifteen-minute break in the middle of each morning and afternoon. Rashid's requested change in break schedule will not exceed the 30 minutes of total break time otherwise allotted, nor will it affect his ability to perform his

duties or otherwise cause an undue hardship for his employer.
Thus, Rashid is entitled to accommodation.[269]


### EXAMPLE 42

### Blanket Policies Prohibiting Time Off

A large employer operating a fleet of buses had a policy of
refusing to accept driver applications unless the applicant agreed
that he or she was available to be scheduled to work any shift,
seven days a week. This policy would violate Title VII if applied to
discriminate against applicants who refrain from work on certain

days for religious reasons, by failing to allow for the provision of
religious accommodation absent undue hardship.[270]

### 2. Voluntary Substitutes and Shift Swaps

The reasonable accommodation requirement can often be satisfied without
undue hardship where a volunteer with substantially similar qualifications is
available and willing to switch shifts, either for a single absence or multiple
absences, including absences occurring over an extended period of time.
 "[T]he obligation to accommodate requires that employers and labor
organizations facilitate the securing of a voluntary substitute with substantially
similar qualifications. Some means of doing this which [covered entities]
should consider are: to publicize policies regarding accommodation and
voluntary substitution; to promote an atmosphere in which such substitutions
are favorably regarded; to provide a central file, [physical or electronic] bulletin
board or other means for matching voluntary substitutes with positions for
which substitutes are needed."[271] The employer's obligation is to make a
good faith effort to allow voluntary substitutions and shift-swaps to
accommodate a religious conflict.[272]  This does not require the employer itself
to arrange a substitute or swap, but where it is difficult for employees to
arrange shift substitutes or swaps on their own, the employer may have an
obligation to do more to facilitate the search for volunteers.[273]  Likewise, if the
employer is on notice that the employee's religious beliefs preclude him not
only from working on his Sabbath but also from inducing others to do so,
reasonable accommodation requires more than merely permitting the
employee to swap.[274]  An employer does not have to permit a substitute or
swap if it would pose an undue hardship.  As noted above, under the *de minimis*
cost standard, if a swap or substitution would result in the employer having to
pay premium wages (such as overtime pay), the frequency of the arrangement
will be relevant to determining if it poses an undue hardship; "the Commission
will presume that the infrequent payment of premium wages for a substitute or
the payment of premium wages while a more permanent accommodation is
being sought are costs which an employer can be required to bear as a means
of providing a reasonable accommodation."[275]

of providing a reasonable accommodation.

If it does not pose an undue hardship, an employer must make an exception to its policy of requiring all employees, regardless of seniority, to work an "equal number of weekend, holiday, and night shifts," and instead permit voluntary shift swaps between qualified coworkers in order to accommodate a particular employee's sincerely held religious belief that he should not work on his or her Sabbath. Of course, if allowing a swap or other accommodation would not provide the coverage the employer needs for its business operations or otherwise pose an undue hardship, the accommodation does not have to be granted.

### 3. Change of Job Tasks and Lateral Transfer

When an employee's religious belief or practice conflicts with a particular task, appropriate accommodations may include relieving the employee of the task or transferring the employee to a different position or location that eliminates the conflict with the employee's religion. Whether or not such accommodations pose an undue hardship will depend on factors such as the nature or importance of the duty at issue, the nature of the employer's business, the availability of others to perform the function, the availability of other positions, and the applicability of a collective bargaining agreement or seniority system.


### EXAMPLE 43

### Restaurant Server Excused from Singing Happy Birthday

Kim, a server at a restaurant, informed her manager that she would not be able to join other waitresses in singing "Happy Birthday" to customers because she is a Jehovah's Witness whose religious beliefs do not allow her to celebrate holidays, including birthdays. There were enough servers on duty at any given time to perform this singing without affecting service. The manager refused any accommodation. If Kim files a Title VII charge alleging denial of religious accommodation, the EEOC will find

cause because the restaurant could have accommodated her with little or no expense or disruption.


### EXAMPLE 44

### Pharmacist Excused from Providing Contraceptives

Neil, a pharmacist, was hired by a large corporation that operates numerous large pharmacies at which more than one pharmacist is on duty during all hours of operation. Neil informed his

is on duty during all hours of operation. Neil informed his employer that he refuses on religious grounds to participate in distributing contraceptives or answering any customer inquiries about contraceptives. The employer reasonably accommodated Neil by offering to allow Neil to signal discreetly to a coworker who would take over servicing any customer who telephoned, faxed, or came to the pharmacy regarding contraceptives.[276]


## EXAMPLE 45

### Pharmacist Not Permitted to Turn Away Customers

In the above example, assume that instead of facilitating the assistance of such customers by a coworker, Neil leaves on hold indefinitely those who call on the phone about a contraceptive rather than transferring their calls, and walks away from in-store customers who seek to fill a contraceptive prescription rather than signaling a coworker. Neil refuses to signal another employee or inform the customer on the phone that he is placing them on a brief hold while he gets another employee. The employer is not required to accommodate Neil's request to remain in such a position yet avoid all situations where he might even briefly interact with customers who have requested contraceptives, or to accommodate a disruption of business operations. The employer may discipline or terminate Neil if he disrupts business operations.[277]

The employee should generally be accommodated in his or her current position if doing so does not pose an undue hardship.[278] For example, if a pharmacist who has a religious objection to dispensing contraceptives can be accommodated without undue hardship by allowing the pharmacist to signal a coworker to assist customers with such prescriptions, the employer should not choose instead to accommodate by transferring the pharmacist to a different position. If no such accommodation is possible, the employer needs to consider whether lateral transfer is a possible accommodation.[279] The employer cannot transfer the pharmacist to a position that entails less pay, responsibility, or opportunity for advancement unless a lateral transfer is unavailable or would otherwise pose an undue hardship.[280]


## EXAMPLE 46

### Lateral Transfer Versus Transfer to a Lower-Paying Position

An electrical utility lineman requests accommodation of his Sabbath observance, but because the nature of his position

requires being available to handle emergency problems at any
time, there is no accommodation that would permit the lineman
to remain in his position without posing an undue hardship.  The
employer can accommodate the lineman by offering a lateral
transfer to another assignment at the same pay, if available.  If,
however, no job at the same pay is readily available, then the
employer could satisfy its obligation to reasonably accommodate
the lineman by offering to transfer him to a different job, even at
lower pay, if one is available.[281]

### 4.  Modifying Workplace Practices, Policies and Procedures

An employer may have to make an exception to its policies, procedures, or

practices in order to grant a religious accommodation.[282]

#### a. Dress and Grooming Standards

When an employer has a dress or grooming policy that conflicts with an
employee's religious beliefs or practices, the employee may ask for an
exception to the policy as a reasonable accommodation.[283]  Religious dress
may include clothes, head or face coverings, jewelry, or other items.  Religious
grooming practices may relate, for example, to shaving or hair length.  Absent
undue hardship, religious discrimination may be found where an employer fails
to reasonably accommodate the employee's religious dress or grooming
practices.[284]

### EXAMPLE 47

### Facial Hair

Prakash, who works for CutX, a surgical instrument manufacturer,
does not shave or trim his facial hair because of his Sikh religious
observance.  When he seeks a promotion to manage the division
responsible for sterilizing the instruments, his employer tells him
that, to work in that division, he must shave or trim his beard
because otherwise his beard may contaminate the sterile field.
When Prakash explains that he cannot trim his beard for religious
reasons, the employer offers to allow Prakash to wear two face
masks instead of trimming his beard.  Prakash thinks that wearing
two masks is unreasonable (for reasons unrelated to his religious
practice) and files a Title VII charge.  CutX will prevail because it
offered a reasonable accommodation that would eliminate
Prakash's religious conflict with the hygiene rule.

Some courts have concluded that it would pose an undue hardship if an
employer was required to accommodate a religious dress or grooming practice

that conflicts with the public image the employer wishes to convey to

customers.[285]  While there may be circumstances in which allowing a
particular exception to an employer's dress and grooming policy would pose an
undue hardship, an employer's reliance on the broad rubric of "image" to deny
a requested religious accommodation may in a given case be considered
disparate treatment, including because it is tantamount to reliance on
customer religious bias (so-called "customer preference") in violation of Title
VII.[286]


### EXAMPLE 48

### Religious Garb

Nasreen, a Muslim ticket agent for a commercial airline, wears a
hijab (headscarf) to work at the airport ticket counter.  After
September 11, 2001, her manager objected, telling Nasreen that
the customers might think she was sympathetic to terrorist
hijackers.  Nasreen explains to her manager that wearing the
hijab is her religious practice and continues to wear it.  She is
terminated for wearing a hijab over her manager's objection.
Customer fears or prejudices do not amount to undue hardship.
As a result, the airline's refusal to accommodate her and its
subsequent decision to terminate her violate Title VII.  In addition,
if the commercial airline had denied Nasreen the position due to
perceptions of customer preferences about religious attire, that
would also be disparate treatment based on religion in violation
of Title VII, because it would be the same as refusing to hire
Nasreen because she is a Muslim.  *See supra* § 12-II-B.[287]

There may be limited situations in which the need for uniformity of appearance
is so important that modifying the dress code would pose an undue hardship.
[288]  This issue should be resolved on a case-by-case basis.

### b. Use of Employer Facilities

If any employee needs to use a workplace facility as a reasonable
accommodation, for example use of a quiet area for prayer during break time,
the employer should accommodate the request under Title VII unless it would
pose an undue hardship.  If the employer allows employees to use the facilities
at issue for non-religious activities not related to work, it may be difficult for the
employer to demonstrate that allowing the facilities to be used in the same
manner for religious activities is not a reasonable accommodation or poses an
undue hardship.[289]

### EXAMPLE 49

### Use of Employer Facilities

An employee whose assigned work area is a factory floor rather than an enclosed office asks his supervisor if he may use one of the company's unoccupied conference rooms to pray during a scheduled break time. The supervisor must grant this request if it would not pose an undue hardship. An undue hardship would exist, for example, if the only conference room is used for work meetings at that time. However, the supervisor is not required to provide the employee with his choice of the available locations and can meet the accommodation obligation by making any appropriate location available that would accommodate the employee's religious needs if this can be done absent undue hardship, for example by offering an unoccupied area of the work space rather than the conference room.

#### c. Tests and Other Selection Procedures

An employer has an obligation to reasonably accommodate an applicant when scheduling a test or administering other selection procedures, where the applicant has informed the employer of a sincerely held religious belief that conflicts with a pre-employment testing requirement, unless undue hardship would result.[290] An employer may not permit an applicant's presumed or actual need for a religious accommodation to affect its decision whether or not to hire the applicant unless the employer can demonstrate that it cannot reasonably accommodate the applicant's religious observance or practice without undue hardship.[291]

#### d. Objections to Providing Social Security Numbers or Complying with Employer Identification Procedures

Whether it poses an undue hardship for an employer to provide an alternative means of identification for matters such as government forms, building security, or timekeeping will depend on the facts. It will typically pose an undue hardship for an employer to accommodate an applicant's or employee's asserted religious belief against providing or using a social security number, or identification requirements imposed by another federal law.[292] However, in cases where an alternative method of identification is feasible and does not pose an undue hardship, it may be required as a religious accommodation.[293]

### 5. Excusing Union Dues or Agency Fees

Absent undue hardship, Title VII requires employers and unions to accommodate an employee who holds religious objections to joining or financially supporting a union.[294] Such an employee can be accommodated,

in many cases, by allowing the equivalent of her union dues (payments by union members) or agency fees (payments often required from non-union members in a unionized workplace) to be paid to a charity agreeable to the employee, the union, and the employer.[295] Whether a charity-substitute accommodation for payment of union dues would cause an undue hardship is an individualized determination based upon, among other things, the union's size, operational costs, and the number of individuals who need the accommodation.[296]

If an employee's religious objection is not to joining or financially supporting the union, but rather to the union's support of certain political or social causes, the employee may be accommodated if it would not pose an undue hardship by, for example, reducing the amount owed, allowing the employee to donate

to a charitable organization the full amount the employee owes or that portion that is attributable to the union's support of the cause to which the employee has a religious objection, or diverting the amount owed to the national, state, or local union in the event one of those entities does not engage in support of the cause to which the employee has a religious objection.[297]

### 6. Permitting Prayer, Proselytizing, and Other Forms of Religious Expression

Some employees may seek to display religious icons or messages at their workstations or use a particular religious phrase when greeting others. Others may seek to proselytize by engaging in one-on-one discussions regarding religious beliefs or distributing literature. Still others may seek to engage in prayer at their workstations or to use other areas of the workplace for either individual or group prayer, study, or meeting. In some of these situations, an employee might request accommodation in advance to permit such religious expression. In other situations, the employer will not learn of the situation or be called upon to consider any action unless it receives complaints about the religious expression from either other employees or customers. As noted in §§ 12-II-A-3 and 12-III-C of this document, prayer, proselytizing, and other forms of religious expression do not solely raise a religious accommodation issue but may also raise intentional discrimination or harassment issues.

To determine whether allowing or continuing to permit an employee to pray, proselytize, or engage in other forms of religiously oriented expression in the workplace would pose an undue hardship, employers should consider the potential disruption, if any, that will be posed by permitting the expression of religious belief.[298] As explained below, relevant considerations may include the effect the religious expression has had, or can reasonably be expected to have, if permitted to continue, on coworkers, customers, or business operations.

#### a. Effect on Workplace Rights of Coworkers

Section 12: Religious discrimination | U.S. Equal Employment Opportunity Commission    Case 8:23-cv-02026-FWS-DFM    Document 159-2    Filed 08/15/25    Page 61 of 142    8/14/25, 11:53 PM

Page ID #:3196

Religious expression can create undue hardship if it disrupts the work of other employees or constitutes—or threatens to constitute—unlawful harassment. Conduct that is disruptive can still constitute an undue hardship, even if it does not rise to the level of unlawful harassment. Since an employer has a duty under Title VII to protect employees from harassment, it would be an undue hardship to accommodate expression that is harassing.[299]  As explained in § 12-III-A-2-b of this document, religious expression directed toward coworkers, made in coworkers' presence, or that a coworker learns of, might constitute unlawful harassment in some situations, for example where it is facially abusive (i.e., demeans people of other religions) or where, even if not abusive, it persists even though it is clearly unwelcome. However, as with bias from customers, if coworkers' objections are not because the conduct is facially abusive or persistent but rather because of bias of coworkers against religious expression generally or that particular religious expression, it is unlikely that accommodating the religious expression would be an undue hardship. It is necessary to make a case-by-case determination regarding whether the effect on coworkers actually is an undue hardship. Mere subjective offense or disagreement with unpopular religious views or practices by coworkers is not sufficient to rise to the level of unlawful harassment.  However, this does not require waiting until the unwelcome behavior becomes severe or pervasive. [300]  As with harassment on any basis, it is permitted and advisable for employers to take action to stop alleged harassment *before* it becomes severe or pervasive, because while isolated incidents of harassment generally do not violate federal law, a pattern of such incidents may be unlawful.[301]

### b. Effect on Customers

The determination of whether it is an undue hardship to allow employees to engage in religiously oriented expression toward customers is a fact-specific inquiry and will depend on the nature of the expression, the nature of the employer's business, and the extent of the impact on customer relations.  For example, one court found that it was a reasonable accommodation to allow an employee to use the general religious greeting "Have a Blessed Day" with coworkers and with customers who had not objected, rather than using it with everyone, including a customer who objected.[302]  However, other courts have found undue hardship where religiously oriented expression was used in the context of a regular business interaction with a client.[303]  Whether or not the client objects, religiously oriented expression may create an undue hardship for an employer where the expression could be mistaken as the employer's message, particularly in the instance of government employers.[304]  Where the religiously oriented expression is not limited to use of a phrase or greeting, but rather is in the manner of individualized, specific proselytizing, an employer is far more likely to be able to demonstrate that it would constitute an undue hardship to accommodate an employee's religious expression, regardless of the length or nature of the business interaction.[305]

**EXAMPLE 50**

**Display of Religious Objects by an Employee**

Susan and Roger are members of the same church and are both
employed at XYZ Corporation. Susan works as an architect in a
private office on an upper floor, where she occasionally interacts
with coworkers, but not with clients. Roger is a security guard
stationed at a desk in the front lobby of the XYZ building through
which all employees, clients, and other visitors must enter. At a
recent service at Susan and Roger's church, the minister
distributed posters with the message "Jesus Saves!" and
encouraged parishioners to display the posters at their
workplaces in order to "spread the word." Susan and Roger each
display the poster on the wall above their respective
workstations. XYZ orders both to remove the poster despite the
fact that both explained that they felt a religious obligation to
display it, and despite the fact that there have been no
complaints from coworkers or clients.

Susan and Roger file charges alleging denial of religious
accommodation. The employer will probably be unable to show
that allowing Susan to display a religious message in her personal
workspace posed an undue hardship, unless there was evidence

of disruption to the business or the workplace which resulted. By
contrast, because Roger sits at the lobby desk and the poster is
the first thing that visitors see upon entering the building, it
would appear to represent XYZ's views and would therefore likely
be shown to pose an undue hardship.[306]

**EXAMPLE 51**

**Undue Hardship to Allow Employee to Discuss Religion with
Clients**

Helen, an employee in a mental health facility that served a
religiously and ethnically diverse clientele, frequently spoke with
clients about religious issues and shared religious tracts with
them as a way to help solve their problems, despite being
instructed not to do so. After clients complained, Helen's
employer issued her a letter of reprimand stating that she should
not promote her religious beliefs to clients and that she would be
terminated if she persisted. Helen's belief in the need to
evangelize to clients cannot be accommodated without undue
hardship. The employer has the right to control speech that

threatens to impede provision of effective and efficient services. Clients, especially in a mental health setting, may not understand that the religious message represents Helen's beliefs rather than the facility's view of the most beneficial treatment for the patient. [**307**]

### 7. Employer-Sponsored Programs

Some employers have integrated their own religious beliefs or practices into the workplace, and they are entitled to do so.[**308**]  However, if an employer holds religious services or programs or includes prayer in business meetings, Title VII requires that the employer accommodate an employee who asks to be excused for religious reasons, including non-belief, absent a showing of undue hardship.[**309**]  Excusing an employee from religious services normally does not create an undue hardship because it does not cost the employer anything and does not disrupt business operations or other workers.[**310**]

### EXAMPLE 52

### Prayer at Meetings

Michael's employer requires that the mandatory weekly staff meeting begin with a religious prayer.  Michael objects to participating because he believes it conflicts with his own sincerely held religious beliefs.  He asks his supervisor to allow him to arrive at the meeting after the prayer.  The supervisor must accommodate Michael's religious belief by either granting his request or offering an alternative accommodation that would remove the conflict between Michael's religious belief and the staff meeting prayer, even if other employees of Michael's religion do not object to being present for the prayer.[**311**] The outcome would be the same if Michael sought the accommodation based on his lack of religious belief.

### EXAMPLE 53

### Employer Holiday Decorations

Each December, the president of XYZ corporation directs that several wreaths be placed around the office building and a tree be displayed in the lobby.  Several employees complain that to accommodate their non-Christian religious beliefs, the employer should take down the wreaths and tree, or alternatively should add holiday decorations associated with other religions.  Title VII does not require that XYZ corporation remove the wreaths and

Section 12: Religious Discrimination | U.S. Equal Employment Opportunity Commission      Case 8:23-cv-02026-FWS-DFM      Document 159-2      Filed 08/15/25      Page 64 of 142      8/14/25, 11:53 PM

Page ID #:3199

tree or add holiday decorations associated with other religions.

[312] The result under Title VII on these facts would be the same
whether in a private or government workplace.[313]

Similarly, an employer is required, absent undue hardship, to excuse an
employee from compulsory personal or professional development training or
participation in an initiative or celebration where it conflicts with the
employee's sincerely held religious beliefs, observances, or practices.[314]
There may be cases, however, where an employer can show that it would pose
an undue hardship to provide an alternative training or to excuse an employee
from any part of a particular training, even if the employee asserts it is contrary
to his religious beliefs to attend (e.g., where the training provides information
on how to perform the job, on how to comply with equal employment
opportunity obligations, or on other workplace policies, procedures, or
applicable legal requirements).


## EXAMPLE 54

### Religious Objection to Training Program – Employee Must Be Excused

As part of its effort to promote employee health and productivity,
the new president of a company institutes weekly mandatory on-
site meditation classes led by a local spiritualist.  Angelina
explains to her supervisor that the meditation conflicts with her
sincerely held religious beliefs and asks to be excused from
participating.  Because it would not pose an undue hardship, the
company must accommodate Angelina's religious belief by
excusing her from the weekly meditation classes, even if the
company and other employees believe that this form of
meditation does not conflict with any religious beliefs.


## EXAMPLE 55

### Religious Objection to Training Program – Employee Need Not Be Excused

Employer XYZ holds an annual training for employees on a variety
of personnel matters, including compliance with EEO laws and
also XYZ's own internal anti-discrimination policy, which includes
a prohibition on sexual orientation discrimination.  Lucille asks to
be excused from the portion of the training on sexual orientation
discrimination because she believes that it "promotes the
acceptance of homosexuality," which she sincerely believes is

immoral and sinful based on her religion. The training does not
tell employees to value different sexual orientations but simply
discusses and reinforces laws and conduct rules requiring
employees not to discriminate against or harass other employees
based on sexual orientation and to treat one another
professionally. Because an employer needs to make sure that its
employees know about and comply with such laws and
workplace rules, it would be an undue hardship for XYZ to excuse
Lucille from the training.[315]

## · NOTE TO EEOC INVESTIGATORS ·

While not all of the following issues will be in dispute in every charge alleging
denial of religious accommodation, if CP alleges that R failed to accommodate
CP's religious beliefs, observances, or practices, the investigator should
generally follow this line of inquiry, considering these steps:

⇒ Ascertain the nature of the belief, observance, or practice that CP claims R
has failed to accommodate (e.g., dress, grooming, holy day observance,
etc.) and what accommodation was sought and needed (e.g., exception to
dress code, schedule change, leave, etc.).

⇨ If disputed by R, determine what evidence R relies on to support its
position that CP's beliefs are not "religious" in nature.

⇨ If disputed by R, determine what evidence R relies on to support its
position that CP does not "sincerely hold" the particular religious
belief, observance, or practice at issue.

⇒ Ascertain whether R was aware of the need for a religious accommodation,
i.e., whether CP informed R that an accommodation was needed and that
it was for religious reasons, whether R knew of the need for a religious
accommodation through other means, or whether R believed CP needed
an accommodation (regardless of whether that belief was accurate). The
investigator should seek evidence of when, where, how, and to whom any
such notice was given, and the names of any witnesses to the notification,
or, absent such notice, evidence regarding whether R believed CP would
require accommodation.

⇒ If R claims that it was not aware of CP's need for an accommodation, the
investigator should attempt to resolve any discrepancies between R's
contention and CP's allegation by gathering additional available evidence
corroborating or refuting CP's and R's contentions.

⇒ Determine R's response, if any, to any notification of the need for an
accommodation or any belief that an accommodation may be required.
Was an accommodation offered, and if so, what? The investigator should
obtain R's documentary evidence of all attempts to accommodate CP, if
any attempts were made.

⇒ The investigator should seek a specific and complete explanation from R

⇒ The investigator should seek a specific and complete explanation from R as to the facts on which it relied in making a determination regarding whether to accommodate CP (e.g., why R concluded CP did not have a sincerely held religious belief or practice, what accommodations, if any, R offered, why it chose to offer or not offer an accommodation, or why R concluded that accommodation would have posed an undue hardship in terms of cost, disruption, effect on coworkers, or any other reason). For example, in the event R is a union and the accommodation claim relates to payment of agency fees or union dues, the investigator should obtain any relevant information regarding how the particular union at issue may have handled payment by this religious objector in order to provide accommodation.

⇒ If R asserts that it did not accommodate CP's request because it would have posed an undue hardship, obtain all available evidence regarding whether and what kind of a hardship would in fact have been posed, i.e., whether the alleged burden would have been more than *de minimis*. If R's undue hardship defense is based on cost, ascertain the cost of the accommodation in relation to R's size, nature of business operations, operating costs, and the impact, if any, of similar accommodations already being provided to other employees. If R's undue hardship defense is based on a factor other than cost (i.e., disruption, production or staffing levels, security, or other factor), similarly ascertain the impact of the accommodation with respect to R's particular workplace and business.

⇒ When there is more than one method of accommodation available that would not cause undue hardship, the investigator should evaluate whether the accommodation offered is reasonable by examining: (1) whether any alternative accommodation that was available was reasonable; (2) whether R considered any alternatives for accommodation; (3) the alternative(s) for accommodation, if any, that R actually offered to CP; (4) whether the alternative(s) the employer offered eliminated the conflict; and (5) whether the alternative(s) the employer offered adversely affected CP's terms, conditions, or privileges of employment or employment opportunities, as compared to other available accommodations (e.g., a loss in pay).[316]

⇒ If R asserts CP failed to cooperate with R in reaching an accommodation, obtain any available evidence regarding the relevant communications between R and CP, including any evidence documenting CP's refusal of any offer of reasonable accommodation.

⇒ If it appears, or if CP claims, that R based an adverse action (e.g., refusal to hire) in part on its belief that CP would need a religious accommodation, obtain any available evidence bearing on the employer's motivations for the action.

### · Employer Best Practices ·

**Reasonable Accommodation - Generally.**

- Employers should inform employees and applicants that they will make reasonable efforts to accommodate religious practices.

- Employers should train managers and supervisors on how to recognize religious accommodation requests from employees.

- Employers should consider developing internal procedures for processing religious accommodation requests. Where the employer relies on a staffing firm or other entity for any of its staffing needs, the employer and the staffing entity should coordinate in advance how they will handle accommodating applicants' or employees' religious beliefs or practices, consistent with these best practices.

- Employers should individually assess each request and avoid assumptions or stereotypes about what constitutes a religious belief or practice or what type of accommodation is appropriate.

- Employers and employees should confer fully and promptly to the extent needed to share any necessary information about the employee's religious needs and the available accommodation options.

- An employer is not required to provide an employee's preferred accommodation if there is more than one reasonable alternative. An employer should, however, consider the employee's proposed method of accommodation, and if it is denied, explain to the employee why his proposed accommodation is not being granted.

- Managers and supervisors should be trained to consider alternative available accommodations if the particular accommodation requested would pose an undue hardship.

- When faced with a request for a religious accommodation which cannot be promptly implemented, an employer should consider offering alternative methods of accommodation on a temporary basis, while a permanent accommodation is being explored. In this situation, an employer should also keep the employee apprised of the status of the employer's efforts to implement a permanent accommodation.

**Undue Hardship – Generally**

- The undue hardship standard refers to the legal requirement. Employers should be flexible in evaluating whether or not an accommodation is feasible, in light of that legal requirement. As with all aspects of employee relations, employers are free to go beyond the requirements of the law.

- An employer should not assume that an accommodation will conflict with the terms of a seniority system or collective bargaining agreement (CBA)

without first checking if there are any exceptions for religious accommodation or other avenues to allow an accommodation consistent with the seniority system or CBA.

- An employer should not automatically reject a request for religious accommodation just because the accommodation would interfere with the existing seniority system or terms of a CBA.  Although an employer may not upset coworkers' settled expectations, an employer is free to seek a voluntary modification to a CBA in order to accommodate an employee's religious needs.

- Employers should train managers that, if the requested accommodation would violate the CBA or seniority system, they should confer with the employee to determine if an alternative accommodation is available.

- Employers should ensure that managers are aware that reasonable accommodation may require making exceptions to policies or procedures that are not part of a CBA or seniority system, where it would not infringe on other employees' legitimate expectations.

### Schedule Changes

- Employers should work with employees who need an adjustment to their work schedules to accommodate their religious practices.

- Notwithstanding that the legal standard for undue hardship is "more than a *de minimis* cost," employers may choose voluntarily to incur whatever additional operational or financial costs they deem appropriate to accommodate an employee's religious need for scheduling flexibility.

- Employers should consider adopting flexible leave and scheduling policies and procedures that will often allow employees to meet their religious and other personal needs.  Such policies can reduce individual requests for exceptions.  For example, some employers have policies allowing alternative work schedules or a certain number of "floating" holidays for each employee.  While such policies may not cover every eventuality and some individual accommodations may still be needed, the number of such individual accommodations may be substantially reduced.

### Voluntary Substitutes or Swaps

- Employers should facilitate and encourage voluntary substitutions and swaps with employees of substantially similar qualifications by publicizing policies permitting such arrangements, promoting an atmosphere in which substitutes are favorably regarded, and providing a central file, bulletin board, group e-mail, or other means to help an employee with a religious conflict find a volunteer to substitute or swap.

**Change of Job Assignments and Lateral Transfers**

- An employer should consider a lateral transfer when no accommodation which would keep the employee in his or her position is possible absent undue hardship. However, an employer should only resort to transfer, whether lateral or otherwise, after fully exploring accommodations that would permit the employee to remain in his or her position.

- Where a lateral transfer is unavailable, an employer should not assume that an employee would not be interested in a lower-paying position if that position would enable the employee to abide by his or her religious beliefs. If there is no accommodation available that would permit the employee to remain in his or her current position or an equivalent, the employer should offer the next best available position as an accommodation and permit the employee to decide whether or not to take it.

**Modifying Workplace Practices, Policies, and Procedures**

- Employers should make efforts to accommodate an employee's religious practice of wearing a beard or religious garb such as a yarmulke, hijab, long skirts (as opposed to pants), or turban.

- Managers and employees should be trained not to engage in stereotyping based on religious dress and grooming practices and should not assume that atypical dress will create an undue hardship.

- Employers should be flexible and creative regarding work schedules, work duties, and selection procedures to the extent practicable.

- Employers should be sensitive to the risk of unintentionally pressuring or coercing employees to attend social gatherings if an employee has indicated a religious objection to attending.

**Permitting Prayer, Proselytizing, and Other Forms of Religious Expression**

- Employers should train managers to gauge the actual disruption posed by religious expression in the workplace, rather than merely speculating that disruption may result. Employers should also train managers to identify alternatives that might be offered to avoid actual disruption (e.g., designating an unused or private location in the workplace where a prayer session, study, or meeting can occur if it is disrupting other workers in a different location).

- Employers should incorporate a discussion of religious expression, and the need for all employees to treat each other professionally, regardless of actual or perceived religious or lack of religious beliefs, into any anti-harassment training provided to managers and employees.

### · Employee Best Practices ·

- Employees should advise their supervisors or managers of the nature of the conflict between their religious needs and the work rules.

- Employees should provide enough information to enable the employer to understand what accommodation is needed, and why it is necessitated by a religious observance, practice, or belief.

- Employees who seek to proselytize in the workplace should cease doing so with respect to any individual who indicates that the communications are unwelcome.

## 12-V RELATED FORMS OF DISCRIMINATION

### A. National Origin, Race, and Color

Title VII's prohibition against religious discrimination may overlap with Title VII's prohibitions against discrimination based on national origin, race, and color. Where a given religion is strongly associated – or perceived to be associated – with a certain national origin, the same facts may state a claim of both religious and national origin discrimination.[317] All four bases might be implicated where, for example, coworkers target a dark-skinned Muslim employee from Saudi Arabia for harassment because of his color, religion, national origin, and/or race.[318]

### B. Retaliation

Title VII prohibits retaliation by an employer, employment agency, or labor organization because an individual has engaged in protected activity.[319] Protected activity consists of opposing a practice the employee reasonably believes is made unlawful by one of the employment discrimination statutes or filing a charge, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under Title VII.[320] EEOC has taken the position that requesting a religious accommodation is a protected activity under this provision of Title VII.[321] Retaliation in this context means taking an action against the employee because of her protected activity that "well might

have dissuaded a reasonable worker from making or supporting a charge of discrimination."[322]

### EXAMPLE 56

### Retaliation for Requesting Accommodation

Jenny requests that she be excused from daily employer-sponsored Christian prayer meetings because she is an atheist.

Her supervisor insists that she attend, but she persists in her request that she should be excused and explains that requiring her to attend is offensive to her religious beliefs. She takes her request to human resources and informs them that requiring her to attend these prayer meetings is offensive to her religious beliefs. Despite her supervisor's objections, the human resources department instructs the supervisor that in the circumstances no undue hardship is posed and he must grant the request. Motivated by reprisal, her supervisor shortly thereafter gives her an unjustified poor performance rating and denies her requests to attend training that is approved for similarly situated employees. This retaliation violates Title VII.

## · Employer Best Practices ·

### Retaliation

- Employers can reduce the risk of retaliation claims by training managers and supervisors to be aware of their anti-retaliation obligations under Title VII, including specific actions that may constitute retaliation.

- Employers can help reduce the risk of retaliation claims by carefully and timely recording the accurate business reasons for disciplinary or performance-related actions and sharing these reasons with the employee.

# Addendum on Executive Order Compliance

## Guidance Procedures

### Executive Order 13891

The definition of "guidance" in Executive Order 13891 encompasses this interpretive guidance. *See* Exec. Order No. 13891, 84 Fed. Reg. 155235, 155235 (defining "guidance document"); Memorandum from Dominic J. Mancini, Acting Administrator, Office of Information and Regulatory Affairs, Office of Management and Budget, to Regulatory Policy Officers at Executive Departments and Agencies and Managing Directors of Certain Agencies and Commissions (Oct. 31, 2019), **https://www.whitehouse.gov/wp-content/uploads/2019/10/M-20-02-Guidance-Memo.pdf (https://www.whitehouse.gov/wp-content/uploads/2019/10/M-20-02-Guidance-Memo.pdf)** (explaining the exclusions under E.O. 13891)

**Guidance-Memo.pdf**) (explaining the exclusions under E.O. 13891).

Because the Commission is issuing this document as interpretive guidance, within the recognized constraints of its authority, the Commission concludes that the guidance procedures under Executive Order 13891, as codified in EEOC regulations at 29 CFR 1695.01-.10, apply. Accordingly, the Commission states that:

> The contents of this document do not have the force and effect of law and are not meant to bind the public in any way. Any final document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies.

The EEOC and the Office of Management and Budget (OMB) have determined

that the guidance raises novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in Executive Order 12866. In consequence, it is "significant guidance" within the meaning of Section 2(c) of Executive Order 13891. Pursuant to Section 4(a)(iii)(D) of Executive Order 13891, an agency submitting a significant guidance document to OIRA for review should demonstrate how the guidance document complies with Executive Orders 12866, 13563, 13609,[323] 13771, and 13777.

**Executive Order 12866**

The EEOC has coordinated issuance of the guidance with OMB. Pursuant to Section 3(f) of Executive Order 12866, the EEOC and OMB have determined that the guidance will not have an annual effect on the economy of $100 million or more. It will not adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities. It will not create a serious inconsistency or otherwise interfere with an action taken or planned by another agency, nor will they materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof. It will, however, raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in Executive Order 12866. In consequence, it is "significant regulatory action" within the meaning of section 3(f) of Executive Order 12866.

**Executive Order 13563**

The guidance will maximize net benefits and reduce the burden on the public by clarifying the legal standards applicable to religious discrimination claims, presenting typical scenarios in which religious discrimination may arise, and providing guidance to employers on how to balance the needs of individuals in a diverse religious climate. The guidance is not being issued because of any retrospective review.

**Executive Orders 13771**

**Executive Orders 13771**

The guidance will reduce the burden on the public by clarifying the legal standards the EEOC will apply to religious discrimination claims. The guidance will be an Executive Order 13771 deregulatory action.

**Executive Orders 13777**

Providing clear, accurate guidance that is up to date with current law is part of the Commission's regulatory reform agenda. Therefore, this guidance is being issued as part of the Commission's regulatory reform agenda.

**Congressional Review Act**

Pursuant to 29 C.F.R. § 1695.6(e), the Commission will submit this significant guidance document to Congress under the procedures described in 5 U.S.C. § 801. This guidance is not a "major rule" as defined in 5 U.S.C. § 804(2).

# Addendum Pursuant to 29 C.FR. §1695.6(c) on Major Comments
# on Proposed Compliance Manual on Religious Discrimination
# and EEOC Responses

The EEOC received 71 unique comments[324] from individuals, organizations, and members of Congress on the proposed Compliance Manual on Religious Discrimination, which was posted for public input on **www.regulations.gov (http://www.regulations.gov)** on November 17, 2020. A number of these comments were submitted on behalf of multiple organizations or officeholders, including one on behalf of 51 organizations and another on behalf of 44 organizations. The major comments and the Commission's responses to those comments are summarized below.

## Process

Comment: Numerous organizational and Congressional commenters asserted that there was insufficient opportunity for stakeholder consultation and inadequate time allotted for Commissioner and public input. These commenters requested that the Commission withdraw rather than finalize the proposed guidance. Several commenters also expressed concerns with listening sessions that the General Counsel held and the commenters felt that they undermined the comment period.

Response: The Commission engaged in an internal process and inter-agency consultation before issuing the proposal, and then

provided a standard 30-day public input period. This is the first significant guidance that the Commission has issued under the regulations found at 29 CFR 1695.01-.10, which call for a public comment period and other procedural measures. In 2008, the public was not given an opportunity to comment on a proposed draft of the guidance. The comment period yielded many detailed comments from a wide range of stakeholders representing many differing perspectives. Moreover, issuance of both the proposal and of the final guidance was subject to review and clearance by the Office of Management and Budget. Many public commenters noted that the update is needed and timely. Regarding the General Counsel's listening sessions, these sessions were not organized to receive comments on the proposed guidance. Instead, they were an opportunity for the General Counsel to hear organizations' perspectives on the Commission's enforcement efforts. The General Counsel did not seek comments on the proposed guidance and instead encouraged participants to submit comments through the formal process, if they were interested. Furthermore, the listening sessions in no way prevented the public from having the opportunity to comment.

## Definition of Religion

Comment: Some commenters expressed concern that the draft did not make sufficiently clear that Title VII protects against discrimination based on a lack of religious faith.

Response: The Commission has made additions to reference repeatedly that discrimination based on a lack of religious faith is prohibited.

## Religious Organization Exemption

Comment: Various commenters took issue with the draft's statement that it was an "open question" whether a for-profit corporation can constitute a "religious corporation" within the meaning of section 702(a) of Title VII, 42 U.S.C. § 2000e(1)(a).

Response: The final guidance has deleted this language. Instead, the final guidance observes that although courts have historically relied on for-profit status to indicate that an entity is not a "religious corporation" under § 702(a), the plain text of the statute does not reference for-profit and nonprofit status, and that it is possible courts may be more receptive to finding a for-profit corporation can qualify given language from the Supreme Court's decision in *Hobby Lobby*.

Comment: Many organizational and Congressional commenters asked for

<u>Comment</u>:  Many organizational and Congressional commenters asked for clarification or revision of the proposal's interpretation of the scope of the statutory exemption permitting employment of individuals "of a particular religion" by religious corporations under § 702(a) or religious educational institutions under § 703(e)(2).  Some commenters asked the Commission to state that religious organizations are barred from discrimination based on race, color, sex, national origin, or other bases, even if motivated by a religious belief.  By contrast, others asked for greater clarity that religious organizations are shielded from such claims by the statutory permission to hire individuals "of a particular religion." Additionally, some commenters discussed how the Commission should proceed if a respondent entity invokes the religious organization exception.

> <u>Response</u>:  The final guidance clearly states that religious organizations are subject to the Title VII prohibitions against discrimination on the basis of race, color, sex, national origin (as well as the anti-discrimination provisions of the ADEA, ADA, and GINA), and related retaliation, but are permitted to assert the statutory exemption as an affirmative defense.
>
> The guidance further notes that "[c]ourts have held that the religious organization's assertion that the challenged employment decision was made on the basis of religion is subject to a pretext inquiry, where the employee has the burden to prove pretext."  The guidance discusses  a case where the court found if the religious organization presented "'convincing evidence' that the challenged employment practice resulted from discrimination on the basis of religion," then the religious organization exemption "deprives the EEOC of jurisdiction to investigate further to determine whether the religious discrimination was a pretext for some other form of discrimination."

## Ministerial Exception

<u>Comment</u>:  Some commenters objected to the nature or extent of the Commission's treatment of the ministerial exception.  Others discussed the draft's handling of procedural matters relating to adjudication of the ministerial exception when asserted as a defense.

> <u>Response</u>:  The final guidance has streamlined the discussion of the ministerial exception and has clarified how the Commission will procedurally address assertions of the defense.

## Interaction of Title VII with the First Amendment and the Religious Freedom Restoration Act (RFRA)

<u>Comment</u>:  Numerous commenters asked the Commission to delete or modify references to RFRA as a potential defense to Title VII enforcement by the

government. Some noted the holdings in particular Title VII decisions addressing RFRA defenses, and cited RFRA's legislative history stating it was not intended to modify Title VII.

> Response:  The final guidance refines treatment of the cited authorities in this section, including explanations of the outcome in cases in which RFRA was raised as a defense to EEO enforcement.

Comment:  The National Federation of Independent Business recommended insertion of language guiding EEOC staff to confer with the EEOC Office of Legal Counsel, which may as needed consult with the Department of Justice's Office of Legal Counsel, when matters raise the interaction of the First Amendment or RFRA with statutes enforced by the EEOC.

> Response:  The final guidance includes this type of instruction to EEOC staff.

## Employment Decisions

Comment:  The Sikh Coalition requested that an example in this section be revised to illustrate a claim of unlawful segregation of those who wear religious garb, and also requested various descriptions of ritual practices in this and other sections to improve accuracy and reduce rather than reinforce bias or stereotypes.

> Response:  The final guidance incorporates these recommended changes.

## Harassment

Comment:  Numerous commenters asked the Commission to clarify and further emphasize that consensual non-harassing conversations about religious topics are not potential harassment of coworkers.

> Response:  The final guidance includes additional statements and examples illustrating instances of non-harassing, non-disruptive religious expression.

Comment:  Some commenters recommended that the Commission address whether or when employee statements on private social media may implicate the EEO laws with respect to discrimination, including harassment, either by or against religious employees.

> Response:  The final guidance adds additional authority to the discussion of social media and harassment.

## Interaction of Harassment and Accommodation of Religious Expression

Comment:  With respect to balancing harassment and accommodation obligations, numerous commenters asked the Commission to make clear that employers are permitted to, and should, take remedial action once on notice of unwelcome potential harassment on any basis, even if the harassing conduct is not yet severe or pervasive.

> Response:  The final guidance includes additional language explicitly reiterating an employer's rights and responsibilities under Title VII with respect to coworker complaints about unwelcome harassing conduct.

## Reasonable Accommodation and Undue Hardship

Comment:  Various commenters addressed the Commission's statement in the draft that a denial of religious accommodation absent undue hardship is actionable even if there was not an additional, independent adverse employment action taken against the employee.  Some commenters agreed with the Commission's position and others opposed it.

> Response:  The final guidance maintains the Commission's position, which is also articulated in the existing 2008 document, and has been the subject of past and current litigation brought by the Commission on behalf of applicants and employees who were unlawfully denied religious accommodation.  Requiring an employee to work without religious accommodation where a work rule conflicts with his religious beliefs necessarily alters the terms and conditions of his employment for the worse.

Comment:  Numerous commenters expressed concerns that the Commission's citation to laws enforced by the U.S. Department of Health and Human Services regarding rights of those with objections to participating in certain health care duties could be misleading with respect to the requirements under either those laws or Title VII.

> Response:  The final guidance includes a clear statement that the Commission is referencing these laws for informational purposes and is not opining on any of their requirements or whether they would require additional burdens on employers beyond Title VII's analysis for reasonable accommodation.

Comment:  Commenters offered a range of perspectives on the Supreme Court's 1977 holding that the Title VII undue hardship defense permits an employer to deny any religious accommodation that would impose more than a *de minimis* burden on the operation of the employer's business.  Some commenters believed the Commission's inclusion of a citation to Justice Alito's concurring opinion in the denial of certiorari in *Patterson v. Walgreen Co.*, 140 S. Ct. 685 (2020), expressing that the Court should reconsider this definition, was

potentially confusing or misleading.

Response:  The final guidance deletes this citation to ensure clarity regarding the current legal standard.

---

[**1**] This document uses examples that refer to practices and beliefs of various religions.  These examples are intended to clarify the legal principles for which they are used and do not purport to represent the religious beliefs or practices of all members of the cited religions.  Unless otherwise noted, cases are cited in this document for their holdings under Title VII of the Civil Rights Act of 1964 (Title VII).  In some instances, links to non-EEOC internet sites are provided for the reader's convenience in obtaining additional information; EEOC assumes no responsibility for their content and does not endorse their organizations or

guarantee the accuracy of these sites.  Use of the term "employee" in this document should be presumed to include an applicant and, as appropriate, a former employee.

[**2**] *See* 42 U.S.C. § 2000e(k) (Title VII's prohibition against sex discrimination applies to discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions.");  *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1737 (2020) (holding that Title VII's prohibition of discrimination based on sex, 42 U.S.C. § 2000e-2(a), includes a prohibition of discrimination because of sexual orientation or transgender status).

[**3**]  42 U.S.C. § 2000e-2(a)(1), (2).

[**4**] 42 U.S.C. § 2000e(j).

[**5**] *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977).

[**6**] *Compare Hardison*, 432 U.S. at 84 (interpreting Title VII "undue hardship" standard), *with* 42 U.S.C. § 12111(10)(A) (defining ADA "undue hardship" standard).  *Note:* Various state and local laws extend beyond Title VII in terms of the protected bases covered, the discrimination prohibited, the accommodation required, and the legal standards and defenses that apply.

[**7**] *See, e.g., Cooper v. Gen. Dynamics, Convair Aerospace Div.*, 533 F.2d 163, 168 (5th Cir. 1976) (stating "*all* forms and aspects of religion, however eccentric, are protected").

[**8**] This common formulation derives from the seminal Supreme Court decisions interpreting the conscience exemption in the Military Selective Service Act, 50 U.S.C. § 3806(j).  *See, e.g., Redmond v. GAF Corp.*, 574 F.2d 897, 901 n.12 (7th Cir. 1978) ("We believe the proper test to be applied to the determination of what is 'religious' under § 2000e(j) can be derived from the Supreme Court decisions in *Welsh v. United States*, 398 U.S. 333 (1970), and *United States v. Seeger*, 380 U.S. 163 (1969), i.e., (1) is the 'belief' for which protection is sought 'religious' in person's own scheme of things, and (2) is it

'sincerely held.'" (quoting those decisions)); *Fallon v. Mercy Cath. Med. Ctr.*, 877
F.3d 487, 490-91 (3d Cir. 2017) (applying same test to Title VII claim of religious
discrimination); *Davis v. Fort Bend Cnty.*, 765 F.3d 480, 485 (5th Cir. 2014)
(same); *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 448 (7th Cir. 2013)
(same); *EEOC v. Union Independiente de la Autoridad de Acueductos*, 279 F.3d 49,
56 (1st Cir. 2002) (same); *see also, e.g.*, EEOC Guidelines on Discrimination
Because of Religion, 29 C.F.R. § 1605.1 (stating that EEOC has "consistently
applied" this standard to Title VII).

[**9**] *Fallon*, 877 F.3d at 491 (quoting *Welsh*, 398 U.S. at 340 (quoting *Seeger*, 380
U.S. at 176)).

[**10**] *See, e.g.*, *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1168 (9th Cir. 2007)
(addressing "non-adherence or reverse religious discrimination claim"); *Reed v.
Great Lakes Cos.*, 330 F.3d 931, 933-34 (7th Cir. 2003) ("[F]or these purposes, . . .
'religion' includes antipathy to religion.  And so an atheist . . . cannot be fired
because his employer dislikes atheists."); *Shapolia v. Los Alamos Nat'l Lab'y*, 992
F.2d 1033, 1037 (10th Cir. 1993) (plaintiff claimed he was fired "because he did
not hold the same religious beliefs as his supervisors"); *Young v. Sw. Sav. & Loan
Ass'n*, 509 F.2d 140 (5th Cir. 1975) (finding Title VII violated by requiring atheist
employee to attend prayer portion of business meeting).

[**11**] *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719,
1731-32 (2018) (holding that a state administrative agency's consideration of
baker's First Amendment free exercise claim opposing alleged violation of
public accommodations nondiscrimination law "violated the State's duty under
the First Amendment not to base laws or regulations on hostility to a religion or
religious viewpoint" and apply laws "in a manner that is neutral toward
religion"); *Epperson v. Ark.*, 393 U.S. 97, 103-04 (1968) ("Government in our
democracy, state and national, must be neutral in matters of religious theory,
doctrine, and practice. It may not be hostile to any religion or to the advocacy
of no religion; and it may not aid, foster, or promote one religion or religious
theory against another or even against the militant opposite. The First
Amendment mandates governmental neutrality between religion and religion,
and between religion and nonreligion."); *see also Bd. of Educ. v. Grumet*, 512
U.S. 687, 714 (1994) (O'Connor, J., concurring) ("We have time and again held
that the government generally may not treat people differently based on the

God or gods they worship, or do not worship.").

[**12**]  In fiscal year 2019, EEOC received 2,725 religious discrimination charges,
accounting for 3.7% of all charges filed with the Commission that year.  In fiscal
year 1997, EEOC received 1,709 religious discrimination charges, accounting for
2.1% of all charges filed with the Commission that year.  Statistics regarding the
number of religious discrimination charges filed with the Commission and
dispositions can be found at **https://www.eeoc.gov/data/enforcement-and-
litigation-statistics-0 (https://www.eeoc.gov/data/enforcement-and-
litigation-statistics-0)** .

[**13**]  In general, the principles discussed in this Section apply to Title VII claims against private employers as well as to federal, state, and local public sector employers, unless otherwise noted.  *See* 42 U.S.C. §§ 2000e(a)-(b), 2000e-16(a) *et seq*.  *See, e.g., infra* § 12-I-C-3 ("Additional Interaction of Title VII with the First Amendment and the Religious Freedom Restoration Act (RFRA)").  Claims under various state or local laws may be analyzed under different standards. Investigators should contact the Office of Legal Counsel if questions arise about how to appropriately analyze charges brought against government entities.

[**14**]  42 U.S.C. § 2000e-2.  To determine whether an entity is covered by Title VII, *see* EEOC, Compliance Manual: Threshold Issues (2000), https://www.eeoc.gov/laws/guidance/section-2-threshold-issues [hereinafter Threshold Issues].  Although this document concerns Title VII, employers and employees should note that there may be state and local laws in their jurisdiction prohibiting religious discrimination in employment, some of which may be parallel to Title VII and some of which may afford broader coverage.

[**15**]  See, e.g., *EEOC v. Abercrombie & Fitch Stores, Inc.*, 731 F.3d 1106, 1120 (10th Cir. 2013) ("A religious accommodation claim is distinct from a disparate treatment claim." (quoting EEOC, Compliance Manual: Religious Discrimination § 12-IV (2008)), discussing case law describing disparate treatment and reasonable accommodation as different theories of discrimination), *rev'd and remanded*, 575 U.S. 768, 135 S. Ct. 2028 (2015).

[**16**]  *Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. at 2031-32.

[**17**]  *Id.* at 2032-33.  Since the *Abercrombie* decision was issued, some lower courts have nevertheless continued to characterize denial of accommodation as a distinct cause of action.

[**18**]  42 U.S.C. § 2000e(j); *see Redmond v. GAF Corp.*, 574 F.2d 897, 900 (7th Cir. 1978) (observing that "the very words of the statute . . . leave little room for such a limited interpretation"; "to restrict the act to those practices which are mandated or prohibited by a tenet of the religion, would involve the court in determining not only what are the tenets of a particular religion, which by itself perhaps would not be beyond the province of the court, but would frequently require the courts to decide whether a particular practice is or is not required by the tenets of the religion," a determination that would be "irreconcilable with the warning issued by the Supreme Court" that "'[i]t is no business of courts to say . . . what is a religious practice or activity'" (quoting *Fowler v. Rhode Island*, 345 U.S. 67, 70 (1953))); *see also Emp't Div., Dep't of Hum. Res. v. Smith*, 494 U.S. 872, 887 (1990) (explaining in Free Exercise Clause case that "[r]epeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim").  However, as discussed in this section, Title VII does not cover all beliefs; for example, social, political, or economic philosophies, and mere personal preferences, are not "religious" beliefs within the meaning of the statute.

the meaning of the statute.

**[19]**   *See Thomas v. Rev. Bd.*, 450 U.S. 707, 714 (1981) (ruling that "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection"); *see also Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (holding that although animal sacrifice may seem "abhorrent" to some, Santeria belief is religious in nature and is protected by the First Amendment); *Toronka v. Cont'l Airlines*, 649 F. Supp. 2d 608, 612 (S.D. Tex. 2009) (holding in Title VII case that a moral and ethical belief in the power of dreams that is based on religious convictions and traditions of African descent is a religious belief, and that this determination does not turn on veracity but rather is based on a theory of "'man's nature or his place in the Universe,'" even if considered by others to be "nonsensical" (quoting *Brown v. Dade Christian Schs., Inc.*, 556 F.2d 310, 324

(5th Cir. 1977) (Roney, J., dissenting))); *United States v. Meyers*, 906 F. Supp. 1494, 1499 (D. Wyo. 1995) (relying on First Amendment jurisprudence to observe in Religious Freedom Restoration Act case that "one man's religion will always be another man's heresy").

**[20]**   *Welsh v. United States*, 398 U.S. 333, 339 (1970) (interpreting what is now the Military Selective Service Act, 50 U.S.C. § 3806(j)); *see also Thomas*, 450 U.S. at 716 ("[I]t is not within the judicial function and judicial competence to inquire whether the petitioner or [another practitioner] . . . more correctly perceived the commands of their common faith.  Courts are not arbiters of scriptural interpretation.") (First Amendment).

**[21]**   *United States v. Seeger*, 380 U.S. 163, 166, 176 (1965).  Although *Seeger* arose under what is now the Military Selective Service Act, 50 U.S.C. § 3806(j), the EEOC has "consistently applied this standard" to Title VII, *see Commission Guidelines*, 29 C.F.R. § 1605.1.  The courts have as well.  *See supra* note 8.

**[22]**   *Thomas*, 450 U.S. at 714 ("The determination of what is a 'religious' belief or practice is more often than not a difficult and delicate task. . . . However, the resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."); *Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682, 725 (2014)* ("[I]t is not for us to say that the line [employee] drew [between work that was consistent with religious beliefs and work that was morally objectionable] was an unreasonable one."  (quoting Thomas, 450 U.S. at 715)).

**[23]**   *Commission Guidelines*, 29 C.F.R. § 1605.1 ("The fact that no religious group espouses such beliefs or the fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief of the employee or prospective employee."); *Welsh*, 398 U.S. at 343 (finding that petitioner's beliefs were religious in nature although the church to which he belonged did not teach those beliefs) (Military Selective Service Act); *accord Africa v. Pennsylvania*, 662

F.2d 1025, 1032-33 (3d Cir. 1981) (First Amendment); *Bushouse v. Local Union 2209, United Auto., Aerospace & Agric. Implement Workers of Am.*, 164 F. Supp. 2d 1066, 1076 n.15 (N.D. Ind. 2001) ("Title VII's intention is to provide protection and accommodation for a broad spectrum of religious practices and belief not merely those beliefs based upon organized or recognized teachings of a particular sect.").

[**24**] *Commission Guidelines*, 29 C.F.R. § 1605.1 ("This standard was developed in [*Seeger*] and [*Welsh*]. The Commission has consistently applied this standard in its decisions."); *see Torcaso v. Watkins*, 367 U.S. 488, 489-90 (1961) (ruling that government may not favor theism over pantheism or atheism) (First and Fourteenth Amendments); *Welsh*, 398 U.S. at 339-340 (reiterating that a belief in God or divine beings is not necessary to qualify as a religion; nontheistic beliefs can be religious within the meaning of the statute as long as they "occupy in the life of that individual 'a place parallel to that filled by . . . God' in traditionally religious persons.").

[**25**] *United States v. Meyers*, 906 F. Supp. 1494, 1499 (D. Wyo. 1995) (observing that the threshold for establishing the religious nature of beliefs is low; under the First Amendment, "if there is any doubt about whether a particular set of beliefs constitutes a religion, the Court will err on the side of freedom and find that the beliefs are a religion . . . [because the country's] founders were animated in large part by a desire for religious liberty"), *aff'd*, 95 F.3d 1475, 1482-83 (10th Cir. 1996); *see also Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 887, 887 (1990) (explaining in Free Exercise Clause case that "[r]epeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim").

[**26**] *Meyers*, 906 F. Supp. at 1502 (ruling that religions address "ultimate ideas," i.e., "fundamental questions about life, purpose, and death," and that single-faceted worship of marijuana was not a religion for First Amendment purposes), *aff'd*, 95 F.3d at 1483. "Thus, a genuinely held belief that involves matters of the afterlife, spirituality, or the soul, among other possibilities, qualifies as religion under Title VII." *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 448 (7th Cir. 2013).

[**27**] *Fallon v. Mercy Catholic Med. Ctr. of Se. Pa.*, 877 F.3d 487, 491 (3d Cir. 2017) (quoting *Africa*, 662 F.2d at 1032). Although "religion" is often marked by external manifestations such as ceremonies, rituals or clergy, such manifestations are not required for a belief to be "religious." *See, e.g., Malnak v. Yogi*, 592 F.2d 197, 209-10 (3d Cir. 1979).

[**28**] *See Fallon*, 877 F.3d at 492 (employee's objection to flu vaccine did not qualify as a religious belief protected by Title VII because his beliefs that "one should not harm their own body and . . . that the flu vaccine may do more harm than good" did not "address fundamental and ultimate questions having to do with deep and imponderable matters" and were not "comprehensive in

nature").  Similarly, EEOC and courts have found that the Ku Klux Klan is not a religion within the meaning of Title VII because its philosophy has a narrow, temporal, and political character.  *See* Commission Decision No. 79-06, CCH EEOC Decisions ¶ 6737 (1983); *Bellamy v. Mason's Stores, Inc.*, 368 F. Supp. 1025, 1026 (E.D. Va. 1973), *aff'd*, 508 F.2d 504 (4th Cir. 1974); *Slater v. King Soopers*, 809 F. Supp. 809, 810 (D. Colo. 1992) (dismissing religious discrimination claim by a member of the Ku Klux Klan who allegedly was fired for participating in a Hitler rally because the Ku Klux Klan is "political and social in nature" and is not a religion for Title VII purposes); *see also Brown v. Pena*, 441 F. Supp. 1382, 1385 (S.D. Fla. 1977) (holding that plaintiff's belief that eating cat food contributes to his well-being is a personal preference and not a religion).  In a related context, the Supreme Court has held that, unlike religious beliefs, philosophical and personal beliefs "do[] not rise to the demands of the Religion Clauses." *Wisconsin v. Yoder*, 406 U.S. 205, 216 (1972).  When evaluating whether the belief qualifies as religious, courts should consider whether the belief is merely focused on an "isolated moral teaching" or rather is part of a "comprehensive system of beliefs about fundamental or ultimate matters." *Fallon*, 877 F.3d at 492.

[**29**] *Fallon*, 877 F.3d at 492.  *See also Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 225 (3d Cir. 2000) (addressing merits of Title VII religious accommodation claim based on plaintiff's refusal to participate in medical procedures that terminate a pregnancy); *cf.  Gadling-Cole v. W. Chester Univ.*, 868 F. Supp. 2d 390, 396-97 (E.D. Pa. 2012)(emphasizing that Title VII religious discrimination claims have been held cognizable as to topics that "overlap both

the religious and political spectrum, such as abortion, so long as the claims are based on a plaintiff's bona fide religious belief").

[**30**] *See Yoder*, 406 U.S. at 216 (explaining that "if the Amish asserted their [free exercise] claims [against a compulsory education law] because of their subjective evaluation and rejection of the contemporary secular values accepted by the majority, much as Thoreau rejected the social values of his time and isolated himself at Walden Pond, their claims would not rest on a religious basis").

[**31**] *See Davis v. Fort Bend Cnty.*, 765 F.3d 480, 485, 486-87 (5th Cir. 2014) (holding that whether a practice is religious turns not on the nature of the activity itself, but rather whether the plaintiff "sincerely believed it to be religious in her own scheme of things," and finding the lower court erred in characterizing plaintiff's attendance at service and event breaking ground for a new church and feeding community as "a personal commitment, not religious conviction"); *Redmond v. GAF Corp.*, 574 F.2d 897, 901 (7th Cir. 1978) (finding the employer liable for failing to accommodate employee's participation in Saturday Bible classes pursuant to a sincerely held religious belief given that he was appointed to be lifetime leader of his church Bible study class many years earlier, time of meeting was scheduled by church elders, and employee felt that his participation was at dictate of his elders and constituted a "religious

obligation"); *see also Dachman v. Shalala*, 9 F. App'x 186, 191-93 (4th Cir. 2003) (ruling that plaintiff's accommodation request to be home by time of Sabbath observance was covered by Title VII, but time off sought for tasks that could be performed at another time, such as purchasing ritual foods, cooking, and cleaning in preparation for the observance, was a personal preference that the employer was not required to accommodate); *Jiglov v. Hotel Peabody, GP*, 719 F. Supp. 2d 918, 929-30 (W.D. Tenn. 2010) (holding that a scheduling accommodation request could be covered by Title VII where employee's religious dictates for observance of Russian Orthodox Easter included not only attendance at church service but also a priest's blessing of the family meal, the sharing of the meal, and prayer with family members); *Duran v. Select Med. Corp.*, No. 08-cv-2328-JPM-tmp, 2010 WL 11493117, at *5-6 (W.D. Tenn. Mar. 19, 2010) (holding that a scheduling accommodation request to be able to attend

Christmas Mass was covered by Title VII, but not the family meal and gift exchange that followed).

[**32**] *Cf. Spies v. Voinovich*, 173 F.3d 398, 406-07 (6th Cir. 1999) (ruling there was no obligation to accommodate a vegan diet that an individual conceded was unrelated to his Zen Buddhist religious beliefs); *LaFevers v. Saffle*, 936 F.2d 1117 (10th Cir. 1991) (holding that although not all Seventh-day Adventists are vegetarian, an individual adherent's genuine religious belief in such a dietary practice warrants constitutional protection under the First Amendment).

[**33**] *Compare Fallon*, 877 F.3d at 492-93 (recognizing that anti-vaccination beliefs such as those held by Christian Scientists can be part of a "broader religious faith" and therefore subject to Title VII religious accommodation in some circumstances, but concluding that plaintiff's beliefs did not qualify as religious because he "simply worries about the health effects of the flu vaccine, disbelieves the scientifically accepted view that it is harmless to most people, and wishes to avoid this vaccine."), *with Chenzira v. Cincinnati Child.'s Hosp. Med. Ctr.*, No. 1:11–CV–00917, 2012 WL 6721098, at *4 (S.D. Ohio Dec. 27, 2012) (holding that Title VII could cover a request to be excused from hospital mandatory vaccination policy due to vegan opposition to a vaccine that was animal-tested or contains animal byproducts if plaintiff "subscribe[d] to veganism with a sincerity equating that of traditional religious views," noting her citation to essays about veganism and to Biblical excerpts).

[**34**] *Davis*, 765 F.3d at 486 (quoting *Tagore v. United States*, 735 F.3d 324, 328 (5th Cir. 2013)); *see also Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 452 (7th Cir. 2013) (emphasizing that Title VII has a "broad and intentionally hands-off definition of religion").

[**35**] *See Dettmer v. Landon*, 799 F.2d 929, 932 (4th Cir. 1986) (rejecting argument that witchcraft was a "conglomeration" of "various aspects of the occult" rather than a religion, because religious beliefs need not be "acceptable, logical, consistent or comprehensible to others" to be protected under the First Amendment); *Wash. Ethical Soc'y v. Dist. of Columbia*, 249 F.2d

127, 128 (D.C. Cir. 1957) (holding that ethical society qualifies as a "religious corporation or society" under District of Columbia Tax Statute, and its building is entitled to tax exemption; belief in a Supreme Being or supernatural power is not essential to qualify for tax exemption accorded to "religious corporations," "churches," or "religious societies"). *Compare EEOC v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377, 402 (E.D.N.Y. 2016) (holding, where plaintiff alleged harassment or denial of religious accommodation, that employer's use of conflict resolution program known as "Onionhead" or "Harnessing Happiness" was a "religion" within the meaning of Title VII, since program's system of beliefs and practices was more than intellectual and involved ultimate concerns signifying religiosity, including chants, prayers, and mentions of God, transcendence, and souls), *with Cavanaugh v. Bartelt*, 178 F. Supp. 3d 819, 829-30 (D. Neb. 2016) (ruling that allegation one is a "Pastafarian," a believer in the divine "Flying Spaghetti Monster" who practices the religion of "FSMism," was not a religion within the meaning of Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 1983, or Constitution, but instead "a parody, intended to advance an argument about science, the evolution of life, and the place of religion in public education"), *aff'd*, No. 16-2105 (8th Cir. Sept. 7, 2016).

**[36]** *See EEOC v. Red Robin Gourmet Burgers, Inc.*, No. C04–1291JLR, 2005 WL 2090677, at *3 (W.D. Wash. Aug. 29, 2005) (denying employer's motion for summary judgment on religious accommodation claim arising from employee's refusal to cover his Kemetic religious tattoos to comply with employer's dress code).

**[37]** *See Fallon*, 877 F.3d at 491.

**[38]** *Dockery v. Maryville Acad.*, 379 F. Supp. 3d 704, 718 n.18 (N.D. Ill. 2019) (ruling that "while the 'validity' of a religious belief cannot be questioned, 'the threshold question of sincerity . . . must be resolved in every case'" (quoting *United States v. Seeger*, 380 U.S. 163, 185 (1965)**) (https://1.next.westlaw.com/Link/Document/FullText? findType=Y&serNum=1965125037&pubNum=0000780&originatingDoc=I9cf 9b910544c11e987fd8441446aa305&refType=RP&fi=co_pp_sp_780_185&ori ginationContext=document&transitionType=DocumentItem&contextData= (sc.Search)#co_pp_sp_780_185)** ).

**[39]** *See Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 443 (5th Cir. 2011) (reciting prima facie case for harassment because of religion without reference to inquiry into sincerity of religious belief); *Dixon v. Hallmark Cos.*, 627 F.3d 849 (11th Cir. 2010) (analyzing sincerity of religious belief only with respect to failure-to-accommodate claim, not with respect to discriminatory termination claim).

**[40]** *Cf. Moussazadeh v. Tx. Dep't of Crim. Just.*, 703 F.3d 781, 790 (5th Cir. 2012) (case arising under Religious Land Use and Institutionalized Persons Act (RLUIPA),

[**41**] *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 452 (7th Cir. 2013) (holding that inquiring into sincerity is limited to determining if the asserted belief or practice is in fact the employee's own religious belief; it should not entail considering any matters such as whether employee had a true conversion experience or whether the practices are embedded in his cultural and family upbringing); *see also Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981) ("Particularly in this sensitive area [where employee had quit job producing armaments citing religious objections and claimed that state's denial of unemployment compensation violated the First Amendment], it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker [another Jehovah's Witness who was willing to take the same job] more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation.").

[**42**] *Davis v. Ft. Bend Cnty.*, 765 F.3d 480, 486 (5th Cir. 2014) (quoting *Tagore v. United States*, 735 F.3d 324, 328 (5th Cir. 2013)).

[**43**] *Grayson v. Schuler*, 666 F.3d 450, 454-55 (7th Cir. 2012) (finding in RLUIPA case that Nazirite prisoner's asserted belief in not cutting his hair was sincerely held).

[**44**] *EEOC v. Union Independiente De La Autoridad De Acueductos*, 279 F.3d 49, 57 (1st Cir. 2002).

[**45**] *See, e.g.*, *id.* (holding that evidence the employee had violated a number

of tenets of his professed Seventh Day Adventist faith was sufficient to create a triable issue of fact for jury); *Hansard v. Johns-Manville Prods. Corp.*, No. 1902, 1973 WL 129, at *2 (E.D. Tex. Feb. 16, 1973) (employee's contention that he objected to Sunday work for religious reasons was undermined by his very recent history of Sunday work); *see also Hussein v. Waldorf-Astoria*, 134 F. Supp. 2d 591, 596 (S.D.N.Y. 2001) (employer had a good faith basis to doubt sincerity of employee's professed religious need to wear a beard because he had not worn a beard at any time in his fourteen years of employment, had never mentioned his religious beliefs to anyone at the hotel, and simply showed up for work one night and asked for an on-the-spot exception to the no-beard policy), *aff'd*, 2002 WL 390437 (2d Cir. Mar. 13, 2002).

[**46**] *See, e.g.*, *Brown v. Gen. Motors Corp.*, 601 F.2d 956, 960 (8th Cir. 1979) ("[42 U.S.C.] § 2000e-2(a)(1) does not require an employer to reasonably accommodate the purely personal preferences of its employees" and thus would not have required the employer in this case to bear the costs of "excusing vast numbers of employees who wish to have Friday night off for secular reasons"); *Dachman v. Shalala*, 9 F. App'x 186, 192 (4th Cir. 2001) (holding that employer not required to accommodate Jewish employee's desire to leave work earlier on Friday afternoon to pick up Challah bread instead of doing it on Thursday evening; "Title VII does not protect secular preferences"

(quoting *Tiano v. Dillard Dep't Stores, Inc.*, 139 F.3d 679, 682 (9th Cir. 1998))).

[**47**] *See, e.g., Union Independiente*, 279 F.3d at 57 (fact that employee initially "objected only to certain membership requirements" and "voiced his opposition to any form of union membership after UIA agreed to accommodate him with respect to each practice he had identified" gave rise to jury issue on sincerity).

[**48**] *See, e.g., EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1575 (7th Cir. 1997) (en banc) (finding that Jewish employee proved her request for leave to observe Yom Kippur was based on a sincerely held religious belief even though she had never in her prior eight-year tenure sought leave from work for a religious observance, and conceded that she generally was not a very religious person, where the evidence showed that certain events in her life, including the

birth of her son and the death of her father, had strengthened her religious beliefs over the years); *Cooper v. Oak Rubber Co.*, 15 F.3d 1375 (6th Cir. 1994) (holding that employee held sincere religious belief against working on Saturdays, despite having worked the Friday night shift at plant for approximately seven months after her baptism, where seventeen months intervened before employee was next required to work on Saturday and employee's undisputed testimony was that her faith and commitment to her religion grew during this time); *Cunningham v. City of Shreveport*, 407 F. Supp. 3d 595, 609-10 (W.D. La. 2019) (holding that disputed material facts precluded summary judgment on sincerity where employee who previously grew beard during vacations and extended weekends asserted new religious adherence prompted wearing beard full-time); *EEOC v. IBP, Inc.*, 824 F. Supp. 147, 151 (C.D. Ill. 1993) (holding that Seventh-day Adventist employee's previous absence of faith and subsequent loss of faith did not prove that his religious beliefs were insincere at the time that he refused to work on the Sabbath); *see also Union Independiente*, 279 F.3d at 57 & n.8 (noting the fact that the alleged conflict between plaintiff's beliefs and union membership kept changing might call into question the sincerity of the beliefs or "might simply reflect an evolution in plaintiff's religious views toward a more steadfast opposition to union membership").

[**49**] *See EEOC v. Alamo Rent-A-Car, LLC*, 432 F. Supp. 2d 1006, 1012 (D. Ariz. 2006) (finding that it was Muslim employee's sincerely held religious observance to wear headscarf during Ramadan, even though she did not wear it the rest of the year).

[**50**] *See EEOC v. Triangle Catering, LLC*, No. 5:15-CV-00016-FL, 2017 WL 818261, at *9 (E.D.N.C. Mar. 1, 2017) (holding that reasonable factfinder could conclude employee had sincerely held religious belief in wearing religious garb if it credited his explanation for not having worn it to job interview for fear of hiring discrimination).

[**51**] *See Commission Guidelines*, 29 C.F.R. § 1605.1; *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 452-54 (7th Cir. 2013) (holding that employee

*Sweeteners, LLC*, 721 F.3d 444, 452-54 (7th Cir. 2013) (holding that employee presented sufficient evidence to show that his request to attend his father's

funeral in Nigeria to perform specific rites, traditions, and customs "was borne from his own personally and sincerely held religious beliefs" because "participating in the rites and traditions identified by his father is a necessary part of [the employee's] religious observance" even though  employee's religious practices "were not identical to the religious practices his family observes in Nigeria").

[**52**] *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 475 (7th Cir. 2001) (finding that employee's belief that she needed to use the phrase "Have a Blessed Day" was a religious practice covered by Title VII even though using the phrase was not a requirement of her religion); *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1438 (9th Cir. 1993); *see also Adeyeye*, 721 F.3d at 452 ("It is not within our province to evaluate whether particular religious practices or observances are necessarily orthodox or even mandated by an organized religious hierarchy.").

[**53**] Title 42 U.S.C. § 2000e-2(a) applies to employers with fifteen or more employees.  *See* 42 U.S.C. § 2000e(b). Section 2000e-2(b) applies to employment agencies, stating it is unlawful for employment agencies to "fail or refuse to refer for employment, or otherwise to discriminate against, any individual because of his . . . religion . . . or to classify or refer for employment any individual on the basis of his . . . religion . . . ."  Section 2000e-2(c) applies to unions, stating it is unlawful for unions to "(1) to exclude or expel from membership, or otherwise to discriminate against, any individual because of his . . . religion . . . ; (2) to limit, segregate or classify its membership or applicants . . . or to refuse to refer for employment any individual . . . because of such individual's . . . religion . . . ; or (3) to cause or attempt to cause an employer to discriminate . . . in violation of this section."

[**54**] *See* Threshold Issues, *supra* note 14.

[**55**] *See, e.g.*, *EEOC v. Union Independiente De La Autoridad De Acueductos*, 279 F.3d 49 (1st Cir. 2002); *Bushouse v. Local Union 2209*, 164 F. Supp. 2d 1066 (N.D. Ind. 2001).  For further discussion see *infra* §§ 12-II, 12-III, and 12-IV, including 12-IV-C-5.

[**56**] *See Goodman  v. Lukens Steel Co*., 482 U.S. 656, 668-69 (1987) (holding that unions violated "§ 703(c)(1) [of Title VII, which] makes it an unlawful practice for a Union to 'exclude or to expel from its membership, or otherwise to discriminate against, any individual'" when they "ignored [racial] discrimination claims . . . , knowing that the employer was discriminating in violation of the contract"); *Rainey v. Town of Warren*, 80 F. Supp. 2d 5, 17 (D.R.I. 2000) ("It is axiomatic that a union's failure to adequately represent union members in the face of employer discrimination may subject the union to liability under either Title VII or its duty of fair representation.").  To the extent it has been held that a union cannot be held liable where it knowingly acquiesces

in discrimination, the EEOC disagrees. *See EEOC v. Pipefitters Ass'n Local Union 597*, 334 F.3d 656 (7th Cir. 2003); *see also Burton v. Freescale Semiconductor, Inc.*, 789 F.3d 222, 229 (5th Cir. 2015) ("A staffing agency is liable for the discriminatory conduct of its joint-employer client if it participates in the discrimination, or if it knows or should have known of the client's discrimination and fails to take corrective measures within its control.").

**[57]** Section 702(a) of Title VII, 42 U.S.C. § 2000e-1(a), provides:

> [Title VII] shall not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

Section 703(e)(2) of Title VII, 42 U.S.C. § 2000e-2(e)(2) provides:

> [I]t shall not be an unlawful employment practice for a school, college, university, or educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.

The Americans with Disabilities Act (ADA) also provides religious entities with two defenses to claims of discrimination that arise under Title I, the ADA's employment provisions. The first provides that "[t]his subchapter shall not prohibit a religious corporation, association, educational institution, or society from giving preference in employment to individuals of a particular religion to perform work connected with the carrying on by such [entity] of its activities." 42 U.S.C. § 12113(d)(1). The second provides that "[u]nder this subchapter, a religious organization may require that all applicants and employees conform to the religious tenets of such organization." 42 U.S.C. § 12113(d)(2).

**[58]** *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 624 (6th Cir. 2000); *see also Garcia v. Salvation Army*, 918 F.3d 997, 1003 (9th Cir. 2019) ("In applying the [religious organization exemption], we determine whether an institution's 'purpose and character are primarily religious' by weighing '[a]ll significant religious and secular characteristics.'" (quoting *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 618 (9th Cir. 1988)) (second alteration in original)); *LeBoon v. Lancaster Jewish Cmty. Ctr.*, 503 F.3d 217, 226 (3d Cir. 2007) (applying similar "primarily religious" standard); *Killinger v. Samford Univ.*, 113 F.3d 196, 198-99 (11th Cir. 1997) (looking at specific facts to determine whether university was "religious" or "secular").

**[59]** *LeBoon*, 503 F.3d at 226; *but see Spencer v. World Vision, Inc.*, 633 F.3d 723,

**[59]** *LeBoon*, 503 F.3d at 226, *but see Spencer v. World Vision, Inc.*, 633 F.3d 723, 730-33 (O'Scannlain, J. concurring) (expressing concern that "several of the *LeBoon* factors could be constitutionally troublesome if applied to this case").

**[60]**  In *Hall*, 215 F.3d at 624-25, the Sixth Circuit, looking to "all the facts," found that a college of health sciences was a Title VII religious organization because it was an affiliated institution of a church-affiliated hospital, it had a direct relationship with the Baptist church, and the college atmosphere was permeated with religious overtones.  In *Spencer v. World Vision, Inc.*, 633 F.3d 723, 724 (9th Cir. 2011) (per curiam) the Ninth Circuit held that an entity is "eligible" for the exemption, at least, if the entity (1) is organized for a religious purpose; (2) is engaged primarily in carrying out that religious purpose; (3) holds itself out to the public as an entity for carrying out that religious purpose; and (4) does not engage primarily or substantially in the exchange of goods or

services for money beyond nominal amounts.  One judge in *Spencer* took the view that the exemption is met if the entity is a non-profit and satisfies the first three factors, *id.* at 734 (O'Scannlain, J., concurring), and another judge took the view that the Salvation Army, for example, would satisfy the "nominal amounts" standard of the fourth factor, notwithstanding that it generates a large-dollar amount of sales revenue, because it "gives its homeless shelter and soup kitchen services away, or charges nominal fees."  *Id.* at 747 (Kleinfeld, J., concurring).  In *Garcia*, 918 F.3d at 1003-04, the Ninth Circuit held that the Salvation Army is a religious organization under Title VII by applying the *Spencer* test under either judge's formulation.  In *LeBoon*, 503 F.3d at 226-29, the Third Circuit found that a Jewish community center was a Title VII religious organization where, among other factors, the center "identified itself as Jewish," relied on coreligionists for financial support, offered instructional programs with Jewish content, began its Board of Trustees meetings with biblical readings, and involved rabbis from three local synagogues in its management).  *See also Killinger*, 113 F.3d at 199-200 (university founded as a theological institution by the Alabama Baptist State Convention qualified as a "religious educational institution" under Title VII; the court noted that all Trustees must be Baptist, the Convention is the university's largest single source of funding, and the school's charter designates its chief purpose as "the promotion of the Christian Religion throughout the world by maintaining and operating … institutions dedicated to the development of Christian character in high scholastic standing.").

**[61]** *LeBoon*, 503 F.3d at 229 (holding that a Jewish community center was a religious organization under Title VII, despite engaging in secular activities such as secular lectures and instruction with no religious content, employing overwhelmingly Gentile employees, and failing to ban non-kosher foods, and noting that a religiously affiliated newspaper and a religious college had also been found covered by the exemption).  However, in *LeBoon*, the court did state that "the religious organization exemption would not extend to an enterprise involved in a wholly secular and for-profit activity."  *LeBoon*, 503 F.3d at 229; *see also Townley Enq'q & Mfg. Co.*, 859 F.2d at 619 (holding that evidence the

company was for profit, produced a secular product, was not affiliated with a church, and did not mention a religious purpose in its formation documents, indicated that the business was not "primarily religious" and therefore did not qualify for the religious organization exemption). In *Garcia v. Salvation Army*, 918 F.3d 997, 1003 (9th Cir. 2019), the court cited *Townley* as the governing precedent for defining a religious organization.

[**62**] In *Hobby Lobby*, a case interpreting the term "person" under RFRA, the Supreme Court briefly referenced Title VII's religious organization exemption in response to the U.S. Department of Health and Human Services' (HHS) argument that "statutes like Title VII . . . expressly exempt churches and other nonprofit religious institutions but not-for-profit corporations." 573 U.S. at 716. The Court did not expressly agree with HHS's characterization but noted that other statutes "*do* exempt categories of entities that include for-profit corporations from laws that otherwise require these entities to engage in activities to which they object on grounds of conscience." *Id*. "If Title VII and similar laws show anything, it is that Congress speaks with specificity when it intends a religious accommodation not to extend to for-profit corporations." *Id*. at 717. It should be noted that, despite HHS's assertion in its *Hobby Lobby* brief, section 702(a) does not expressly distinguish "religious" entities based on for-profit or nonprofit status.

[**63**] *Cf. id.* at 702, 708 (in a non-Title VII case, rejecting the argument that "'for-profit, secular corporations cannot engage in religious exercise' within the meaning of [the Religious Freedom Restoration Act (RFRA)] or the First Amendment," and holding that RFRA's protections for any "person" whose religious free exercise is substantially burdened by the government is not limited to nonprofits and includes for-profit closely held corporations providing secular goods or services because "no conceivable definition of the term ['person'] includes natural persons and nonprofit corporations, but not for-profit corporations"); *see Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 349 (1987) (O'Connor, J., concurring) (recognizing that it is an open question regarding application of Title VII's religious organizations exemption under section 702 to for-profit organizations, specifically mentioning possible Establishment Clause issues with respect to for-profit organizations).

[**64**] 42 U.S.C. § 2000e-1(a). The Supreme Court, in dicta in a case focused on religious discrimination, has characterized section 702 by stating it "exempts religious organizations from Title VII's prohibition against discrimination on the basis of religion." *Amos*, 483 U.S. at 329. Section 703(e)(2) states, "it shall not be an unlawful employment practice" for certain schools, colleges, universities, or other educational institutions "to hire or employ employees of a particular religion." 42 U.S.C. § 2000e-2(e)(2).

[**65**] *See Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189, 192 (4th Cir. 2011) (holding that exemption "does not exempt religious organizations from Title

(holding that exemption "does not exempt religious organizations from Title VII's provisions barring discrimination on the basis of race, gender, or national origin"); *Boyd v. Harding Acad. of Memphis, Inc.*, 88 F.3d 410, 413 (6th Cir. 1996) (stating that the exemption "does not … exempt religious educational institutions with respect to all discrimination"); *DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 173 (2d Cir. 1993) ("religious institutions that otherwise qualify as 'employer[s]' are subject to Title VII provisions relating to discrimination based on race, gender and national origin"); *Rayburn v. Gen. Conf. of Seventh-day Adventists*, 772 F.2d 1164, 1166 (4th Cir. 1985) ("While the language of § 702 makes clear that religious institutions may base relevant hiring decisions upon religious preferences, Title VII does not confer upon religious organizations a license to make those same decisions on the basis of race, sex, or national origin."); *cf. Garcia*, 918 F.3d at 1004-5 (holding that Title VII retaliation and hostile work environment claims related to religious discrimination were barred by religious organization exception, but adjudicating disability discrimination claim on the merits).

[**66**] 42 U.S.C. § 2000e-2(e) ("Notwithstanding any other provision of [Title VII], it shall not be an unlawful employment practice for [certain religious educational organizations] . . . to hire and employ employees of a particular religion . . . .").

[**67**] Courts take varying approaches regarding the causation standard and proof frameworks to be applied in assessing this defense. *See Kennedy*, 657 F.3d 189 at 193-94 (holding that plaintiff's claims of discharge, harassment, and retaliation based on religion were covered by section 702(a) religious

exemption and thus barred); *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 141 (3d Cir. 2006) ("Thus, we will not apply Title VII to [plaintiff's sex discrimination] claim because Congress has not demonstrated a clear expression of an affirmative intention that we do so in situations where it is impossible to avoid inquiry into a religious employer's religious mission or the plausibility of its religious justification for an employment decision."); *DeMarco*, 4 F.3d at 170-71 ("[T]he [*McDonnell Douglas*] inquiry is directed toward determining whether the articulated purpose is the actual purpose for the challenged employment-related action."); *EEOC v. Miss. Coll.*, 626 F.2d 477, 485 (5th Cir. 1980) (holding race and sex discrimination claims barred by section 702 exemption where religious employer presents "convincing evidence" that employment practice was based on the employee's religion).

[**68**] "For the purposes of this subchapter … [t]he term "religion" includes all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j).

[**69**] *See Curay-Cramer*, 450 F.3d at 141 (distinguishing the case "from one in which a plaintiff avers that truly comparable employees were treated differently following substantially similar conduct"); *DeMarco*, 4 F.3d at 171 (stating pretext inquiry "focuses on . . . whether the rule applied to the plaintiff has been applied uniformly"); *EEOC v. Fremont Christian Sch.*, 781 F.2d 1362,

has been applied uniformly"); *EEOC v. Fremont Christian Sch.*, 781 F.2d 1362, 1368 n.1 (9th Cir. 1986) (finding that Title VII's exemption did not apply when the religious employer's practice and justification were "conclusive[ly]" a pretext for sex discrimination).

[**70**] *See Curay-Cramer*, 450 F.3d at 141 ("[T]he existence of [section 702(a)] and our interpretation of its scope prevent us from finding a clear expression of an affirmative intention on the part of Congress to have Title VII apply when its application would involve the court in evaluating violations of [Catholic] Church doctrine."); *DeMarco*, 4 F.3d at 170-71 ("The district court reasoned that, where employers proffered religious reasons for challenged employment actions, application of the *McDonnell Douglas* test would require 'recurrent inquiry as to the value or truthfulness of church doctrine,' thus giving rise to constitutional concerns.  However, in applying the *McDonnell Douglas* test to

determine whether an employer's putative purpose is a pretext, a fact-finder need not, and indeed should not, evaluate whether a defendant's stated purpose is unwise or unreasonable.  Rather, the inquiry is directed toward determining whether the articulated purpose is the actual purpose for the challenged employment-related action." (citations omitted)); *cf. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 725 (2014) (in determining whether an agency rule contravened a closely held corporation's rights under the Religious Freedom Restoration Act, "it is not for the Court to say that . . . religious beliefs are mistaken or unreasonable"; rather the Court's "'narrow function . . . is to determine' whether the plaintiffs' asserted religious belief reflects 'an honest conviction'").

[**71**] *Fremont Christian Sch.*, 781 F.2d at 1367 n.1; *see also Miss. Coll.*, 626 F.2d at 486 (if evidence disclosed that the college "in fact" did not consider its religious preference policy in determining which applicant to hire, section 702 did not bar EEOC investigation into applicant's sex discrimination claim).

[**72**] *Fremont Christian Sch.*, 781 F.2d at 1366 (quoting *Miss. Coll.*, 626 F.2d at 485).

[**73**] *See Garcia v. Salvation Army*, 918 F.3d 997, 1007 (9th Cir. 2019) (holding that Title VII's religious organizations exemption is not jurisdictional and can be waived if not timely raised in litigation). "Because Congress did not rank the religious exemption as jurisdictional, this Court will 'treat the restriction as nonjurisdictional in character.'" *Smith v. Angel Food Ministries, Inc.*, 611 F. Supp. 2d 1346, 1351 (M.D. Ga. 2009) (quoting *Arbaugh*, 546 U.S. 500, 515 (2006)).

[**74**] *See Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 339 (1987) (addressing the issue of whether the § 702 exemption to the secular nonprofit activities of religious organizations violates the Establishment Clause of the First Amendment, the Court held that "as applied to the nonprofit activities of religious employers, § 702 is rationally related to the legitimate purpose of alleviating significant governmental interference with the ability of religious organizations to define and carry out

interference with the ability of religious organizations to define and carry out
their religious missions"); *Kennedy v. St. Joseph's Ministries, Inc.*, 657 F.3d 189,
192 (4th Cir. 2011) ("The revised [religious organization exemption] provision,
adopted in 1972, broadens the exemption to include any activities of religious
organizations, regardless of whether those activities are religious or secular in
nature.").

[**75**] *Little v. Wuerl*, 929 F.2d 944, 951 (3d Cir. 1991) (holding religious
organization exemption barred religious discrimination claim by parochial
school teacher who was discharged for failing to follow church canonical
procedures with respect to annulment of a first marriage before remarrying).

[**76**] *See* 42 U.S.C. § 2000e(j) (defining religion to include "all aspects of
religious observance and practice, as well as belief"); *see also Little*, 929 F.2d at
951 (concluding that "the permission to employ persons 'of a particular
religion' includes permission to employ only persons whose beliefs and
conduct are consistent with the employer's religious precepts").

[**77**] *Hall v. Baptist Mem'l Health Care Corp.*, 215 F.3d 618, 624 (6th Cir. 2000);
*see, e.g.*, *Killinger v. Samford Univ.*, 113 F.3d 196, 200 (11th Cir. 1997) (holding
that under religious organization exemption School of Divinity need not employ
professor who did not adhere to the theology advanced by its leadership);
*Little*, 929 F.2d at 951 (holding that religious organization exemption barred
religious discrimination claim challenging parochial school's termination of
teacher who had failed to validate her second marriage by first seeking an
annulment of her previous marriage through the canonical procedures of the
Catholic church).

[**78**] *See Hall*, 215 F.3d at 625 (finding that Title VII's religious organization
exemption was not waived by  the employer's receipt of federal funding or
holding itself out as an equal employment opportunity employer);  *Little*, 929
F.3d at 951 (finding that Title VII's religious organization exemption was not
waived by Catholic school knowingly hiring a Lutheran teacher); *see also Garcia
v. Salvation Army*, 918 F.3d 997, 1007 (9th Cir. 2019) (holding that Title VII's
religious organization exemption is not jurisdictional and can be waived).

[**79**] "In this context, there are circumstances, like those presented here, where
a religious institution's ability to 'create and maintain communities composed
solely of individuals faithful to their doctrinal practices' will be jeopardized by a

plaintiff's claim of gender discrimination."  *Curay-Cramer,* 450 F.3d at 140-42
(affirming dismissal under the religious organization exemption and First
Amendment grounds of Catholic school teacher's claim that her termination for
signing pro-choice newspaper advertisement constituted sex discrimination
under Title VII; evaluating the plaintiff's claim that male employees were
treated less harshly for different conduct that violated church doctrine (e.g.,
opposition to the Iraq war) would require the court to "measure the degree of
severity of various violations of Church doctrine" in violation of the First
Amendment); *see also Miss. College*, 626 F.2d at 485  (holding that a plaintiff is

barred from proceeding with a Title VII suit if a religious employer presents "convincing evidence" that the employment practice was based on a religious preference).

[**80**] *Id.* at 141 ("We distinguish this case from one in which a plaintiff avers that truly comparable employees were treated differently following substantially similar conduct . . . Requiring a religious employer to explain why it has treated two employees who have committed essentially the same offense differently poses no threat to the employer's ability to create and maintain communities of the faithful.")

[**81**] 565 U.S. 171 (2012).

[**82**] *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049, 2061 (2020).

[**83**] *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 188-89 (2012).

[**84**] *Our Lady of Guadalupe,* 140 S. Ct. at 2060.

[**85**] *Hosanna-Tabor*, 565 U.S, at 195 n.4 ("We conclude that the exception operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar."); *Our Lady of Guadalupe*, 140 S. Ct. at 2055.

[**86**] *Id.*; *see also Hosanna-Tabor*, 565 U.S. at 188 (agreeing that the ministerial exception "precludes application of such legislation to claims concerning the employment relationship between a religious institution and its ministers"). There is a split in the courts on whether ministerial employees can bring EEO harassment claims. *Compare Elvig v. Calvin Presbyterian Church*, 375 F.3d 951, 953 (9th Cir. 2004) (holding that the ministerial exception does not bar sexual harassment and retaliation claims that do not "implicate the Church's ministerial employment decisions"), *and Clement v. Roman Catholic Diocese of Erie*, No. 16-117, 2017 WL 2619134, at *4 n.3 (W.D. Pa. June 16, 2017) (ruling that sexual harassment claim by ministerial employee was not barred because *Hosanna-Tabor* expressly limited its holding to employment discrimination claims based on hiring and termination decisions and left open whether the ministerial exception bars other types of claims), *with Skrzypczak v. Roman Catholic Diocese of Tulsa*, 611 F.3d 1238, 1246 (10th Cir. 2010) (holding that minister's hostile work environment claim was barred under ministerial exception), *and Preece v. Covenant Presbyterian Church*, No. 8:13CV188, 2015 WL 1826231, at *7 (D. Neb. Apr. 22, 2015) (holding that the ministerial exception barred sexual harassment claim because it "clearly implicate[d] an internal church decision and management"). The Court in *Our Lady of Guadalupe* did not address this precise question. On one hand, the Court emphasized that "*the selection and supervision* of the teachers upon whom the schools rely to do this work lie at the core of their mission." 140 S. Ct. at 2055 (emphasis added); *see also id.* at 2060 ("at a component of [a religious institution's] autonomy is the selection of the individuals who play certain key roles"); *id.* ("a church's

the selection of the individuals who play certain key roles.'"); *id.* ("A church's independence on matters 'of faith and doctrine' requires the authority to select, supervise, and if necessary, remove a minister without interference by secular authorities."). On the other hand, the Court stated broadly, "[w]hen a school with a religious mission entrusts a teacher with the responsibility of educating and forming students in the faith, *judicial intervention into disputes between the school and the teacher* threatens the school's independence in a way that the First Amendment does not allow." *Id*. at 2069 (emphasis added); *see also id.* at 2060 ("Under [the ministerial exception] rule, courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions.").

[**87**] *Id*. at 2061.

[**88**] *Id.*

[**89**] *Id.* at 2060; *see also Hosanna-Tabor*, 565 U.S. at 184 ("The Establishment Clause prevents the Government from appointing ministers, and the Free Exercise Clause prevents it from interfering with the freedom of religious groups to select their own.").

[**90**] *Our Lady of Guadalupe*, 140 S. Ct. at 2060.

[**91**] *Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 310 (4th Cir. 2004) (Fair Labor Standards Act ("FLSA")).

[**92**] *See Conlon v. InterVarsity Christian Fellowship*, 777 F.3d 829, 834 (6th Cir. 2015) (holding that to invoke the ministerial exception "an employer need not be a traditional religious organization such as a church, diocese, or synagogue, or an entity operated by a traditional religious organization"); *see, e.g., Penn v. N.Y. Methodist Hosp.*, 884 F.3d 416, 424-25 (2d Cir. 2018) (although it was a "close question," the district court did not err in finding that hospital, which was no longer affiliated with the United Methodist Church and took steps to distance itself from its religious heritage, was a 'religious group,' at least with respect to its Department of Pastoral Care," because the Department's operations were "marked by clear or obvious religious characteristics"); *Grussgott v. Milwaukee Jewish Day Sch., Inc.*, 882 F.3d 655 (7th Cir. 2018) (Jewish day school was religious institution for purposes of applying the ministerial exception where school had a rabbi on staff and maintained its own chapel and Torah scrolls, and students were taught Jewish studies and Hebrew and engaged in daily prayer); *Conlon*, 777 F.3d at 829, 833-34 (parachurch campus student organization "whose purpose is to advance the understanding and practice of Christianity in colleges and universities" was a religious organization); *Shaliehsabou*, 363 F.3d 299 (Hebrew nursing home is a religious institution for purposes of applying the ministerial exception to the FLSA where its bylaws define it as a religious and charitable nonprofit and declare that its mission is to provide elder care to "aged of the Jewish faith in accordance with the precepts of Jewish law and customs"; pursuant to that mission, the nursing home maintained a rabbi on staff, employed mashgichim to ensure compliance with

Jewish dietary laws, and placed a mezuzah on every resident's doorpost); *Yin v. Columbia Int'l Univ.*, 335 F. Supp. 3d 803 (D.S.C. 2018) (religious university that

"trains Christians for global missions, full-time vocational Christian ministry in a variety of strategic professions, and marketplace ministry" and "educates people from a biblical worldview" could invoke exception).

[**93**] *See Our Lady of Guadalupe*, 140 S. Ct. at 2058-59 (the schools maintained that their decisions were based on "classroom performance—specifically, [the teacher's] difficulty in administering a new reading and writing program"—and "poor performance—namely, a failure to observe the planned curriculum and keep an orderly classroom").

[**94**] 140 S. Ct. at 2066.

[**95**] *Hosanna-Tabor*, 565 U.S. at 190.

[**96**] *Our Lady of Guadalupe*, 140 S. Ct. at 2055, 2062; *Hosanna-Tabor*, 565 U.S. at 190-92 (holding that the ministerial exception applied to a parochial school teacher, because she pursued a rigorous religious course of study to become a "called" teacher, which included being ordained and receiving the title of "minister," she held herself out as a minister of the church, she led daily prayers and occasional chapel services, and she provided religious instruction).

[**97**] *Hosanna-Tabor*, 565 U.S. at 193.

[**98**] *Our Lady of Guadalupe*, 140 S. Ct. at 2064.

[**99**] *Id.* at 2064, 2068.

[**100**]  *Hosanna-Tabor*, 565 U.S. at 193-94 (pointing out that the "heads of congregations themselves often have a mix of duties, including secular ones").

[**101**]  140 S. Ct. at 2063.

[**102**]  *Id.* at 2067.

[**103**]  *Id.* at 2064; *see also Hosanna-Tabor*, 565 U.S. at 194 (explaining that, while relevant, the considerations "cannot be considered in isolation, without regard to the nature of the religious functions performed").

[**104**]  *Id.*

[**105**]  *See id*. at 2056, 2060, 2067 n.26, 2068-69; *Hosanna-Tabor*, 565 U.S. at 190.

[**106**]  *Grussgott v. Milwaukee Jewish Day Sch., Inc*., 882 F.3d 655, 655 (7th Cir. 2018) (finding claims by parochial school Hebrew and Jewish studies teacher barred); *Fratello v. Archdiocese of N.Y.*, 863 F.3d 190 (2d Cir. 2017) (finding claims by parochial school principal barred); *Lishu Lin v. Columbia Int'l Univ.*, 335 F. Supp. 3d 803 (D.S.C. 2018) (finding claims by faculty member with secular titles barred where she trained Christians for ministry and educated students from a

barred where one trained Christians for ministry and educated students from a biblical worldview to spread religious message).

[**107**]  *Sterlinski v. Cath. Bishop of Chi.*, 934 F.3d 568 (7th Cir. 2019) (finding claim by church organist barred); *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169 (5th Cir. 2012) (finding claims by church music director barred).

[**108**]  *Penn v. N.Y. Methodist Hosp.*, 884 F.3d 416 (2d Cir. 2018) (finding claims by hospital chaplain barred, viewing chaplaincy department as a religious organization though hospital was not); *Conlon*, 777 F.3d 829 (finding claim by staff spiritual director of fellowship organization barred); *Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 309 (4th Cir. 2004) (given "the importance of dietary laws to the Jewish religion," "mashgiach" (kosher supervisor) at Hebrew Home was ministerial employee for purposes of FLSA).

[**109**]  140 S. Ct. at 2055, 2065, 2069.

[**110**]  *Id.* at 2067 n.26.

[**111**]  *Id.* at 2066.

[**112**]  *Id.*

[**113**]  *See Conlon*, 777 F.3d at 836 (explaining that "[t]he ministerial exception is a structural limitation imposed on the government by the Religion Clauses").

[**114**]  *See Fratello v. Archdiocese of N.Y.*, 863 F.3d 190, 198 (2d Cir. 2017) (stating that "the district court appropriately ordered discovery limited to whether [plaintiff] was a minister within the meaning of the exception" when it found that it could not determine whether the ministerial exception applied on a motion to dismiss).

[**115**]  *See Lee v. Sixth Mount Zion Baptist Church*, 903 F.3d 113, 118 n.4 (3d Cir. 2018) (noting that although the district court first raised the ministerial exception, "the Church [wa]s not deemed to have waived it because the exception is rooted in constitutional limits on judicial authority"); *Conlon*, 777 F.3d at 836 ("The Court's clear language [in *Hosanna-Tabor*] recognizes that the Constitution does not permit private parties to waive the First Amendment's ministerial exception."); *but see Hamilton v. Southland Christian School, Inc.,* 680 F.3d 1316, 1318 (11th Cir. 2012) (finding that the school had waived its ministerial exception defense on appeal by not sufficiently arguing it in its brief).

[**116**]  The First Amendment religion and speech clauses provide that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech."  RFRA, 42 U.S.C. § 2000bb-1(a) and (b), provides: "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except . . . if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is

the least restrictive means of furthering that compelling governmental interest."  RFRA defines "government" to include "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States."  *Id*. § 2000bb-2(1).  "Although the claim is statutory, RFRA protects First Amendment free-exercise rights," *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013), because it was enacted in response to *Employment Division v. Smith*, 494 U.S. 872, 887 (1990), and designed to "restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened."  42 U.S.C. § 2000bb(b)(1). The First Amendment applies only to restrictions imposed by the government— federal or state—not by private parties.  *See Cantwell v. Connecticut*, 310 U.S. 296 (1940).  RFRA applies only to restrictions imposed by the federal government, not by state governments or private parties.  *See* 42 U.S.C.

§ 2000bb-2(1); *City of Boerne v. Flores*, 521 U.S. 507 (1997); *Guam v. Guerrero*, 290 F.3d 1210 (9th Cir. 2002); *Kikumura v. Hurley*, 242 F.3d 950 (10th Cir. 2001).

[**117**]  *See e.g., Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 138 (3d Cir. 2006) (claim that Catholic school engaged in gender discrimination in violation of Title VII could raise "serious constitutional questions" because it required more than limited inquiry into pretext); *cf. Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1754 (2020) ("Because RFRA operates as a kind of super statute, displacing the normal operation of other federal laws, it might supersede Title VII's commands in appropriate cases.").

Some courts have examined an employer's defense to an EEOC action that a nondiscrimination requirement would conflict with their exercise of religion under RFRA, although unsuccessfully thus far.  *See EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir. 2018) (considering but rejecting employer's defense that application of Title VII sex nondiscrimination requirement to its hiring decisions would substantially burden its exercise of religion under RFRA); *EEOC v. Preferred Mgmt. Corp.*, 216 F. Supp. 2d 763, 810 (S.D. Ind. 2002) (same for Title VII religious nondiscrimination and non-harassment requirements).  Other courts have held that a RFRA defense does not apply in suits involving only private parties.  *See, e.g., Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 736-37 (7th Cir. 2015) (RFRA inapplicable where the government is not a party, in part because if the government is not a party, it cannot demonstrate a "compelling government interest" as RFRA requires); *Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402 (6th Cir. 2010) (finding RFRA inapplicable in trademark infringement case).  The Second Circuit has held that an employer could raise RFRA as defense to an employee's Age Discrimination in Employment Act (ADEA) claim, because the ADEA is enforceable both by the EEOC and private litigants, but a number of other circuits have disagreed with that reasoning.  *Compare Hankins v. Lyght*, 441 F.3d 96, 103 (2d Cir. 2006) *with General Conference Corp. of Seventh Day Adventists v. McGill*, 617 F.3d 402, 411 (6th Cir. 2006) (declining to follow *Hankins* based on the text in RFRA), *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036,

1042 (7th Cir. 2006) ("The [*Hankins*] decision is unsound. RFRA is applicable only in suits to which the government is a party."), *abrogated on other grounds*

*by Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 132 S. Ct. 694 (2012), *and Mathis v. Christian Heating Air Conditioning, Inc.*, 158 F. Supp. 3d 317, 326 (E.D. Pa. 2016) (disagreeing with *Hankins* and finding that RFRA does not apply if the government is not a party). One circuit court has found that RFRA's broad definition of "government" to include any branch of the federal government might allow a court to find sufficient government involvement in lawsuits between private parties to allow for a RFRA defense to apply. *See In re Young,* 82 F.3d 1407, 1417 (8th Cir. 1996) ("The bankruptcy code is federal law, the federal courts are a branch of the United States, and our decision in the present case would involve the implementation of federal bankruptcy law."), *vacated on other grounds*, 117 S. Ct. 2502 (1997), *aff'd on remand*, 141 F.3d 854 (1998). *See also Tanzin v. Tanzir*, 141 S. Ct. 486, 493 (2020) ("We conclude that RFRA's express remedies provision permits litigants, when appropriate, to obtain money damages against federal officials in their individual capacities.").

[**118**] *See, e.g., Brown v. Polk Cnty.*, 61 F.3d 650, 659 (8th Cir. 1995) (en banc) (rejecting county employers' argument in Title VII religious discrimination case that they were allowed to prohibit religious expression altogether in the workplace to avoid Establishment Clause claims against them).

[**119**] *See Guidelines on Religious Exercise and Religious Expression in the Federal Workplace* (Aug. 14, 1997), **https://clintonwhitehouse4.archives.gov/WH/New/html/19970819-3275.html (https://clintonwhitehouse4.archives.gov/WH/New/html/19970819-3275.html)** (last visited Jan. 8, 2021) [hereinafter *Federal Workplace Guidelines*]. Although the *Federal Workplace Guidelines* are directed at federal employers, they provide useful guidance for state and local government employers, as well as private employers in some circumstances. In addition, the U.S. Department of Justice maintains a website, **www.firstfreedom.gov (http://www.firstfreedom.gov)**, which provides information on a variety of constitutional and statutory religious discrimination issues.

[**120**] *See, e.g., Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 164-65 (2d Cir. 2001) (holding that state agency did not violate either Title VII or the First

Amendment Free Exercise Clause by refusing to allow employee to evangelize clients of state agency while performing job duties; in addition, employer would have risked First Amendment Establishment Clause violation by permitting the accommodation); *cf. Fraternal Order of Police v. City of Newark*, 170 F.3d 359 (3d Cir. 1999) (Alito, J.) (holding that police department violated Sunni Muslim officer's First Amendment free exercise rights by refusing to make a religious exception to its "no beard" policy to accommodate his beliefs, while exempting other officers for medical reasons); *Draper v. Logan Cnty. Pub. Lib.*, 403 F. Supp. 2d 608 (W.D. Ky. 2005) (holding that public library violated an

employee's First Amendment free speech and free exercise rights by prohibiting her from wearing a necklace with a cross ornament).

[**121**]   *See Harrell v. Donahue*, 638 F.3d 975, 984 (8th Cir. 2011) (holding RFRA claims alleging religious discrimination in federal employment are barred because "Title VII provides the exclusive remedy for [] claims of religious discrimination"); *Francis v. Mineta*, 505 F.3d 266, 272 (3d Cir. 2007) (stating that "[i]t is equally clear that Title VII provides the exclusive remedy for job-related claims of federal religious discrimination, despite [plaintiff's] attempt to rely upon the provisions of RFRA"). *But see Lister v. Def. Logistics Agency*, No. 2:05-CV-495, 2006 WL 162534, at *3 (S.D. Ohio Jan. 20, 2006) (denying defendants' motion to dismiss as to RFRA claim and finding that "Title VII does not preclude Plaintiff from pursuing claims under the Fifth Amendment to the United States Constitution and RFRA" because "[a]lthough the claims arise from the same factual circumstance as the Title VII claim, the claims are distinct from Plaintiff's claim for employment discrimination and therefore are not precluded by Title VII").  In addition, one appellate court has held that a federal employee is not preempted from bringing a RFRA claim against another agency (not his employer) to challenge that agency's action interfering with employment.  *See, e.g.*, *Tagore v. United States*, 735 F.3d 324 (5th Cir. 2013) (allowing employee's RFRA claim to proceed against agency that enforced building security regulations and denied her permission to enter building while wearing a kirpan).

[**122**]   *See, e.g.*, *Hobby Lobby*, 573 U.S. at 733 (rejecting "the possibility that discrimination in hiring, for example on the basis of race, might be cloaked as

religious practice to escape legal sanction" under RFRA, and stating that the decision "provides no such shield"); *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 589-97 (6th Cir. 2018) (holding that EEOC's enforcement of Title VII did not violate RFRA), *aff'd on other grounds sub nom. Bostock v. Clayton Cnty.*, 140 S. Ct. 1731 (2020); ***EEOC v. Preferred Mgmt. Corp., 216 F. Supp. 2d 763, 810-11 (S.D. Ind. 2002)*** **(https://1.next.westlaw.com/Link/Document/FullText? findType=Y&serNum=2002160113&pubNum=0004637&originatingDoc=I55 3accf0223811e8a5e6889af90df30f&refType=RP&fi=co_pp_sp_4637_810&o riginationContext=document&transitionType=DocumentItem&contextDat a=(sc.DocLink)#co_pp_sp_4637_810)** (holding under RFRA that "even if the EEOC *had* substantially burdened [the employer's] religious beliefs or practices in prosecuting this matter, its conduct still comports with the RFRA's mandates [because] [t]here is a 'compelling government interest' in creating such a burden [–] the eradication of employment discrimination based on the criteria identified in Title VII, including religion" – and "the intrusion is the least restrictive means that Congress could have used to effectuate its purpose"); *see also Bostock*, 140 S. Ct. at 1753-54 (holding that discrimination based on sexual orientation or transgender status is actionable under Title VII's sex discrimination prohibition, but declining to address how an employer's religious convictions about sexual orientation or transgender status are

religious convictions about sexual orientation or transgender status are protected under Title VII's statutory religious organization exception, RFRA, or the First Amendment's ministerial exception, noting that how doctrines "protecting religious liberty interact with Title VII are questions for future cases"); *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983) (holding that the compelling governmental interest in eradicating racial discrimination in education substantially outweighed the burden of denying tax exempt status under 26 U.S.C. § 501(c)(3) to a religious university that engage in race discrimination).

[**123**] *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 281 (3d Cir. 2001) (explaining that prima facie case and evidentiary burdens of an employee alleging religious discrimination mirror those of an employee alleging race or sex discrimination). A disparate impact analysis could also apply in the religion context, particularly in the area of recruitment and hiring, or with respect to dress codes or other facially neutral rules. *See, e.g.*, *Barrow v. Greenville Indep. Sch. Dist.*, 480 F.3d 377 (5th Cir. 2007) (affirming summary judgment, citing lack of statistical evidence for employer on Title VII claim brought by teacher who asserted policy favoring teachers whose children attended the public schools had a disparate impact on those whose children attended private school for religious rather than secular reasons); *Muhammad v. N.Y. City Transit Auth.*, 52 F. Supp. 3d 468, 485-88 (E.D.N.Y. 2014) (holding that disparate impact religious discrimination claim could proceed where policy of transferring to non-driver positions those with objections to the headwear portion of employer's uniform policy disproportionately affected Muslim employees, employer's desire to maintain customer comfort and boost employee morale did not amount to a legitimate business necessity for its transfer practice, and availability of a less restrictive alternative could be proven from employer's own prior practice of permitting drivers to wear khimars as long as they matched their uniforms); *Jenkins v. N.Y. City Transit Auth.*, 646 F. Supp. 2d 464, 470-71 (S.D.N.Y. 2009) (holding that Pentecostal employee stated a claim under Title VII for disparate impact based on religion challenging dress code requiring female bus operators to wear pants rather than long skirts). However, because the reasonable accommodation/undue hardship analysis is usually used when a neutral work rule adversely affects an employee's religious practice, *see infra* § 12-IV, disparate impact analysis is seldom used in religion cases.

[**124**] *See* 42 U.S.C. § 2000e-3(b).

[**125**] *Id.*; 42 U.S.C. § 2000e-2(e)(1); *see also infra* §§ 12-I-C, 12-II-D.

[**126**] *See, e.g.*, *Patterson v. Ind. Newspapers Inc.*, 589 F.3d 357, 365 (7th Cir. 2009) (ruling that plaintiff may proceed on a claim that "her supervisors, though also Christian, did not like her brand of Christianity," because "[t]he issue is whether plaintiff's specific religious beliefs were a ground for" an adverse employment action); *Preferred Mgmt. Corp.*, 216 F. Supp. 2d at 813 (finding evidence raised a reasonable inference that failure to hire was based on religion where applicant was told "[y]ou damned humanists are ruining the

world" and will "burn in hell forever").

[**127**]  It is not an unlawful employment practice for an employment agency to comply with an employer's request for applicants of a particular religion "in those relatively rare instances where religion . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e-2(e)(1). i); *see also supra* §§ 12-I-C-1, 12-I-C-2 (discussing religious organization exemption and ministerial exception), 12-II-D (discussing BFOQ).

[**128**]  *See EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2033 (2015) ("An employer may not make an applicant's religious practice, confirmed or otherwise, a factor in employment decisions. . . . If the applicant actually requires an accommodation of that religious practice, and the employer's desire to avoid the prospective accommodation is a motivating factor in his decision, the employer violates Title VII" absent an available defense or exemption); *see also Commission Guidelines*, 29 C.F.R. § 1605.3.

[**129**]  *See* 42 U.S.C. § 2000e-3(b).

[**130**]  *See Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. at 2033 (holding Title VII prohibits failing to hire an applicant in order to avoid accommodating the applicant's religious practice, whether or not the applicant informed the employer of the need for an accommodation).

[**131**]  *See, e.g.*, *Muhammad v. N.Y. City Transit Auth.*, 52 F. Supp. 3d 468, 485-87 (E.D.N.Y. 2014) (analyzing disparate impact claim arising from disproportionate effect of employer's dress code provision on those wearing certain types of religious garb); *Jenkins v. N.Y. City Transit Auth.*, 646 F. Supp. 2d 464, 470-71 (S.D.N.Y. 2009) (holding that Pentecostal employee stated a claim under Title VII for religion-based disparate impact when challenging dress code requiring female bus operators to wear pants rather than long skirts).

[**132**]  In *Noyes v. Kelly Servs. Inc.*, 488 F.3d 1163, 1165 (9th Cir. 2007), the plaintiff alleged "reverse religious discrimination" when she was not promoted because she did not follow the religious beliefs of her supervisor and management, who were members of a small religious group and favored and promoted other members of the religious group.  The court ruled that while the employee did not adhere to a particular religion, the fact that she did not share the

employer's religious beliefs was the basis for the alleged discrimination against her, and the evidence was sufficient to create an issue for trial on whether the employer's decision to promote another employee was a pretext for religious discrimination.  *Id*. at 1168-69.

[**133**]  *See, e.g.*, *Campos v. City of Blue Springs*, 289 F.3d 546 (8th Cir. 2002) (holding that evidence supported finding of religiously motivated constructive discharge based on plaintiff's Native American spiritual beliefs); *EEOC v. Univ. of Chi. Hosp.*, 276 F.3d 326 (7th Cir. 2002) (holding that evidence was sufficient to

proceed to trial in case brought on behalf of recruiter alleging constructive discharge based on her evangelical religious beliefs); *Altman v. Minn. Dep't of Corr.*, 251 F.3d 1199, 1203 (8th Cir. 2001) (holding, in case raising both Title VII and First Amendment claims, that an employer may not discipline employees for conduct because it is religious in nature if it permits such conduct by other employees when not motivated by religious beliefs); *Tincher v. Wal-Mart Stores*, 118 F.3d 1125, 1131 (7th Cir. 1997) (holding a reasonable jury could conclude that employer's articulated reason for the discharge of a Seventh-day Adventist was pretextual and that the real reason was religious discrimination because of the inconvenience caused by employee's inability to work on Saturdays). However, not all employer decisions affect a term, condition, or privilege of employment as required to be actionable as disparate treatment.  *See, e.g.*, *Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629 (6th Cir. 2003) (holding a resignation 53 days prior to the effective date of an employer's policy that would have posed conflict with employees' religious beliefs did not constitute constructive discharge).

[**134**]  *See Haji v. Columbus City Sch.*, 621 F. App'x 309 (6th Cir. 2015) (in case involving a school employee who violated the employer's attendance policy by leaving early to attend a local mosque without signing out or obtaining permission to leave, holding that the plaintiff failed to present evidence that non-Muslims were treated more favorably, or other evidence supporting an inference of discrimination).

[**135**] *Cf. Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 71 (1986) (holding that a benefit "that is part and parcel of the employment relationship may not be

doled out in a discriminatory fashion, even if the employer would be free . . . not to provide the benefit at all" (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 75 (1984))).  However, at least one court has held that a private employer providing company resources to recognized employee "affinity groups" does not violate Title VII by denying this privilege to any group promoting or advocating any religious or political position, where the company excluded not only groups advocating a particular religious position but also those espousing religious indifference or opposition.  *See Moranski v. Gen. Motors Corp.*, 433 F.3d 537 (7th Cir. 2005).

[**136**] *See Delelegne v. Kinney Sys., Inc.*, No. 02–11657–RGS, 2004 WL 1281071 (D. Mass. June 10, 2004) (holding that Ethiopian Christian parking garage cashier could proceed to trial on claims of religious harassment and discriminatory termination where he was not allowed to bring a Bible to work, pray, or display religious pictures in his booth, while Somali Muslim employees were permitted to take prayer breaks and to display religious materials in their booths).

[**137**] This type of fact pattern also arises where there is no comparator.  *See, e.g.*, *Dixon v. Hallmark Cos.*, 627 F.3d 849 (11th Cir. 2010) (ruling that apartment complex property manager could proceed to trial on claim challenging termination for violating the employer's religious displays policy by refusing to

remove a poster of flowers with the words "Remember the Lilies . . . Matthew 6:28" she had hung in the on-site management office, where the employer also terminated the manager's husband, telling him, "You're fired too. You're too religious." This fact pattern may also give rise to a denial of accommodation issue. *See infra* § 12-IV-C-6.

[**138**]  *See infra* § 12-III.

[**139**]  *See infra* § 12-IV.  As explained above, Title VII defines "religion" as "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

[**140**]  Determining whether religious expression disrupts coworkers or customers is discussed in §§ 12-III-C and 12-IV-C-6, *infra*. Additionally, in a government workplace, the First Amendment Free Exercise Clause and Establishment Clause may affect the employer's or employee's ability to restrict or engage in religious expression. *See supra* § 12-I-C-3 ("Interaction of Title VII with the First Amendment and the Religious Freedom Restoration Act (RFRA)"); *see also Federal Workplace Guidelines*, *supra* note 119, §§ 2-B, 2-E (noting implications of RFRA for neutral rules that burden religion in the federal workplace).

[**141**]  However, there may be special circumstances where religion can be a bona fide occupational qualification for a particular position. *See infra* § 12-II-D (discussing when religion can be a bona fide occupational qualification).

[**142**]  *Cf.* 42 U.S.C. § 2000e-2(g) (permitting covered entities to discharge or refuse to "hire and employ" or refer an individual who does not meet federal security requirements). *See infra* § 12-IV-B-5 (discussing security requirements and Title VII's accommodation obligation).

[**143**]  42 U.S.C. § 2000e-2(e)(1).

[**144**]  *Compare Abrams v. Baylor Coll. of Med.*, 805 F.2d 528 (5th Cir. 1986) (holding that being non-Jewish was not a BFOQ for a university which had a contract to supply physicians on rotation at a Saudi Arabian hospital when the hospital presented no evidence to support its contention that Saudi Arabia would actually have refused an entry visa to a Jewish faculty member), *and Rasul v. Dist. of Columbia*, 680 F. Supp. 436 (D.D.C. 1988) (holding that Department of Corrections failed to demonstrate that Protestant religious affiliation was a BFOQ for position as prison chaplain because chaplains were recruited and hired on a facility-wide basis and were entrusted with the job of planning, directing, and maintaining a total religious program for all inmates, whatever their respective denominations), *with Kern v. Dynalectron Corp.*, 577 F. Supp. 1196 (N.D. Tex. 1983) (holding that requirement that pilot convert to

Islam was a BFOQ, where not based on a preference of contractor performing
work in Saudi Arabia, but on the fact that non-Muslim employees caught flying
into Mecca would, under Saudi Arabian law, be beheaded), *aff'd*, 746 F.2d 810
(5th Cir. 1984).

[**145**]  42 U.S.C. § 2000e-2(a)(1).

[**146**]  *Faragher v. Boca Raton*, 524 U.S. 775, 786 (1998) (quotation marks and
citations omitted).

[**147**]  *Id*.

[**148**]  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986).

[**149**]  *Meritor Sav. Bank*, 477 U.S. at 67 (quoting *Henson v. City of Dundee*, 682
F.2d 897, 904 (11th Cir. 1982) (alteration in *Meritor*)).

[**150**]  *Meritor Sav. Bank*, 477 U.S. at 66; *see also Faragher*, 524 U.S. at 786-88.

[**151**] *Meritor Sav. Bank*, 477 U.S. at 65.

[**152**]  *Id*. at 66; *see, e.g.*, *Venters v. City of Delphi*, 123 F.3d 956 (7th Cir. 1997)
(holding that an employee who was terminated after she disagreed with
supervisor's religious beliefs raised a triable Title VII harassment claim based
on two separate theories of harassment liability: that a supervisor conditioned
a "tangible employment benefit" upon "adher[ing] to [her supervisor's set of
religious values," and that the employer created a hostile work environment).

[**153**]  *See Martin v. Stoops Buick, Inc*., No. 1:14-cv-00298-RLY-DKL, 2016 WL
2989037, at *6 (S.D. Ind. May 24, 2016) (denying summary judgment for
employer where a reasonable juror could find that plaintiff's termination was
motivated by her refusal to continue reading the Bible with her manager); *Scott
v. Montgomery Cnty. Sch. Bd*., 963 F. Supp. 2d 544, 553-57 (W.D. Va. 2013)
(holding that a reasonable jury could find plaintiff's rejection of her
supervisor's overtures, including her requests to join Bible study
group, attend religious retreat, or begin each day with prayer before work,
resulted in negative performance evaluations and then the non-renewal of her
contract, even though the allegations did not establish a hostile work
environment claim); *Rice v. City of Kendallville*, No. 1:07–CV–180–TS, 2009 WL
857463, at *8-9 (N.D. Ind. Mar. 31, 2009) (holding that discrimination could be

found where plaintiff was terminated but her coworker, who engaged in same
misconduct but attended their supervisor's church, was not); *see also Venters*,
123 F.3d at 964 (holding that employee established that she was discharged on
the basis of her religion after supervisor, among other things, repeatedly called
her "evil" and stated that she had to share his Christian beliefs in order to be a
good employee).

[**154**]  Many of the example's facts are taken from *Sattar v. Motorola, Inc*., 138
F.3d 1164 (7th Cir. 1998).  However, in *Sattar* the plaintiff alleged only

discriminatory discharge, not harassment.  The court of appeals upheld
summary judgment in favor of the employer, ruling that the employer had
supplied sufficient evidence that it had discharged the plaintiff for deficient
performance and poor leadership skills, and that the plaintiff had not supplied
evidence that these reasons were pretext for religious discrimination.

[**155**]  Courts may come to different conclusions regarding whether job duties
and religious beliefs conflict and, in turn, whether there is a duty to
accommodate at all.  *Compare Summers v. Whitis*, No. 4:15-cv-00093-RLY-DML,
2016 WL 7242483, at \*5-7 (S.D. Ind. Dec. 15, 2016) (holding that deputy county
clerk terminated for refusing on religious grounds to process same-sex
marriage licenses did not prove failure to accommodate because there was no
conflict between her religious beliefs and her job duties, where the duties were
purely administrative, and she was not required to perform or attend marriage
ceremonies, personally issue licenses or certificates, say congratulations, offer
a blessing, or express religious approval), *with Slater v. Douglas Cnty.*, 743 F.
Supp. 2d 1188, 1193-95 (D. Or. 2010) (holding that county clerk's office
employee could proceed with denial of accommodation and discriminatory
termination claim arising from her religious refusal to process same-sex
domestic partnership registration paperwork).

[**156**]  *See Pedersen v. Casey's Gen. Stores, Inc.*, 978 F. Supp. 926, 929 (D. Neb.
1997) (awarding relief following jury finding that employer's refusal to
accommodate employee's need to have Easter day off, while knowing that she
could not compromise her religious needs and where it would not have posed
an undue hardship, amounted to constructive discharge in violation of Title

VII); *see also Venters*, 123 F.3d at 972 (ruling that "the accommodation
framework . . . has no application when the employee alleges that he was fired
because he did not share or follow his employer's religious beliefs").

[**157**]  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation
marks and citation omitted).

[**158**]  *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *see also Dediol v.
Best Chevrolet, Inc*., 655 F.3d 435, 443 (7th Cir. 2011) (stating the prima facie
case of hostile work environment based on religion).

[**159**]  *See Rivera v. P.R. Aqueduct & Sewers Auth.*, 331 F.3d 183, 189-91 (1st Cir.
2003) ("A constellation of factors led to the friction between Rosario and her
coworkers, but no reasonable fact finder could conclude on the basis of the
incidents we have described or the general atmosphere in the office that one of
these factors was an antipathy towards Rosario"s underlying religious
convictions."); *Marcus v. West*, No. 99 C 0261, 2002 WL 1263999, at \*11 (N.D. Ill.
June 3, 2002) (finding that mistreatment of Sanctified Pentecostal Christian
employee was not because of religion, where supervisor mistreated all of her
employees and had poor management and interpersonal skills).

[**160**]  *See Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 387-88  & n.34 (2d Cir. 2020):

[160] See *Reedy v. Harriott Int'l, Inc.*, 662 F.3d 515, 524-25 (7th Cir. 2015); *Turner v. Barr*, 811 F. Supp. 1, 3-4 (D.D.C. 1993) (finding that hostile environment was created where Jewish employee was subjected to a "joke" about the Holocaust, denied opportunity to work overtime, and ridiculed as a "turnkey," even though the latter two incidents did not refer to religion, because the facts showed that he was singled out for such treatment because of his religion).

[161]  See *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-19 (4th Cir. 2008) (reversing summary judgment for the employer and remanding the case for trial because a reasonable fact finder could conclude that a Muslim employee who wore a kufi as part of his religious observance was subjected to hostile work environment religious harassment when fellow employees repeatedly called him "Taliban" and "towel head," made fun of his appearance, questioned his allegiance to the United States, suggested he was a terrorist, and made comments associating all Muslims with senseless violence); *EEOC v. WC&M*

*Enters., Inc.*, 496 F.3d 393, 398-401 (5th Cir. 2007) (reversing summary judgment for the employer and remanding the case for trial because a reasonable fact finder could conclude that harassment initiated after September 11, 2001, against a car salesman who was born in India and was a practicing Muslim, was severe or pervasive and motivated by his national origin and religion); *EEOC v. T-N-T Carports, Inc.*, No. 1:09–CV–27, 2011 WL 1769352, at *4 (M.D.N.C. May 9, 2011) (holding that evidence could show harassment was motivated by religious animosity where coworkers suggested employee, a devout Christian, belonged to a cult and was a devil worshipper; physically intimidated her while simultaneously using derogatory words about her religion; called her "crazy" about her religious beliefs; drew devil horns, a devil tail, and a pitchfork on her Christmas photo; used profanity followed by mock apologies; and cursed the Bible and teased about Bible reading).  In *Sunbelt*, the Fourth Circuit held: "we cannot regard as 'merely offensive,' and thus 'beyond Title VII's purview,' *Harris*, 510 U.S. at 21, constant and repetitive abuse founded upon misperceptions that all Muslims possess hostile designs against the United States, that all Muslims support jihad, that all Muslims were sympathetic to the 9/11 attack, and that all Muslims are proponents of radical Islam."  521 F.3d at 318.

[162] See *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 279 (3d Cir. 2001) (holding that supervisor criticizing professor's refusal to work on her Sabbath, scheduling meetings on Jewish holidays, and charging her for leave on those holidays could be found to have "infected [professor's] work experience" because of her religion).

[163] *Chamberlin v. 101 Realty, Inc.*, 915 F.2d 777, 784 (1st Cir. 1990); *see Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 806 (8th Cir. 2019) ("Harassing conduct is considered unwelcome if it was uninvited and offensive.").

[164] In *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21-22 (1993), the Court clarified that a complainant alleging a hostile work environment must establish not only that the alleged harassment was objectively hostile but also that she subjectively viewed the conduct as hostile.  Some courts continue to identify

unwelcomeness as a separate element of a hostile work environment claim, *see, e.g.*, *Maldonado-Cátala v. Municipality of Naranjito*, 876 F.3d 1, 10 (1st Cir.

2017); *Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 445 (5th Cir. 2017), and other courts address unwelcomeness as part of assessing subjective hostility, stating that conduct that is subjectively hostile must also logically be unwelcome, *see, e.g.*, *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 904 (7th Cir. 2018) (holding that because a reasonable jury could find that the conduct was unwelcome, there was an issue of material fact regarding subjective hostility); *Kokinchak v. Postmaster Gen. of the U.S.*, 677 F. App'x 764, 767 (3d Cir. 2017) (treating unwelcomeness and subjective hostility as the same issue).

[**165**]  *See WC&M Enters.*, 496 F.3d at 400-01 (finding religious and national origin harassment claim could be based on having been referred to as a "Muslim extremist" and constantly called "Taliban," among other terms); *Khan v. United Recovery Sys., Inc.*, No. H-03-2292, 2005 WL 469603, at *16-17 (S.D. Tex. Feb. 28, 2005) (finding religious harassment claim could be based on (1) alleged comments by coworker that court characterized as "malicious and vitriolic," including that all Muslims are terrorists who should be killed, that he wished "all these Muslims were wiped off the face of the earth," and that plaintiff might get shot for wearing an "Allah" pendant; (2) additional comments questioning plaintiff about what was being taught at her mosque and whether it was "connected with terrorists"; and (3) allegation that plaintiff's supervisor placed newspaper articles on her desk about mosques in Afghanistan that taught terrorism, along with a note telling her to come into his office and justify such activity).

[**166**]  *See Venters v. City of Delphi*, 123 F.3d 956, 976 (7th Cir. 1997) (holding that employee established comments were unwelcome where she made clear her objection to the comments once she told her supervisor he had "crossed the line").  Complaints to family, friends, or coworkers may also indicate subjective hostility.  *See, e.g.*, *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1454 (7th Cir. 1994).

[**167**]  *See Venters*, 123 F.3d at 976.

[**168**]  *See Faragher*, 524 U.S. at 787-88; *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 82-83 (1998) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."); *Harris*, 510 U.S. at 23; *see also EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (evidence that coworkers repeatedly called the employee "Taliban" and "towel head" and made other negative comments related to being a Muslim was enough to overcome summary judgment on both the objective and subjective elements of the severe-or-pervasive test).

[**169**] *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 83 (2d Cir. 2009).

[**170**] *Harris*, 510 U.S. at 23.

[**171**] *Id.*; *see also Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 390 (2d Cir. 2020) ("Although the presence of physical threats or impact on job performance are relevant to finding a hostile work environment, their absence is by no means dispositive.").

[**172**] *See Johnson v. Spencer Press of Me., Inc.*, 364 F.3d 368 (1st Cir. 2004) (ruling that jury properly found hostile work environment where supervisor repeatedly insulted plaintiff, mocked his religious beliefs, and threatened him with violence); *cf. Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1167 (7th Cir. 1998) (Muslim supervisor barraged former Muslim employee with e-mails containing dire warnings of the divine punishments that awaited those who refuse to follow Islam).

[**173**] *Harris*, 510 U.S. at 21; *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986).

[**174**] *Harris*, 510 U.S. at 22 ("[E]ven without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality . . . . Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct."); *see also Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1454-55 (7th

Cir. 1994) ("[T]he mention in *Harris* of an unreasonable interference with work performance was not intended to penalize the employee who possesses the dedication and fortitude to complete her assigned tasks even in the face of offensive and abusive [conduct] . . . . As Justice Scalia separately explained in *Harris*, the test under Title VII 'is not whether work has been impaired, but whether working conditions have been discriminatorily altered.'").

[**175**] *See Harris*, 510 U.S. at 23 ("Whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances . . . . [N]o single factor is required.").

[**176**] *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998) (citing *Oncale*, 523 U.S. at 80); *see also* (finding coworker's conduct did not create a hostile work environment where coworker sang religious songs, quoted religious scripture, preached and spoke about Church and the Bible, referred to plaintiff as the devil an unspecified number of times over a six-month period, and informed plaintiff that she would go to Hell for not believing in Jesus Christ); *Walker v. McCarthy*, 582 F. App'x 6 (D.C. Cir. 2014) (ruling that plaintiff did not state a hostile work environment religion claim based on receipt of an invitation and emails regarding a coworker's same-sex marriage); *Sheikh v. Indep. Sch. Dist. 535*, No. 00–1896DWFSRN, 2001 WL 1636504 (D. Minn. Oct. 18, 2001) (holding

that a Muslim employee who was ostracized by colleagues because he refused
to shake hands with female colleagues did not suffer a materially adverse
change in the terms and conditions of employment).

[**177**] *Compare Garcimonde-Fisher v. Area203 Marketing, LLC*, 105 F. Supp. 3d
825, 838-41 (E.D. Tenn. 2015) (ruling that owner's cumulative actions may have
amounted to "[o]verwhelming pressure to conform to a particular religion or
sect," where he decorated walls with Judeo-Christian artwork, biblical posters
and Ten Commandments placards; distributed to employees materials with
religious messages and solicitations for donations to overtly religious charities;
played Christian movies on breakroom TV all day; employed a staff chaplain
who hosted prayer meetings and Bible studies during work; and made
comments to one plaintiff he was Catholic was not "the right kind of
Christian"), *with **Alansari v. Tropic Star Seafood Inc., 388 F. App'x 902, 905***

***(11th Cir. 2010) (https://1.next.westlaw.com/Link/Document/FullText?
findType=Y&serNum=2022583008&pubNum=0006538&originatingDoc=I99
411220225211e68cefc52a15cd8e9f&refType=RP&fi=co_pp_sp_6538_905&o
riginationContext=document&transitionType=DocumentItem&contextDat
a=(sc.UserEnteredCitation)#co_pp_sp_6538_905)*** (per curiam) (finding that
solicitations to go to church because "Jesus would save" plaintiff, other
comments about the plaintiff's Muslim religion, and the playing of Christian
music on the radio did not amount to hostile work environment), ***DeFrietas v.
Horizon Inv. & Mgmt. Corp., No. 2:06-cv-926, 2008 WL 204473, at *6 (D. Utah
Jan. 24, 2008) (https://1.next.westlaw.com/Link/Document/FullText?
findType=Y&serNum=2014886196&pubNum=0000999&originatingDoc=I99
411220225211e68cefc52a15cd8e9f&refType=RP&originationContext=docu
ment&transitionType=DocumentItem&contextData=
(sc.UserEnteredCitation))*** ("Sporadic invitations to attend church with a
coworker, while uncomfortable, do not constitute a hostile work
environment."), *aff'd in part and rev'd in part on other grounds*, 577 F.3d 1151
(10th Cir. 2009), *Marcus v. West*, No. 99 C 0261, 2002 WL 1263999, at *11 (N.D. Ill.
June 3, 2002) (finding that asking a very religious employee to swear on a Bible
to resolve differences with a colleague and telling her that people did not like
her "church lady act" were isolated incidents that were not severe or pervasive
enough to create a hostile work environment), *and Sublett v. Edgewood
Universal Cabling Sys., Inc.*, 194 F. Supp. 2d 692, 703 (S.D. Ohio 2002) (finding
supervisor's single comment to Rastafarian employee that those "dread things"
made him look too "radical" was not sufficiently severe to create a hostile
environment).

[**178**] *Cf. Tessler v. KHOW Radio, Inc.*, No. 95–B–2414, 1997 WL 458489, at *8 (D.
Colo. Apr. 21, 1997).

[**179**]  *Cf. Brown v. Polk Cnty.*, 61 F.3d 650, 656-57 (8th Cir. 1995) (en banc)
(holding that it did not pose an undue hardship for employer to accommodate
supervisor's sporadic and voluntary prayers during workplace meetings).

[**180**] *See, e.g., EEOC v. Prospect Airport Servs., Inc.*, 621 F.3d 991, 1000 (9th Cir. 2010) (explaining that "[t]he "required level of severity or seriousness varies

inversely with the pervasiveness or frequency of the conduct" (alteration in original)); *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010) ("[A] plaintiff need not show that her [work] environment was both severe *and* pervasive; only that it was sufficiently severe *or* sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions."); *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999) (explaining that in determining whether the alleged conduct rises to the level of severe or pervasive, a court should consider the factual "totality of the circumstances," and that using a "holistic perspective is necessary, keeping in mind that each successive episode has its predecessors, the impact of the separate incidents may accumulate, and the work environment created thereby may exceed the sum of the individual episodes"); *see also, e.g., Shanoff v. Ill. Dep't of Hum. Servs.*, 258 F.3d 696, 705 (7th Cir. 2001) (six instances of "rather severe" harassment over four months were sufficient to allow a reasonable jury to rule in favor of plaintiff).

[**181**] *See Hall v. City of Chi.*, 713 F.3d 325, 330 (7th Cir. 2013) (stating that "one extremely serious act of harassment could rise to an actionable level as could a series of less severe acts" (quoting *Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 693 (7th Cir. 2001)); *cf. Johnson v. Spencer Press of Me., Inc.*, 364 F.3d 368 (1st Cir. 2004) (in affirming the jury verdict for plaintiff on a religious harassment claim, court noted plaintiff's testimony that a supervisor who made ongoing derogatory remarks about plaintiff's religion also once put the point of a knife under plaintiff's chin, in addition to threatening to kill him with a hand grenade, run him over with a car, and shoot him with a bow and arrow).

[**182**] *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (D.C. Cir. 2013) (Kavanaugh, J., concurring) ("As several courts have recognized, . . . a single *verbal* (or visual) incident can . . . be sufficiently severe to justify a finding of a hostile work environment.").

[**183**] *See Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 552 (7th Cir. 2002) (holding that the combined impact of the comments directed at the employee and at others was not severe or pervasive enough to create a hostile work environment; "[M]any of the actions that [the employee] identifies were

not directed at him . . . . As 'second-hand' harassment, the impact of these incidents are 'obviously not as great as the impact of harassment directed at the plaintiff.'" (quoting *Russell v. Bd. of Trs. of Univ. of Ill. at Chi.*, 243 F.3d 336, 343 (7th Cir. 2001))).

[**184**] *See, e.g., Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 389 & n.44 (2d Cir. 2020) (reaching this conclusion and noting that the EEOC has long taken this position); *Ellis v. Houston*, 742 F.3d 307, 320-21 (8th Cir. 2014) (explaining that when offensive comments not directly made to plaintiff become known to

plaintiff, "their relevance to claims of a hostile work environment is clear"); *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 811 (11th Cir. 2010) (en banc) ("[W]ords and conduct . . . may state a claim of a hostile work environment, even if the words are not directed specifically at the plaintiff."); *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999) (overhearing "I'm sick and tired of these fucking women" could be "humiliating and fundamentally offensive to any woman in that work environment").

[**185**]   *Cf. Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 276 (4th Cir. 2000) (stating that "a routine difference of opinion" cannot support a hostile work environment claim); *Sunbelt Rentals, Inc.*, 521 F.3d at 315 (4th Cir. 2008)  ("[E]ven incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard."); *see also Chinery v. American Airlines*, 778 F. App'x 142, 145-46 (3d Cir. 2019) (examining whether social media posts about workplace issues and the plaintiff created a hostile work environment, but determined that the conduct was not objectively severe or pervasive).  Social media posts that do involve the workplace can become part of a hostile work environment claim. *See Roy v. Correct Care Sols.*, LLC, 914 F.3d 52, 63 n.4 (1st Cir. 2019) ("Furthermore, it is not clear at all that Facebook messages should be considered non-workplace conduct where, as here, they were about workplace conduct, including Dever's reports and rumors, and were sent over social media by an officer who worked in Roy's workplace.").  In addition, an employee's wearing religious garb in the workplace, or workplace religious decorations that do not demean or degrade other employees, or their religious views generally, would not, standing alone, constitute a hostile work environment.

[**186**]   *See Faragher v. Boca Raton*, 524 U.S. 775, 802-03 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759-60 (1998).

[**187**]   *Ellerth*, 524 U.S. at 758.

[**188**]   *Faragher*, 524 U.S. at 789-90.

[**189**]   For strict liability to apply to a constructive discharge claim, a supervisor's tangible employment action must have precipitated the decision to quit.  Otherwise, the employer is entitled to raise the affirmative defense described above.  *See Pa. State Police v. Suders*, 542 U.S. 129, 146-50 (2004).

[**190**]   *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807.

[**191**]   *See, e.g., Chavez v. Colo. Dep't of Educ.*, 244 F. Supp. 3d 1106, 1128 (D. Colo. 2017) (ruling that because employer took adequate action to address plaintiff's complaints that she was being pressured and treated unfairly by her supervisor for refusing to continue attending the supervisor's Bible study and other church activities, plaintiff could not prevail on harassment claim).

[**192**]   *See Vance v. Ball State Univ.*, 570 U.S. 421, 448-49 (2013) (noting that a complainant can establish employer liability, even when "a harasser is not a

supervisor," "by showing that [the] employer was negligent in failing to prevent harassment from taking place").

[**193**] *See Ellerth*, 524 U.S. at 762; *Faragher*, 524 U.S. at 788; *Hafford v. Seidner*, 183 F.3d 506, 513 (6th Cir. 1999); *cf. Guidelines on Discrimination Because of National Origin*, 29 C.F.R. § 1606.8(d) (stating employer is liable for coworker harassment on the basis of national origin when it knew or should have known of the conduct and failed to take immediate and appropriate corrective action); *id.* § 1604.11(e) (sexual harassment).

[**194**]  *Cf. Powell v. Yellow Book USA, Inc.*, 445 F.3d 1074, 1078 (8th Cir. 2006) (finding that employer was not liable for religious harassment of plaintiff because, upon learning of her complaints about a coworker's proselytizing, the employer promptly held a meeting and told the coworker to stop discussing religion matters with plaintiff, and there was evidence that the company

continued to monitor the situation to ensure that the coworker did not resume her proselytizing).

[**195**] *Compare Erickson v. Wisconsin Dep't of Corr.*, 469 F.3d 600, 608 (7th Cir. 2006) (discussing female employee's Title VII action against prison employer based on harassment by male inmates; ruling that "a reasonable jury could have found that, after [the employee's] discussion with her supervisors . . . , [prison] had enough information to make a reasonable employer think there was some probability that [the employee] was being sexually harassed, yet took no remedial action as it was obligated to do under Title VII" (quotation marks and citations omitted)), *with Berry v. Delta Airlines, Inc.*, 260 F.3d 803 (7th Cir. 2001) (finding that employer was not liable for alleged sexual harassment of its female employee by a male contractor because it promptly investigated the allegations, requested a change in the contractor's shift so that he would not have contact with the employee, and asked that all contractors be required to view sexual harassment training video).  *Cf. Commission Guidelines*, 29 C.F.R. § 1604.11(e), 1606.8(e).

[**196**] *See EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 621 (9th Cir. 1988) ("Where the religious practices of employers . . . and employees conflict, Title VII does not, and could not, require individual employers to abandon their religion.  Rather, Title VII attempts to reach a mutual accommodation of the conflicting religious practices."); *cf. Burwell v. Hobby Lobby*, *Stores, Inc.*, 573 U.S. 682, 702 (2014) (rejecting court's holding below that, unlike nonprofit corporations, "for-profit, secular corporations cannot engage in religious exercise") (RFRA).

[**197**]  *See Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 607 (9th Cir. 2004) ("[A]n employer need not accommodate an employee's religious beliefs if doing so would result in discrimination against his coworkers or deprive them of contractual or other statutory rights.").

[**198**] *Id.*

[**199**] *See Ervington v. LTD Commodities, LLC*, 555 F. App'x 615, 618 (7th Cir. 2014) (upholding discharge for employee's continuing, after warning, to violate

company's anti-harassment policy by distributing religious pamphlets that denigrated other religions); *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 745-46 (9th Cir. 2004) (ruling that supervisor's harassment of subordinate in violation of employer's anti-harassment policy was a legitimate nondiscriminatory reason for termination, even if the violations were motivated by the supervisor's religious beliefs).

[**200**]  *Smith v. City of Phila.*, 285 F. Supp. 3d 846, 854 (E.D. Pa. 2018).

[**201**]  *See Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 133 (1st Cir. 2004) ("Under Title VII, an employer must offer a reasonable accommodation to resolve a conflict between an employee's sincerely held religious belief and a condition of employment, unless such an accommodation would create an undue hardship for the employer's business."); *Weathers v. FedEx Corp. Servs., Inc.*, No. 09 C 5493, 2011 WL 5184406, at *11 (N.D. Ill. Nov. 1, 2011) (ruling that employee's request for clarification of an employer "letter of counseling" instructing that his discussions of religion with coworkers "must cease" was a request for accommodation, and holding that an ongoing broad instruction not to discuss religion could be found to be an adverse action, because it left him "unable to exercise his religious belief and unable to discuss a subject of broad scope and of great importance to him" even if the conversation was initiated by others).

[**202**]  *Cf. EEOC v. Abercrombie & Fitch Stores, Inc*., 135 S. Ct. 2028, 2034 (2015) ("Title VII does not demand mere neutrality with regard to religious practices – that they be treated no worse than other practices.  Rather, it gives them favored treatment, affirmatively obligating employers not 'to fail or refuse to hire or discharge any individual. . . because of such individual's' 'religious observance and practice.'" (alteration in original)).

[**203**] 42 U.S.C. § 2000e(j); *Commission Guidelines*, 29 C.F.R. § 1605.2(b).

[**204**]  *Compare Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977) (interpreting Title VII "undue hardship" standard), *with* 42 U.S.C. § 12111(10)(A) (defining ADA "undue hardship" standard).  *See infra* § 12-IV-B.

[**205**]  *Abercrombie & Fitch Stores, Inc*., 135 S. Ct. at 2034.

[**206**]  *See id.* ("An employer is surely entitled to have, for example, a no-headwear policy as an ordinary matter.  But when an applicant requires an accommodation as an 'aspec[t] of religious . . . practice,' it is no response that the subsequent 'fail[ure] . . . to hire' was due to an otherwise-neutral policy." (alterations in original)).

[**207**] *Protos v. Volkswagen of Am., Inc.*, 797 F.2d 129, 136 (3d Cir. 1986) (citation

omitted); *see also id.* ("This is . . . part of our 'happy tradition' of avoiding unnecessary clashes with the dictates of conscience.") (citation omitted); *cf. Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 146 (1987) (explaining that, under the Free Exercise Clause of the First Amendment, the government "may not force an employee 'to choose between following the precepts of her religion and forfeiting benefits, . . . and abandoning one of the precepts of her religion in order to accept work'" (citation omitted) (alteration in original)).

[**208**]    *Hardison*, 432 U.S. at 84.

[**209**]    Furthermore, if companies are interested in expressing their views on social issues and having their employees convey the company's views, the issue of religious accommodation could arise to the extent an employee believes that a message the employer would like the employee to convey violates the employee's religious beliefs.  For example, if a company has a policy that all employees in its retail stores must wear shirts conveying messages celebrating LGBTQ Pride in the month of June, or that requires employees to say "Jesus is our Savior" when answering the phone during the Christmas season, the company may have an obligation to accommodate employees who cannot convey these messages because of religious beliefs.

[**210**]    *See Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 68 (1980) ("The employer violates the statute unless it 'demonstrates that [it] is unable to reasonably accommodate . . . an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business.'"); *Hardison*, 432 U.S. at 74 ("[T]he employer's statutory obligation to make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship, is clear." ); *cf. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. at 2033-34 ("[R]eligious practice is one of the protected characteristics that cannot be accorded disparate treatment and must be accommodated.").

[**211**]    *See* 42 U.S.C. § 2000e-2(a)(1) (making it unlawful "to discriminate against any individual with respect to his. . . terms, conditions, or privileges of employment, because of such individual's . . . religion").

[**212**]    *Compare Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 765 (3d Cir. 2004) ("An employer's failure to reasonably accommodate an employee's sincerely held religious belief that conflicts with a job requirement can also amount to an adverse employment action unless the employer can demonstrate that such an accommodation would result in 'undue hardship.'"), *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 614 n.5 (9th Cir. 1988) ("The threat of discharge (or other adverse employment practices) is a sufficient penalty.  An employee does not cease to be discriminated against because he temporarily gives up his religious practice and submits to the employment policy." (internal citation omitted)), *and Rodriguez v. City of Chi.*, No. 95-C-5371, 1996 WL 22964, at *3 (N.D. Ill. Jan. 12, 1986) ("It is nonsensical to suggest that an employee who, when forced by

his employer to choose between his job and his faith, elects to avoid potential financial and/or professional damage by acceding to his employer's religiously objectionable demands has not been the victim of religious discrimination."), *with Brooks v. City of Utica*, 275 F. Supp. 3d 370, 378 (N.D.N.Y. 2017) ("[U]nrealized threats do not constitute adverse employment actions."). *See generally Reed v. UAW*, 569 F.3d 576, 580 (6th Cir. 2009) (stating that because plaintiff has not shown any material adverse action, his reasonable accommodation claim fails, however, "an employee who believes that he is being treated less favorably because of his religion or some other protected ground has the right to bring a disparate treatment claim."); *Mohammed v. Schneider Nat'l Carriers, Inc.*, No. 18-0642, 2018 WL 5634897, at *2-4 (W.D. Pa. Oct. 12, 2018) (magistrate judge report and recommendation) (reviewing cases), *adopted*, 2018 WL 5633994 (W.D. Pa. Oct. 31, 2018).

[**213**]  *See Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1019 (4th Cir. 1996) ("[A] prima facie case under the accommodation theory requires evidence that [the employee] informed her employer that her religious needs conflicted with an employment requirement and asked the employer to accommodate her religious needs."); *Redmond v. GAF Corp.*, 574 F.2d 897, 901 (7th Cir. 1978) ("Implicit within plaintiff's prima facie case is the requirement that plaintiff inform his employer of both his religious needs and his need for an accommodation.").

[**214**]  *See, e.g.*, *Dixon v. Hallmark Cos.*, 627 F.3d 849, 856 (11th Cir. 2010) (holding that employer was incorrect in arguing that employees' accommodation claim failed because they did not expressly tell employer that they did not want to take down religious artwork because of their religion, reasoning that evidence of the employer's awareness of the tension between its order to remove the artwork and the employees' religious beliefs was sufficient to establish notice); *Brown v. Polk Cnty.*, 61 F.3d 650, 654 (8th Cir. 1995) (en banc) (where plaintiff alleged that he was terminated based on his known religious activities, court held that employer had obligation to accommodate absent undue hardship even though plaintiff had never explicitly asked for a religious accommodation because employer's "first reprimand related directly to religious activities by" plaintiff); *id.* ("An employer need have only enough information about an employee's religious needs to permit the employer to understand the existence of a conflict between the employee's religious practices and the employer's job requirements." (internal quotation marks and citation omitted)); *Hellinger v. Eckerd Corp.*, 67 F. Supp. 2d 1359, 1363-64 (S.D. Fla. 1999) (ruling that notice was sufficient where employer learned of applicant's religious objection to a particular practice when he contacted applicant's former supervisor for a reference).

[**215**]  *See supra* note 210.

[**216**]  *Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. at 2033-34 (holding that decision not to hire Muslim applicant because of assumed conflict between

decision about a Muslim applicant because of assumptions about her headscarf and company "Look Policy" violated Title VII's prohibition that actions are not taken "with the *motive* of avoiding the need for accommodating

a religious practice").

[**217**] *See Xodus v. Wackenhut Corp*., 619 F.3d 683, 686-87 (7th Cir. 2010) (finding that district court did not clearly err in determining that employee had failed to put employer on sufficient notice because he only referenced his "beliefs" but did not say they were religious); *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1439 (9th Cir. 1993) (employee's request for leave to participate in his wife's religious conversion ceremony was sufficient to place employer on notice that this was pursuant to a religious practice or belief; an employer need have "only enough information about an employee's religious needs to permit the employer to understand the existence of a conflict between the employee's religious practices and the employer's job requirements").

[**218**]  *Cf. LaFevers v. Saffle,* 936 F.2d 1117 (10th Cir. 1991) (holding that although not all Seventh-day Adventists are vegetarian, an individual adherent's genuine religious belief in such a dietary practice warrants constitutional protection under the First Amendment); *see Seshadri v. Kasraian*, 130 F.3d 798, 800 (7th Cir. 1997) (holding that employee who seeks accommodation need not belong to an established church, "but a person who seeks to obtain a privileged legal status by virtue of his religion cannot preclude inquiry designed to determine whether he has in fact a religion"); *Chrysler Corp. v. Mann*, 561 F.2d 1282, 1285 (8th Cir. 1977) (observing that the plaintiff "did little to acquaint Chrysler with his religion and its potential impact upon his ability to perform his job"); s*ee also Redmond*, 574 F.2d at 902 (noting that "an employee who is disinterested in informing his employer of his religious needs 'may forego the right to have his beliefs accommodated by his employer'" (citation omitted)).

[**219**]  *See, e.g.*, *Toronka v. Cont'l Airlines, Inc.*, 649 F. Supp. 2d 608, 611-12 (S.D. Tex. 2009) (holding in Title VII case that a moral and ethical belief in the power of dreams that is based on religious convictions and traditions of African descent is a religious belief, and that this determination does not turn on veracity but rather is based on a theory of "'man's nature or his place in the Universe,'" even if considered by others to be "eccentric" (quoting *Brown v. Dade Christian Schs., Inc.*, 556 F.2d 310, 324 (5th Cir. 1977) (Roney, J.,

dissenting); *Cooper v. Gen. Dynamics*, 533 F.2d 163, 168-69 (5th Cir. 1976))); *cf. Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (holding that although animal sacrifice may seem "abhorrent" to some, Santeria is religious in nature and is protected by the First Amendment); *Thomas v. Rev. Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 714 (1981) (ruling that "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection"); *United States v. Meyers*, 906 F. Supp. 1494, 1499 (D. Wyo. 1995) (relying on First Amendment jurisprudence to observe in Religious Freedom Restoration Act

Amendment jurisprudence to observe in Religious Freedom Restoration Act case that "one man's religion will always be another man's heresy").

[**220**] *See Cary v. Carmichael*, 908 F. Supp. 1334, 1344 (E.D. Va. 1995) (holding no religious discrimination where employee failed to give employer proper notice so that it could attempt an accommodation of his religious objection to signing consent form for a drug test), *aff'd sub nom*, 116 F.3d 472 (4th Cir. 1997) (unpublished table decision); *see also Elmenayer v. ABF Freight Sys.*, No. 98-CV-4061 (JG), 2001 WL 1152815, at *5 (E.D.N.Y. Sept. 20, 2001) (holding that employer was not liable for disciplining an employee for tardiness where the employee failed – until after his discharge – to explain that tardiness was because he attended a prayer service), *aff'd on other grounds*, 318 F.3d 130 (2d Cir. 2003).

[**221**] Notwithstanding the different legal standards for determining when a failure to accommodate poses an undue hardship under Title VII and the ADA, *see supra* notes 5 and 6, courts have endorsed a cooperative information-sharing process between employer and employee for religious accommodation requests, similar to the "interactive process" used for disability accommodation requests under the ADA.  *See Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986) (explaining that "bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business." (internal quotation marks and citation omitted)); *see also Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1155 n.5 (10th Cir. 2000) (stating that "[t]he [ADA] 'interactive process' rationale is equally applicable to the obligation to offer a reasonable accommodation to an individual whose religious beliefs conflict with an

employment requirement").

[**222**] *See, e.g., EEOC v. Arlington Transit Mix, Inc*., 957 F.2d 219, 222 (6th Cir. 1991) ("After failing to pursue [a voluntary waiver of seniority rights] or any other reasonable accommodation, the company is in no position to argue that it was unable to accommodate reasonably [plaintiff's] religious needs without undue hardship on the conduct of its business."); *EEOC v. Ithaca Indus., Inc.*, 849 F.2d 116, 118-19 (4th Cir. 1988) (finding that employer's failure to attempt to accommodate, absent any showing of undue hardship, violated Title VII).

[**223**] *Ansonia Bd. of Educ.*, 479 U.S. at 68-69 (holding that an employer could satisfy its obligation by offering an alternative reasonable accommodation to the particular one proposed by the employee); *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 146 (5th Cir. 1982) (explaining that an "employee has a correlative duty to make a good faith attempt to satisfy his needs through means offered by the employer" and that a "reasonable accommodation need not be on the employee's terms only" before concluding that the employee failed to fully explore shift swaps proposed by his employer); *Chrysler Corp. v. Mann*, 561 F.2d 1282, 1286 (8th Cir. 1977) (where employee "will not attempt to accommodate his own beliefs through the means already available to him or cooperate with his employer in its conciliatory efforts, he may forego the right to have his

beliefs accommodated").

[**224**] *See supra* §§ 12-I-A-2 ("Sincerely Held"), 12-I-A-3 ("Employer Inquiries into Religious Nature or Sincerity of Belief"); *see also Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444, 451 (7th Cir. 2013) ("If the managers who considered the request had questions about whether the request was religious, nothing would have prevented them from asking [the employee] to explain a little more about the nature of his request . . . . [The] law leaves ample room for dialogue on these matters."); *Vinning-El v. Evans*, 657 F.3d 591, 594 (7th Cir. 2011) (noting, in a prison religious accommodation case, that where asserted religious belief differed significantly "from the orthodox beliefs of [prisoner's] faith, . . . [s]uch a belief isn't impossible, but it is sufficiently rare that a prison's chaplain could be skeptical and conduct an inquiry to determine whether the claim was nonetheless sincere"); *Dockery v. Maryville Acad.*, 379 F. Supp. 3d 704,

718-19 (N.D. Ill. 2019) (holding that employer had objective basis for questioning whether employee sincerely believed that it was against his religion to work during Sabbath, where employee previously was willing to do so, employee himself testified that he told employer he could not work on Friday and Saturdays "because he was 'used to' and 'accustomed to' having those days off 'to be able to worship with [his] family and do different things with [his] family,'" and employee failed to explain or provide more information to employer as requested).

[**225**] *See Bushouse v. Loc. Union 2209*, 164 F. Supp. 2d 1066, 1078 & n.18 (N.D. Ind. 2001) (holding that union's refusal to provide accommodation unless employee produced independent corroboration that his accommodation request was motivated by a sincerely held religious belief did not violate Title VII's religious accommodation provision, but cautioning that the holding was limited to "the facts and circumstances of the present case" and that "[t]he inquiry [into sincerity] and the scope of that inquiry will necessarily vary based upon the individual requesting corroboration and the facts and circumstances of the request").

[**226**]  *See United States v. Broyles*, 423 F.2d 1299, 1302 (4th Cir. 1970) (letter from retired Army officer who had known conscientious objector for more than twenty years, and letter from college president who had known him for more than ten years, were "[i]mpressive backing" for his claims of sincere religious belief).

[**227**]  *See Ansonia Bd. of Educ.*, 479 U.S. at 70 (referring to reasonable accommodation as one that "eliminates the conflict between employment requirements and religious practices"); *see also, e.g.*, *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569 (7th Cir. 1997) (ruling that employer did not satisfy reasonable accommodation requirement by offering to let Jewish employees take off a day other than Yom Kippur, because that would not eliminate the conflict between religion and work); *Opuku-Boateng v. California*, 95 F.3d 1461, 1467 (9th Cir. 1996) (if negotiations between employer and employee "do not

141 (9th Cir. 1996) ("If negotiations between employer and employee 'do not produce a proposal by the employer that would eliminate the religious conflict, the employer must either accept the employee's proposal or demonstrate that

it would cause undue hardship were it to do so'"); *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1378 (6th Cir. 1994) ("If the employer's efforts fail to eliminate the employee's religious conflict, the burden remains on the employer to establish that it is unable to reasonably accommodate the employee's beliefs without incurring undue hardship."); *EEOC v. Universal Mfg. Corp.*, 914 F.2d 71, 72 (5th Cir. 1990) (per curiam) (district court "erred in ruling that, absent a showing of undue hardship by an employer, accommodating only one of the two practices of the employee's religion, both of which conflicted with the employee's work duties, satisfied as a matter of law the duty of 'reasonable accommodation'"); *Baker v. Home Depot*, 445 F.3d 541, 547-48 (2d Cir. 2006) ("[T]he shift change offered to Baker was no accommodation at all because, although it would allow him to attend morning church services, it would not permit him to observe his religious requirement to abstain from work *totally* on Sundays."); *cf. US Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002) (in context of Americans with Disabilities Act, "the word 'accommodation' . . . conveys the need for effectiveness").

Some courts of appeals have appeared to suggest that a reasonable accommodation need only lessen the conflict between religion and work, even in the absence of a showing that other accommodations would impose undue hardship. But, in practice, even those courts have not applied a standard that is materially different from the one described above, and they take into account facts that the Commission and other courts would analyze as relevant only to undue hardship. *See, e.g.*, *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307 (4th Cir. 2008) (analyzing reasonableness of proposed accommodation based in part on facts typically considered as part of undue hardship analysis); *Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1030-33 (8th Cir. 2008) (rejecting jury instruction that described a reasonable accommodation as one must eliminate any work-religion conflict because "[w]hat is reasonable depends on the totality of the circumstances and therefore might, or might not, require elimination of a particular, fact-specific conflict"). The Commission believes its approach to this issue is straightforward and in keeping with the purpose of Title VII's accommodation requirement. Concerns about issues such as conflicts with a union contract or burdens on other employees' settled expectations can and should be addressed in the context of evaluating whether an accommodation would impose an undue hardship. Moreover, the employer need not grant an employee's requested accommodation if the employer wishes instead to offer an alternative reasonable accommodation of its own choosing that also would eliminate the work-religion conflict and would not adversely affect the employee's terms, conditions, or privileges of employment.

[**228**]  *See, e.g.*, *Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 168 (2d Cir. 2001) (holding that employer complied with Title VII when it granted partial accommodation—allowing proselytizing at certain times, not at all times, as requested—where employer could not allow additional proselytizing without

requested "where employer could resolve additional proselytizing without
"jeopardiz[ing] the state's ability to provide services in a religion-neutral
manner," which the court apparently concluded would pose an undue
hardship); *Ilona of Hungary, Inc*., 108 F.3d at 1576 (suggesting that if employer
would suffer undue hardship from eliminating a religious conflict by granting a
full day of leave to observe a religious holiday, the employer should still "offer a
partial day off").;

[**229**]  *See Ansonia Bd. of Educ.*, 479 U.S. at 70 (explaining that the
accommodation of unpaid leave generally has "*no direct effect upon either
employment opportunities or job status*" in the course of concluding that it
would generally be reasonable, but emphasizing that "unpaid leave is not a
reasonable accommodation when paid leave is provided for all purposes *except*
religious ones" (first emphasis added) (internal quotation marks and citation
omitted)); *Adeyeye*, 721 F.3d at 455 (not a reasonable accommodation to offer
"voluntary self-termination with the possibility of being rehired"); *Cosme v.
Henderson*, 287 F.3d 152, 160 (2d Cir. 2002) (stating that "an accommodation
might be unreasonable if it imposes a significant work-related burden on the
employee without justification"); *Wright v. Runyon*, 2 F.3d 214, 217 (7th Cir.
1993) (explaining that the question whether an accommodation is reasonable
requires a "more searching inquiry" if an employee, "in order to accommodate
his religious practices, had to accept a reduction in pay or some other loss of
benefits"); *Am. Postal Workers Union v. Postmaster Gen*., 781 F.2d 772, 776-77
(9th Cir. 1986) (holding employers must offer accommodations that
"reasonably preserve th[e] employee's . . . compensation, terms, conditions, or
privileges of employment"); *Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 519-
20 (6th Cir. 1975) (ruling that where a transfer would adversely affect employee

because, *inter alia*, it would involve a substantial reduction in pay, employer
"first must attempt to accommodate the employee within his current job
classification," and transfer may be considered "as a last resort" only if "no such
accommodation is possible, or if it would impose an undue hardship upon the
employer"); *see also Commission Guidelines*, 29 C.F.R. § 1605.2(c)(2)(ii) ("[W]hen
there is more than one means of accommodation which would not cause
undue hardship, the employer or labor organization must offer the alternative
which least disadvantages the individual with respect to his or her employment
opportunities.").

[**230**] *See Ansonia Bd. of Educ.*, 479 U.S. at 68 ("[W]here the employer has
already reasonably accommodated the employee's religious needs, the
statutory inquiry is at an end.  The employer need not further show that each of
the employee's alternative accommodations would result in undue hardship.");
*Rodriguez v. City of Chi.*, 156 F.3d 771, 776 (7th Cir. 1998) (employee is not
entitled to his choice of reasonable accommodation); *Smith v. Pyro Mining Co.*,
827 F.2d 1081, 1085 (6th Cir. 1987) (same); *cf. Opuku-Boateng*, 95 F.3d at 1475
(ruling that employer violated Title VII because it offered no accommodation,
such as employee's suggestions of scheduling him instead for other equally
undesirable shifts, and employer did not show undue hardship).

[231] *See Ansonia Bd. of Educ.*, 479 U.S. at 70-71 ("unpaid leave is not a reasonable accommodation when paid leave is provided for all purposes *except* religious ones . . . [because] [s]uch an arrangement would display a discrimination against religious practices that is the antithesis of reasonableness").  In cases involving requests for leave as an accommodation, an employer does not have to provide paid leave as an accommodation beyond that otherwise available to the employee but may have to provide unpaid leave as an accommodation if doing so would not pose an undue hardship.

[232] *See Commission Guidelines*, 29 C.F.R. § 1605.2(c)(2)(ii) ("[W]hen there is more than one means of accommodation which would not cause undue hardship, the employer or labor organization must offer the alternative which least disadvantages the individual with respect to his or her employment opportunities.").  This principle is consistent with the Supreme Court's holding

in *Ansonia Board of Education* that an employer discharges its accommodation obligation by offering *any* accommodation that is reasonable. 479 U.S. at 68-69.  In reaching this conclusion, the Court observed that the EEOC guideline calling for employers to offer the accommodation that least disadvantages an individual's employment opportunities (without undue hardship) is different from requiring an "employer to accept any alternative favored by the employee short of undue hardship."  *See id.* at 69 n.6 (referring to 29 C.F.R. § 1605.2(c)(2) (ii)).  The Court emphasized that the guideline "contains a significant limitation," calling for comparative analysis of accommodations only when an accommodation offered by an employer disadvantages employment opportunities*.  Id*. In the wake of *Ansonia*, many courts have, consistent with the Commission's guidelines, evaluated whether employer accommodations had a negative impact on the individual's employment opportunities as part of the analysis into whether the accommodations were "reasonable."  *See supra* note 229 (citing cases).

[233] *Pyro Mining Co.*, 827 F.2d at 1085 (quoting *Redmond v. GAF Corp.*, 574 F.2d 897, 902-03 (7th Cir. 1978)).

[234]  *Cf. Baker v. Home Depot*, 445 F.3d 541, 547-48 (2d Cir. 2006) (finding that employer's offer to schedule employee to work in the afternoon or evenings on Sundays, rather than the mornings, was not a "reasonable" accommodation under Title VII where employee's religious views required not only attending Sunday church services but also refraining from work on Sundays).

[235] *See Ansonia*, 479 U.S. at 69 (employer is not required to offer employee's preferred reasonable accommodation); *Porter v. City of Chi.*, 700 F.3d 944, 951 (7th Cir. 2012) (same).

[236]  *See infra* note 278.

[237] *See Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 226 (3d Cir. 2000) (finding that state hospital's offer to transfer nurse laterally to newborn

intensive care unit was reasonable accommodation for her religious beliefs which prevented her from assisting in emergency abortions of live fetuses," where hospital had staffing cuts and concerns about risks to patients' safety

and nurse presented no evidence that transfer would affect her salary or benefits); *see also Rodriguez v. City of Chi.*, 156 F.3d 771, 774 (7th Cir. 1998) (holding that city's offer to allow police officer to exercise his right under collective bargaining agreement to transfer to a district with no abortion clinics, which would resolve his religious objection to being assigned to guard such facilities and would result in "no reduction in pay or benefits," was a reasonable accommodation and observing that Title VII did not compel the employer to grant the officer's preferred accommodation of remaining in his district but being relieved of such assignments); *Wright v. Runyon*, 2 F.3d 214, 217 (7th Cir. 1993) (finding that employer reasonably accommodated employee by suggesting he exercise his rights under collective bargaining agreement to bid on jobs that he would have been entitled to, that were "essentially equivalent" to his current position, and that would have eliminated the conflict between work and religion).

**[238]**   Federal conscience laws provide protections related to abortion and sterilization and include the Church Amendments (42 U.S.C. § 300a-7 et seq.), the Coats-Snowe Amendment (Section 245 of the Public Health Service Act, 42 U.S.C. § 238n), the Weldon Amendment (part of every HHS appropriations act since 2005), and Section 1553 of the Affordable Care Act (42 U.S.C. § 18113). These laws are enforced by the Department of Health and Human Services (HHS).  For example, in 2019, HHS found that a university hospital violated the Church Amendments by discriminating against health care personnel who have religious or moral objections to participating in abortions when it scheduled and pressured them to assist with elective abortions despite specific and repeated requests not to be assigned to those procedures due to religious and moral objections.  *See* Letter from Roger T. Severino, Dir., Off. of Civ. Rts., Dep't of Health & Hum. Svcs. & Luis E. Perez, Deputy Dir., Off. of Civ. Rts., Dep't of Health & Hum. Svcs. (Aug. 28, 2019), (finding that the University of Vermont Medical Center unlawfully forced health care personnel, including nurses, to assist in abortions), **https://www.hhs.gov/sites/default/files/uvmmc-nov-letter_508.pdf (https://www.hhs.gov/sites/default/files/uvmmc-nov-letter_508.pdf)**.  The Commission is referencing these laws for informational purposes and is not opining on any of their requirements or whether they would require additional burdens on employers beyond Title VII's analysis for reasonable accommodation.

**[239]** *Lawson v. Washington*, 296 F.3d 799, 805 n.5 (9th Cir. 2002).

**[240]**   *See supra* notes 210-212 and accompanying text.

**[241]** *See Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1379 (6th Cir. 1994) (holding that employer was obligated to accommodate a Seventh-day Adventist employee whose need for accommodation to observe Sabbath had changed in

the 17 months since employer had last scheduled her to work on a Friday night
or Saturday, where her "undisputed testimony was that her faith and
commitment to her religion grew during this time").

[**242**] *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977).  The "more
than a *de minimis* cost" Title VII undue hardship standard is lower than the ADA
undue hardship standard, which requires employers to show that the
accommodation would cause "significant difficulty or expense," 42 U.S.C.
§ 12111(10)(A).

[**243**]   The statute, at 42 U.S.C. § 2000e(j), and the *Commission Guidelines*, at 29
C.F.R. § 1605.2(b), require an employer to reasonably accommodate an
employee's or applicant's religious beliefs and practices unless the "employer
demonstrates"  that doing so would pose an undue hardship.  Even when
courts have focused on reasonableness before looking at undue hardship, the
employer still has the burden of persuasion on the undue hardship issue.  *See,
e.g.*, *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 315 (4th Cir. 2008);
*Sturgill v. United Parcel Serv., Inc.*, 512 F.3d 1024, 1033 n.4 (8th Cir. 2008).

[**244**] *Tooley v. Martin-Marietta Corp.*, 648 F.2d 1239, 1243 (9th Cir. 1981)
(internal quotation marks and citation omitted).

[**245**]   *See Commission Guidelines*, 29 C.F.R. § 1605.2(e).

[**246**] *Compare Cooper*, 15 F.3d at 1380 (finding that employee's request not to
be scheduled for Saturday work due to Sabbath observance posed undue
hardship for employer because it would have required either hiring an
additional worker or risking the loss of production), *and Beadle v. Tampa*, 42

F.3d 633, 637-38 (11th Cir. 1995) (finding that requiring police department to
alter training program schedule to accommodate employee's religious needs
amounted to more than *de minimis* cost and thus an undue hardship because
employee "would not have experienced the educational benefits of working
with different training officers"), *with Protos v. Volkswagen of Am., Inc.*, 797 F.2d
129, 133-34 (3d Cir. 1986) (finding that employee's request not to be scheduled
for Saturday work due to Sabbath observance did not pose undue hardship
where district court found that that efficiency, production, and quality would
be not affected and entire assembly line remained intact notwithstanding
employee's Saturday absences).

[**247**] *See Tabura v. Kellogg USA*, 880 F.3d 544, 558 (10th Cir. 2018) (reversing
summary judgment for employer where it "did not . . . cite to any evidence to
support its assertions" that accommodating plaintiffs' need to observe their
Sabbath would impose an undue hardship "in the form of unauthorized
overtime, quality control issues, and even forcing entire lines to shut down");
*Brown v. Gen. Motors Corp.*, 601 F.2d 956, 960 (8th Cir. 1979) (holding that
"projected 'theoretical' future effects cannot outweigh the undisputed fact that
no monetary costs and *de minimis* efficiency problems were actually incurred
during the three month period in which [employee] was accommodated");

*Tooley v. Martin-Marietta Corp.*, 648 F.2d 1239, 1243 (9th Cir. 1981) (undue hardship requires "proof of actual imposition on coworkers or disruption of the work routine" rather than "conceivable or hypothetical hardships" (internal quotation marks and citation omitted)); *Toledo v. Nobel-Sysco, Inc.*, 892 F.2d 1481, 1492 (10th Cir. 1989) ("Any proffered hardship . . . must be actual," not speculative).

[**248**] *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977); *see also Commission Guidelines*, 29 C.F.R. § 1605.2(e)(1).

[**249**] *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 616 (9th Cir. 1988) (quoting *Anderson v. Gen. Dynamic*, 589 F.2d 397, 402 (9th Cir. 1978)) (alteration in original).

[**250**] *Commission Guidelines*, 29 C.F.R. § 1605.2(e)(1).

[**251**] *Id.* For example, in *Hardison*, the payment of overtime (or premium pay) to another employee so that plaintiff could be off for weekly religious observance was an undue hardship. 432 U.S. at 68-69, 84. By contrast, infrequent payment of premium wages for an occasional religious observance is not "more than *de minimis*." *See, e.g.*, *EEOC v. Sw. Bell Tel. LP*, No. 3:06CV00176 JLH, 2007 WL 2891379, at *4 (E.D. Ark. Oct. 3, 2007) (denying summary judgment for employer on claim by two employees that they were improperly denied leave for annual religious observance that would have required company to pay overtime wages of approximately $220 each to two replacements, where facility routinely paid technicians overtime, employer failed to contact union about possible accommodation, and policy providing for only one technician on leave per day was not always observed, and there was no evidence that customer service needs actually went unmet on day at issue) (jury verdict for plaintiffs subsequently entered), *appeal dismissed*, 550 F.3d 704 (8th Cir. 2008); *see also Redmond v. GAF Corp.*, 574 F.2d 897, 904 (7th Cir. 1987) (ruling that employer could not demonstrate that paying replacement worker premium wages would cause undue hardship because plaintiff would have been paid premium wages for hours at issue).

[**252**] *See, e.g.*, *Brown v. Polk Cnty.*, 61 F.3d 650, 655 (8th Cir. 1995) (en banc) (holding that allowing employee to assign secretary to type his Bible study notes posed more than *de minimis* cost because secretary would otherwise have been performing employer's work during that time); *see also Protos v. Volkswagen of Am., Inc.*, 797 F.2d 129, 134-35 (3d Cir. 1986) (no undue hardship where "efficiency, production, quality and morale … remained intact during [employee's] absence").

[**253**] *See Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 607 (9th Cir. 2004) ("[A]n employer need not accommodate an employee's religious beliefs if doing so would result in discrimination against his coworkers or deprive them of contractual or other statutory rights."); *Virts v. Consol. Freightways Corp. of Del.*, 285 F.3d 508, 517-18 (6th Cir. 2002) (holding that trucking firm had no obligation

under Title VII to accommodate a driver's religious request for only male driving partners, where making assignments in this manner would have violated collective bargaining agreement).

[**254**]  *See, e.g.*, *EEOC v. GEO Grp., Inc.*, 616 F.3d 265, 273 (3d Cir. 2010) ("A religious accommodation that creates a genuine safety or security risk can undoubtedly constitute an undue hardship for an employer-prison.").  However, an employer should not assume that it would pose an undue hardship to accommodate a religious practice that appears to conflict with a generally applicable safety requirement, but rather should assess whether an undue hardship is actually posed.  For example, there are existing religious exemptions to the government enforcement procedures of some safety requirements.  *See, e.g.*, Occupational Safety & Health Admin., U.S. Dep't of Lab., STD 1-6.5: Exemption for Religious Reason from Wearing Hard Hats (June 20, 1994), **https://www.osha.gov/enforcement/directives/std-01-06-005 (https://www.osha.gov/enforcement/directives/std-01-06-005)** (exempting employers from citations for certain violations based on religious objection of employee, but providing for various reporting requirements).

[**255**] *See, e.g.*, *Bruff v. N. Miss. Health Serv., Inc.*, 244 F.3d 495, 501 (5th Cir. 2001) (requiring coworkers of plaintiff mental health counselor to assume disproportionate workload to accommodate plaintiff's request not to counsel certain clients on religious grounds would involve more than *de minimis* cost); *Bhatia v. Chevron USA, Inc.*, 734 F.2d 1382, 1384 (9th Cir. 1984) (per curiam) (holding that it would be undue hardship to reassign plaintiff's share of potentially hazardous work to coworkers); *EEOC v. BJ Servs. Co.*, 921 F. Supp. 1509, 1514 (N.D. Tex. 1995) (stating employer "was not required to deny other employees their vacation days so that they could work in place of [plaintiff]" and that cost of hiring an additional worker was more than *de minimis*).

[**256**] *See, e.g.*, *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 830-31 (9th Cir. 1999) (holding that employer was not required to accommodate job applicant's religiously based refusal to provide his social security number where employer sought it to comply with Internal Revenue Service and Immigration and Naturalization Service requirements).

[**257**]  *See infra* note 266.

[**258**] *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 83 (1977) (holding employer "was not required by Title VII to carve out a special exception to its seniority system in order to help [employee] to meet his religious obligations" of observing the Sabbath and not working on certain specified religious holidays); *Virts*, 285 F.3d at 517-18 (holding trucking firm had no obligation under Title VII to accommodate a driver's religious request for only male driving partners, where making assignments in this manner would have violated CBA); *Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1153, 1156 (10th Cir. 2000) (holding that because seniority system in the CBA gave more senior employees first choice for job assignments, it would be an undue hardship for employer to

grant employee's accommodation request not to be scheduled to work on Saturdays); *Mann v. Frank*, 7 F.3d 1365, 1369-70 (8th Cir. 1993) (finding no violation of the duty to accommodate where the union refused the employer's request to assign another worker to take plaintiff's Saturday shift, which would have violated CBA's provisions governing overtime).

[**259**]  *See Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999) (holding that "the existence of a neutral seniority system does not relieve the employer of its duty to reasonably accommodate the religious beliefs of its employees, so long as the accommodation can be accomplished without disruption of the seniority system and without more than a de minimis cost to the employer"); *EEOC v. Arlington Transit Mix, Inc.*, 957 F.2d 219, 222 (6th Cir. 1991) ("At a minimum, Arlington had an obligation to explore a voluntary waiver of seniority rights before terminating Taylor.  After failing to pursue this or any other reasonable accommodation, the company is in no position to argue that it was unable to accommodate reasonably his religious needs without undue hardship on the conduct of its business.").

[**260**]  *See Commission Guidelines*, 29 C.F.R. § 1605.2(e)(2); *Antoine v. First Student, Inc.*, 713 F.3d 824, 840 (5th Cir. 2013) (holding that allowing employee to voluntarily swap shifts was not an undue hardship where CBA authorized employer-facilitated voluntary route changes).

[**261**]  *Lee v. ABF Freight Sys., Inc.*, 22 F.3d 1019, 1023-24 (10th Cir. 1994) (holding that the employer satisfied its Title VII obligation when it suggested method by which driver would usually be able to work the number of trips each week required under the union contract prior to the Sabbath, and could often

use vacation time on other occasions; employer was not required to grant driver's request to skip assignments, which would then have to be worked by other drivers; his request to work less than other full-time drivers and reimburse employer for additional costs; or his request to transfer with no loss of seniority, which would violate its CBA, where the employer had sought but could not obtain a waiver from the union).

[**262**]  *See Brown v. Polk Cnty.*, 61 F.3d 650, 655 (8th Cir. 1995) (en banc) (holding that allowing employee to assign secretary to type his Bible study notes posed more than *de minimis* cost because secretary would otherwise have been performing employer's work during that time); *see also Protos v. Volkswagen of Am., Inc.*, 797 F.2d 129, 134-35 (3d Cir. 1986) (no undue hardship where "efficiency, production, quality and morale . . .  remained intact during [employee's] absence").

[**263**]  *See Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 607-08 (9th Cir. 2004) (undue hardship for employer to accommodate employee's religiously motivated posting of large signs in his cubicle which he "intended to be hurtful" and to demean and harass his coworkers); *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1021 (4th Cir. 1996) (undue hardship to accommodate "religious need" to send "personal, disturbing letters to [coworkers] accusing them of

need" to send "personal, disturbing letters to [coworkers] accusing them of immorality").

[**264**] *See Opuku-Boateng v. California*, 95 F.3d 1461, 1473 (9th Cir. 1996) (holding that mere complaints by other employees did not constitute undue hardship where employer failed to establish that accommodating employee's religious holidays would have required more than *de minimis* cost or burden on coworkers).

[**265**] *Brown*, 61 F.3d at 655 ("Undue hardship requires more than proof of some fellow-worker's grumbling. . . . An employer . . . would have to show . . . actual imposition on coworkers or disruption of the work routine." (quoting *Burns v. S. Pac. Transp. Co.*, 589 F.2d 403, 407 (9th Cir. 1978) (alterations in original)).

[**266**]  There may be different results depending on the specific setting and the religious garb at issue.  *See, e.g.*, *United States v. Essex Cnty.*, No. 09–2772 (KSH), 2010 WL 551393 (D.N.J. Feb. 16, 2010) (denying motion to dismiss, the court allowed the United States to proceed with denial-of-accommodation claim on behalf of Muslim employee of Essex County Department of Corrections who was denied accommodation of wearing her religious headscarf and terminated).  *But see EEOC v. GEO Group, Inc.*, 616 F.3d 265, 273 (3d Cir. 2010) (rejecting EEOC's claim that prison officials should have accommodated female Muslim employees by granting an exception to the dress code that would permit them to wear their khimars, but agreeing that there is no "per se rule of law about religious head coverings or safety," even for police or paramilitary groups); *Webb v. City of Phila.*, 562 F.3d 256, 260-62 (3d Cir. 2009) (ruling that it would have posed an undue hardship to allow accommodation for a police officer who sought dress code exception to wear khimar); *Finnie v. Lee Cnty.*, 907 F. Supp. 2d 750, 780-81 (N.D. Miss. 2012) (ruling that evidence-supported safety concerns met burden of proving undue hardship would be posed by allowing religious exception to pants-only uniform policy for detention officers).

[**267**]  The *Commission Guidelines*, 29 C.F.R. § 1605.2(d), set forth suggested methods of accommodating scheduling conflicts, but those methods are not intended to comprise an exhaustive list.  Different factual circumstances will require different solutions.  State wage and hour laws may provide certain limitations that affect an employer's potential flexibility.

[**268**]  *See supra* notes 227-229 and accompanying text.

[**269**] *See EEOC v. JBS USA, LLC*, 339 F. Supp. 3d 1135, 1182-83 (D. Colo. 2018) (not undue hardship to allow short unscheduled prayer breaks because "the preponderance of the evidence showed that allowing unscheduled prayer breaks would not have more than a de minimis effect on productivity or safety"); *Mohamed v. 1st Class Staffing, LLC*, 286 F. Supp. 3d 884, 910 (S.D. Ohio 2017) (suggesting that allowing employees to take break either 15 minutes

early or 15 minutes late so that they could have the break room to themselves to pray would not be an undue hardship).

[**270**]  *Cf. Protos v. Volkswagen of Am., Inc.*, 797 F.2d 129, 135 (3d Cir. 1986) (employer would not incur undue hardship from granting exception to mandatory Saturday overtime work for employee whose religious beliefs prevented her from working on her Sabbath, because employer did not have to pay higher wages to fill the vacancy).

[**271**]  *Commission Guidelines*, 29 C.F.R. 1605.2(d)(i),

[**272**]  *See, e.g.*, *Beadle v. Hillsborough Cty. Sheriff's Dep't*, 29 F.3d 589, 593 (11th Cir. 1994) (finding that employer satisfied its accommodation obligation by providing employee a roster with his coworkers' schedules and allowing employee to make announcement on bulletin board and at employee meeting to seek out coworkers willing to swap).

[**273**] *See Tabura v. Kellogg USA*, 880 F.3d 544, 555-57 (10th Cir. 2018) (remanding to determine whether  employer satisfied its accommodation obligation by allowing employees to use paid leave and to seek volunteers to swap shifts to avoid working on their Sabbath, where employees had insufficient paid leave and plaintiffs had difficulty arranging voluntary swaps); *McGuire v. Gen. Motors Corp.*, 956 F.2d 607, 608-10 (6th Cir. 1992) (per curiam) (remanding to determine whether employer satisfied its accommodation obligation by allowing employee to swap shifts to avoid working on his Sabbath where employee found it "virtually impossible" to arrange voluntary swaps).

[**274**]  *See, e.g.*, *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1088-89 (6th Cir. 1987) (where plaintiff believed it was morally wrong to work on the Sabbath and that it was a sin to induce another employee to do so, it was not a reasonable accommodation for employer simply to be amenable to a shift swap; employer would not have incurred undue hardship by soliciting a replacement).

[**275**]  *Commission Guidelines*, 29 C.F.R. § 1605.2(e)(1); *see also Redmond v. GAF Corp.*, 574 F.2d 897, 904 (7th Cir. 1978) (holding that employer could not demonstrate paying replacement worker premium wages would cause undue hardship because plaintiff would have been paid premium wages for the hours at issue); *EEOC v. Sw. Bell Tel. LP*, No. 3:06CV00176 JLH, 2007 WL 2891379, at *4 (E.D. Ark. Oct. 3, 2007) (finding that payment of premium wages for one day to allow two employees to attend yearly Jehovah's Witness convention as part of

their religious practice, at alleged cost of $220.72 per person in facility that routinely paid overtime, was not an undue hardship as a matter of law, where there was no evidence that customer service needs actually went unmet on the day at issue) (jury verdict for plaintiffs subsequently entered), *appeal dismissed*, 550 F.3d 704 (8th Cir. 2008).

[**276**]  *See Noesen v. Med. Staffing Network, Inc.*, 232 F. App'x 581, 584-85 (7th Cir. 2007) (holding that employee's proposed accommodation of assigning responsibility for all initial customer contact to lower-paid technicians, even if it

responsibility for all initial customer contact to lower-paid technicians, even if it could be done, would impose an undue hardship because it would divert technicians from their assigned data input and insurance verification duties, resulting in uncompleted data work); *see also supra* note 238 (discussing potential application of federal conscience protection laws to health care employees).

[**277**]  *See Noesen*, 232 F. App'x at 584.

[**278**]  *Commission Guidelines*, 29 C.F.R. § 1605.2(d)(iii) ("When an employee cannot be accommodated either as to his or her entire job or an assignment within the job, employers and labor organizations should consider whether or not it is possible to change the job assignment or give the employee a lateral transfer."); *see Draper v. U.S. Pipe & Foundry Co.*, 527 F.2d 515, 519-20 (6th Cir. 1975) (holding that transfer involving substantial reduction in pay and that would have "wasted [plaintiff's] skills" would not be reasonable accommodation where plaintiff could have been accommodated in his original position without undue hardship).  *But see Rodriguez v. City of Chi.*, 156 F.3d 771, 775 (7th Cir. 1998) (city's offer of lateral transfer was a reasonable accommodation, and therefore court need not consider whether it would have been an undue hardship for city to accommodate plaintiff in his original position).

[**279**]  *Commission Guidelines*, 29 C.F.R. § 1605.2(d)(iii).

[**280**]  *See Cook v. Lindsay Olive Growers*, 911 F.2d 233, 241 (9th Cir. 1990) (holding, under state law parallel to Title VII, that transfer of employee to a lower-level position was reasonable where no equivalent position was available after employer attempted to find one and where employee would make more money overall because employee would work five shifts rather than four); *Draper*, 527 F.2d at 519-20 (holding that transfer involving substantial reduction in pay and that would have "wasted [plaintiff's] skills" would not be reasonable accommodation where plaintiff could have been accommodated in his original position without undue hardship).

[**281**]  *See Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998) ("An employer may reassign an employee to a lower grade and paid position if the employee cannot be accommodated in the current position and a comparable position is not available.") (ADA).  At least one court has ruled that it is unreasonable for public protectors such as police officers or fire fighters to seek to be relieved from certain assignments as a religious accommodation.  *See Endres v. Ind. State Police*, 349 F.3d 922, 927 (7th Cir. 2003) (holding that state police officer's requested religious accommodation not to be assigned to full-time, permanent work at a casino was unreasonable, because police and fire departments "need the cooperation of all members" and need them to perform their duties "without favoritism").  However, Title VII does not distinguish between public protectors and other employees; it is not per se unreasonable for public protectors to obtain changes in job assignments, schedule changes,

or transfers in situations where a conflict between their job duties and their religious beliefs could be eliminated or reduced. Title VII requires a fact-specific inquiry to determine whether granting a particular accommodation request would pose an undue hardship. *See Rodriguez*, 156 F.3d at 775 (city provided reasonable accommodation by giving police officer with religious objection to guarding abortion clinic opportunity to seek lateral transfer to district without abortion clinics); .

[**282**] *See, e.g.*, *Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 477 (7th Cir. 2001) ("In many cases, a company must modify its stated policies in practice to reasonably accommodate a religious practice." (citing *Minkus v. Metro. Sanitary Dist.*, 600 F.2d 80 (7th Cir. 1979) (holding that municipal employer failed to accommodate a Jewish applicant when it followed its stated policy and scheduled civil service examinations only on Saturdays)).

[**283**] *See, e.g.*, *EEOC v. United Parcel Serv.*, 94 F.3d 314, 320 (7th Cir. 1996) (reversing grant of summary judgment for employer because genuine issue of material fact existed regarding whether employer reasonably accommodated employee's religious practice of wearing beard). *See generally* EEOC, Religious Garb and Grooming in the Workplace: Rights and Responsibilities (2014), **www.eeoc.gov/eeoc/publications/qa_religious_garb_grooming.cfm (https://www.eeoc.gov/eeoc/publications/qa_religious_garb_grooming.cfm)** .

[**284**] *See United Parcel Serv*., 94 F.3d at 318-20; *cf. Daniels v. City of Arlington*, 246 F.3d 500, 505-06 (5th Cir. 2001) (finding no Title VII violations when it would be an unreasonable accommodation and undue hardship for the police to be forced to let individual officers add religious symbols to their uniforms, and the plaintiff failed to respond to reasonable offers of accommodation).

[**285**] *See Cloutier v. Costco Wholesale Corp.*, 390 F.3d 126, 136 (1st Cir. 2004) (holding that it would pose an undue hardship to require Costco to grant an exemption "because it would adversely affect the employer's public image," given Costco's "determination that facial piercings . . . detract from the 'neat, clean and professional image' that it aims to cultivate"); *cf. Brown v. F.L. Roberts & Co.*, 419 F. Supp. 2d 7, 17 (D. Mass. 2006) (stating it was bound to follow *Cloutier* as the law of the circuit and holding that no Title VII violation occurred when employer transferred lube technician whose Rastafarian religious beliefs prohibited him from shaving or cutting his hair to a location with limited customer contact because he could not comply with a new grooming policy, but observing in dicta: "If *Cloutier*'s language approving employer prerogatives regarding 'public image' is read broadly, the implications for persons asserting claims for religious discrimination in the workplace may be grave. One has to wonder how often an employer will be inclined to cite this expansive language to terminate or restrict from customer contact, on image grounds, an employee wearing a yarmulke, a veil, or the mark on the forehead that denotes Ash Wednesday for many Catholics. More likely, and more ominously,

considerations of 'public image' might persuade an employer to tolerate the
religious practices of predominant groups, while arguing 'undue hardship' and
'image' in forbidding practices that are less widespread or well known.").

[**286**]  *See EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2031, 2034
(2015) (recognizing, in case where the employer's grooming policy prohibited
"caps" as "too informal for [its] desired image," that "Title VII requires
otherwise-neutral policies," such as a no-headwear dress code, "to give way to
the need for an accommodation").  Denying the employer's motion for
summary judgment in *EEOC v. Red Robin Gourmet Burgers, Inc.*, No. C04–
1291JLR, 2005 WL 2090677, at *5 (W.D. Wash. Aug. 29, 2005), the court ruled
that notwithstanding the employer's purported reliance on a company profile
and customer study suggesting that it seeks to present a family-oriented and
kid-friendly image, the company failed to demonstrate that allowing an
employee to have visible religious tattoos was inconsistent with these goals.
"Hypothetical hardships based on unproven assumptions typically fail to
constitute undue hardship. . . .  [The employer] must provide evidence of
'actual imposition on coworkers or disruption of the work routine' to
demonstrate undue hardship." *Id.*

[**287**] *See United States v. N.Y. City Trans. Auth.*, No. 04–CV–4237, 2010 WL
3855191, at *22 (E.D.N.Y. Sept. 28, 2010) (holding that pattern-or-practice claim
could proceed on behalf of Muslim and Sikh bus drivers, train operators, and
subway station agents alleging selective enforcement of city's headwear
policies and failure to accommodate Muslim and Sikh employees who could
not comply for religious reasons); *see also EEOC v. Am. Airlines*, Civil Action No.
02-C-6172 (N.D. Ill.) (Order of Resolution filed September 3, 2002) (resolving
claim on behalf of employee who was not hired as passenger service agent
because she wore a hijab for religious reasons in violation of the airline's since-
changed uniform policy; the airline's current uniform policy specifically
contemplates exceptions for religious accommodation of employees); *see also
EEOC v. Alamo Rent-A-Car, LLC*, 432 F. Supp. 2d 1006, 1015-17 (D. Ariz. 2006)
(holding employer violated Title VII by instructing employee she would have to
remove her religious garb whenever interacting with customers, and work in
the back office when she wore it).

[**288**]  *See Webb v. City of Phila.*, 562 F.3d 256, 260-62 (3d Cir. 2009) (holding that
municipal employer established as a matter of law that it would pose an undue
hardship to accommodate wearing of traditional religious headpiece called a

khimar by Muslim police officer while in uniform, in contravention of the
department's dress code directive).  *But cf. Fraternal Order of Police v. City of
Newark*, 170 F.3d 359, 366 (3d Cir. 1999) (explaining that police department's
interests in "fostering a uniform appearance through its 'no-beard' policy" and
in security were undermined when it allowed officers to wear beards for
medical reasons and holding that department's refusal to allow officers also to
wear beards for religious reasons violated the Free Exercise Clause).

[**289**] *Cf. Federal Workplace Guidelines, supra* note 110 § 1.C ("'Accommodation

[**289**] Cf. *Federal Workplace Guidelines*, *supra* note 119 § 1.C ("Accommodation of Religious Exercise"), example (d) (government workplaces that allow employees to use facilities for non-work-related secular activities generally are required to allow the privilege on equal terms for employee religious activities).

[**290**] *See, e.g.*, *Minkus v. Metro. Sanitary Dist.*, 600 F.2d 80, 81-82 (7th Cir. 1979); *Cary v. Carmichael*, 908 F. Supp. 1334, 1343-46 (E.D. Va. 1995) (holding that employee failed to give employer proper notice so that it could attempt an accommodation of his religious objection to signing consent form for a drug test), *aff'd sub nom*, 116 F.3d 472 (4th Cir. 1997).

[**291**] *See, e.g.*, *Minkus*, 600 F.2d at 82-84 (holding that employer must demonstrate it would pose undue hardship to allow applicant to take exam at different time than others as a religious accommodation).

[**292**] *See, e.g.*, *Yeager v. FirstEnergy Generation Corp.*, 777 F.3d 362, 363-64 (6th Cir. 2015) (per curiam) (holding that excusing employee from providing social security number was not required under Title VII because it would require employer to violate another federal law, without reaching issue of whether it constituted an undue hardship); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 830-31 (9th Cir. 1999) (holding that excusing employee from providing social security number would cause undue hardship because it would require violation of another federal law); *Cherry v. Sunoco, Inc.*, No. 07–cv–2235, 2009 WL 2518221, at *7 (E.D. Pa. Aug. 17, 2009) (holding that it would have posed undue hardship on refinery operator to excuse photo identification requirement imposed on employer by U.S. Coast Guard regulations after exemption was denied); *cf. Lizalek v. Invivo Corp.*, 314 F. App'x 881, 882 (7th Cir. 2009) (holding that it would pose an undue hardship to accommodate employee's religious belief that he was exempt from any tax liability and could use multiple names on forms, in part because it would expose employer to potential IRS issues).

[**293**] *See, e.g.*, *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 143 (4th Cir. 2017) (affirming judgment against employer that denied coal mine employee's requested religious accommodation of alternative means to clock in and out when the company adopted a "biometric hand scanner" system that conflicted with his Christian faith, where the evidence showed employer had available an alternative clock-in system for miners who were physically incapable of scanning their hands, but failed to provide it as a religious accommodation), *cert. denied*, 138 S. Ct. 976 (2018).

[**294**] *See Commission Guidelines*, 29 C.F.R. § 1605.2(d)(2); *Tooley v. Martin Marietta Corp.*, 648 F.2d 1239, 1242-44 (9th Cir. 1981) (holding that a union could not force an employer, under a contractual union security clause, to terminate three Seventh-day Adventists who offered to pay an amount equivalent to dues to a nonreligious charity because union failed to show that such an accommodation would deprive it of funds needed for its maintenance and operation); *EEOC v. Univ. of Detroit*, 904 F.2d 331 (6th Cir. 1990) (remanding

for determination whether employer could reasonably accommodate without undue hardship employee's religious objection to associating with certain organizations); *Burns v. S. Pac. Transp. Co.*, 589 F.2d 403, 406-07 (9th Cir. 1978) (holding that allowing an equivalent charitable contribution in lieu of dues did not constitute undue hardship notwithstanding administrative cost to union and "grumblings" by other employees); *Cooper v. Gen. Dynamics*, 533 F.2d 163 (5th Cir. 1976) (holding that religious belief that supporting labor union violated the precept "to love" one's neighbor, i.e., employers, was subject to reasonable accommodation absent undue hardship).

[**295**] *See McDaniel v. Essex Int'l, Inc.*, 696 F.2d 34, 37-38 (6th Cir. 1982) (finding that employee's proposal to donate amount equivalent to dues to a "mutually agreeable" charity was reasonable accommodation that would not have posed undue hardship); *EEOC v. Am. Fed'n of State, Cty. & Mun. E'ees*, 937 F. Supp. 166, 168 (N.D.N.Y. 1996) (holding that donation of shop fee to agreed-upon charity

was reasonable accommodation for employee's religious belief). Some collective bargaining agreements have charities listed in them, pursuant to the requirements of section 19 of the National Labor Relations Act. *See* 29 U.S.C. § 169. At least one court has held that it may be inappropriate to require the religious objector to pay the full amount of the union dues to a charitable organization, however, if non-religious objectors are permitted to pay a reduced amount. *See O'Brien v. City of Springfield*, 319 F. Supp. 2d 90 (D. Mass. 2003) (holding, in part, it was not a reasonable accommodation to require religious objector to pay full union dues where state statute permitted non-union members to pay a lower amount in form of agency fee). *But see Madsen v. Associated Chino Teachers*, 317 F. Supp. 2d 1175, 1179 (C.D. Cal. 2004) (holding it was not disparate treatment under Title VII to require religious objectors to pay full amount of dues to charity where non-religious objectors were only paying agency fee to union).

[**296**] *See Commission Guidelines*, 29 C.F.R. § 1605.2(e); *Nottelson v. Smith Steel Workers D.A.L.U. 19806*, 643 F.2d 445, 450-51 (7th Cir. 1981) (holding that charity-substitute religious accommodation for union dues did not pose undue hardship to union where loss of plaintiff's dues represented only .02% of union's annual budget, and union presented no evidence that the loss of receipts from plaintiff would necessitate an increase in dues of his coworkers, that other workers would seem similar accommodations, or that the accommodation would lead to labor strife); *see also Burns*, 589 F.2d at 407 (holding that excusing employee from paying his monthly $19 union dues did not pose undue hardship, where one union officer testified that the loss "wouldn't affect us at all" and union's asserted fear of many religious objectors was based on mere speculation, but noting that if "in the future, the expressed fear of widespread refusal to pay union dues on religious grounds should become a reality, undue hardship could be proved").

[**297**] *See Univ. of Detroit*, 904 F.2d at 335.

[**298**] *See Wilson v. U.S. W. Commc'ns*, 58 F.3d 1337, 1341-42 (8th Cir. 1995) (given disruption actually caused among coworkers in workplace, employer reasonably accommodated employee's request to wear at all times a button

containing a graphic photograph of a fetus with anti-abortion message by requiring her to cover up the photograph portion when she was at work); *cf. EEOC v. Red Robin Gourmet Burgers, Inc.*, No. C04–1291JLR, 2005 WL 2090677, at *4-5 (W.D. Wash. Aug. 29, 2005) (denying employer's motion for summary judgment because issue of whether employee's Kemetic religious wrist tattoos would disrupt work or otherwise pose an undue hardship raised a disputed factual question to be decided by jury).

[**299**]  *Faragher v. Boca Raton*, 524 U.S. 775, 802-03 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759-60 (1998); *see Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 607 (9th Cir. 2004) ("[A]n employer need not accommodate an employee's religious beliefs if doing so would result in discrimination against his coworkers or deprive them of contractual or other statutory rights.").

[**300**] *See Ervington v. LTD Commodities, LLC*, 555 F. App'x 615, 616-18 (7th Cir. 2014) (in suit challenging discharge where plaintiff's proselytizing violated the company's anti-harassment policy because the religious pamphlets she distributed were offensive to her coworkers, ruling that the employer was not required to accommodate distribution of pamphlets that were offensive to other employees, and rejecting plaintiff's argument that the harassment was not "unlawful" by noting that the statute "does not prohibit employers from enforcing an antiharassment policy that defines harassment more broadly than does Title VII"); *Wilson*, 58 F.3d at 1341-42 (holding that employer did not violate Title VII when it fired employee who refused to cover up a "graphic anti-abortion button" while at work; the court reasoned that plaintiff's requested accommodation that the employer "simply instruct [her] coworkers that they must accept [the plaintiff]'s insistence on wearing a particular depiction of a fetus as part of her religious beliefs is antithetical to the concept of reasonable accommodation" denied certain accommodation options because of demonstrated disruption to coworkers because it had provided a reasonable option that would not be disruptive); *Brown v. Polk Cnty.*, 61 F.3d 650, 656-57 (8th Cir. 1995) (en banc) (ruling employer did not establish that supervisor's "occasional spontaneous prayers and isolated references to Christian beliefs" posed an undue hardship because, although the employer  asserted that the supervisor's conduct had polarized employees along religious lines, it provided

no evidence of "actual imposition on coworkers or disruption of the work routine"); *Rightnour v. Tiffany & Co.*, 354 F. Supp. 3d 511, 525 (S.D.N.Y. 2019) (in suit challenging the plaintiff's termination for poor performance and offensive religion-related comments she had made, explaining that "it does not constitute discrimination to discipline employees for making offensive comments in the workplace, even when those comments are tied to religion"); *Averett v. Honda of Am. Mfg., Inc.*, No. 2:07–cv–1167, 2010 WL 522826, at *8-10 (S.D. Ohio Feb. 9, 2010) (in suit challenging discipline and eventual termination

of plaintiff for repeatedly making written and oral statements that her coworkers were sinful and evil people whom God would punish, explaining "Title VII does not require employer to allow an employee to impose her religious views on others" (internal quotation marks and citation omitted)).

[**301**]  *See  Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807.

[**302**] *See Anderson v. U.S.F. Logistics (IMC), Inc.*, 274 F.3d 470, 476 (7th Cir. 2001) (holding that employer reasonably accommodated plaintiff's religious practice of sporadically using the phrase "Have a Blessed Day" when it permitted her to use the phrase with coworkers and supervisors who did not object, but prohibited her from using the phrase with customers where at least one regular client objected; allowing her to use the phrase with customers who objected would have posed an undue hardship); *see also Banks v. Serv. Am. Corp.*, 952 F. Supp. 703, 710-11 (D. Kan. 1996) (holding that plaintiff food service employees at company cafeteria, who were terminated when they refused to stop greeting customers with phrases such as "God Bless You" and "Praise the Lord," presented a triable issue of fact regarding whether they could have been accommodated without undue hardship, because in the absence of employer proof that permitting the statements was disruptive or that it had any legitimate reason to fear losing business, a reasonable jury could conclude that no undue hardship was posed).

[**303**] *See, e.g., Lizalek v. Invivo Corp*., 314 F. App'x 881, at *2 (7th Cir. 2009) (holding that it would have posed undue hardship to accommodate employee's need to alternate among different identities pursuant to his religious belief that he was three separate beings, where evidence showed employee's practice of

alternating between identities in e-mail correspondence endangered the company's customer relationships and made it difficult for him to communicate with coworkers, and required management to devote "an inordinate amount of time to [the plaintiff's] various requests"); *Johnson v. Halls Merch., Inc.*, No. 87–1042–CV–W–9, 1989 WL 23201 (W.D. Mo. Jan. 17, 1989) (holding that it would have posed undue hardship on employer to permit retail employee's regular statement to customers "in the name of Jesus Christ of Nazareth," because it offended the beliefs of some customers and therefore cost the company business); *see also infra* notes 304-07.

[**304**]  *See Mial v. Foxhoven*, 305 F. Supp. 3d 984 (N.D. Iowa 2018) (holding that employer had not presented sufficient evidence to show as a mater of law that it would suffer undue hardship if required to accommodate employee who began signing internal business emails to coworkers "In Christ," because fact issues existed regarding whether the communications would cause anyone to perceive that the employer government agency was endorsing Christianity, or that the communications caused disruption in the workplace or violated any neutral, generally applicable rules or procedures).

[**305**] *See Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156, 164-65 (2d Cir. 2001)

(holding that allowing an employee to evangelize clients would not be reasonable because it would jeopardize the state employer's ability to provide services in a religion-neutral manner); *Rivera v. Choice Courier Sys., Inc.*, No. 01 Civ.2096 (CBM), 2004 WL 1444852, at *10 (S.D.N.Y. June 25, 2004) (holding that genuine issue of material fact existed as to whether courier was denied reasonable accommodation where courier alleged that employer could have accommodated courier's need to evangelize by transferring him to a position with a less stringent dress code that would have allowed employee to continue wearing a patch stating "Jesus is Lord").

[**306**] *Cf. Dixon v. Hallmark Cos.*, 627 F.3d 849, 855-56 (11th Cir. 2010) (ruling that apartment complex property manager could proceed to trial on claim challenging termination for violating the employer's religious displays policy by refusing to remove a poster of flowers with the words "Remember the Lilies . . . Matthew 6:28" she had hung in the on-site management office, where the

employer also terminated the plaintiff's husband, telling him, "You're fired too. You're too religious."); *Johnson*, 1989 WL 23201 (holding that it would have posed undue hardship on employer to permit retail employee's regular statement to customers "in the name of Jesus Christ of Nazareth," because it offended the beliefs of some customers).  Moreover, a private employer's own rights under the First Amendment Free Speech Clause may provide a defense to a Title VII accommodation claim, if the proposed accommodation would require the private employer involuntarily to display a religious message that could be construed as its own.  *See also infra* § 12-IV-C-7.

[**307**] *See Knight*, 275 F.3d at 168; *Grant v. Fairview Hosp. & Healthcare Servs.*, 02–4232JNEJGL, 2004 WL 326694, at *5 (D. Minn. Feb. 18, 2004) (finding that an ultrasound technician whose religious beliefs required him to dissuade women from having abortions was offered a reasonable accommodation when hospital restricted him from doing so but gave permission for him to be excused from performing ultrasounds on women it knew were contemplating abortions); *see also Grossman v. S. Shore Pub. Sch. Dist.*, 507 F.3d 1097, 1100 (7th Cir. 2007) (affirming summary judgment for school district on terminated guidance counselor's First Amendment free exercise and Title VII claims, the court ruled that the school district was permitted to terminate counselor for conduct, even if her actions of praying with students who approached her for guidance and throwing away school contraceptive education materials were motivated by her religious beliefs; there was insufficient evidence that her termination was based on her religious views alone as opposed to these actions, which the school district was entitled to prohibit.

[**308**] *See Townley*, 859 F.2d at 619-21 (noting private employer has First Amendment free exercise right to express its religion in the workplace). *Cf., e.g., Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 703 (2014) (describing how family-owned company has statement of purpose to "[h]onor[] the Lord in all [they] do by operating the company in a manner consistent with Biblical principles"; "[e]ach family member has signed a pledge to run the businesses in

accordance with the family's religious beliefs and to use the family assets to support Christian ministries"; their stores are closed on Sundays, despite the loss of millions in sales annually; "[t]he businesses refuse to engage in

profitable transactions that facilitate or promote alcohol use; they contribute profits to Christian missionaries and ministries; and they buy hundreds of full-page newspaper ads inviting people to 'know Jesus as Lord and Savior'" (first and third alteration in original)).

[**309**] *See Young v. Sw. Sav. & Loan Ass'n*, 509 F.2d 140, 144-45 (5th Cir. 1975); *see, e.g.*, *EEOC v. United Health Programs of Am., Inc.*, 350 F. Supp. 3d 199, 240-41 (E.D.N.Y. 2018) (awarding attorney's fees, injunctive relief, and costs in addition to the jury's award of compensatory and punitive damages to plaintiff where the employer coerced employees to engage in religious practices at work, creating a hostile work environment based on religion, and terminated an employee who opposed those practices).  Alternatively, an employee may argue simply that mandating attendance in a religious service, without exception, adversely affects the terms and conditions of employment based on religion.

[**310**] *See Mathis v. Christian Heating & Air Conditioning, Inc.*, 158 F. Supp. 3d 317, 333 (E.D. Pa. 2016) (denying summary judgment for the employer where plaintiff, an atheist, sought to refrain from wearing an employee ID badge with the employer's Christian message, because although the employer's message was intended to communicate "what we believe and how we want to be perceived by the public," a reasonable jury could find no harm to the company if its message was not displayed on plaintiff's badge); *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 614-21 (9th Cir. 1988) (employer must accommodate an employee's atheism; no undue hardship because excusing employee from services would not have cost anything nor caused a disruption).

[**311**] *See Young*, 509 F.2d at 144-45 (ruling that employee was constructively discharged based on her religion in violation of Title VII where her superior advised her that she had obligation to attend monthly staff meetings in their entirety and advised her that she could simply "close her ears" during religious exercises with which meetings began).

[**312**]  *See Garry H. v. Dep't of Transp.*, EEOC Appeal No. 0120181570, 2019 WL 4945081, at *2 (Sept. 24, 2019) (recognizing that holiday decorations such as a sign stating "Santa Claus[] is coming in [x number] of days" and Christmas lights are "secular symbols rather than an expression of a religion," and concluding that "displaying them in the federal workplace does not violate the establishment clause of the First Amendment," and does not constitute disparate treatment or hostile work environment harassment based on religion; noting the employer is not required by Title VII either to take them down or to add decorations representing other religions); *see also Federal Workplace Guidelines*, *supra* note 119 at Section D, example (b) (a government workplace does not violate the Establishment Clause by hanging a wreath or

other secular Christmas decorations).

[**313**]   Although it is beyond the scope of Title VII enforcement, we note for the sake of completeness that the U.S. Supreme Court has held that wreaths and Christmas trees are "secular" symbols, akin to items such as lights, Santa Claus, and reindeer, and thus that government display of these items does not violate the Establishment Clause of the First Amendment.  *See Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 616-17 (1989) (holding that stand-alone crèche on county courthouse steps violated Establishment Clause, but display elsewhere of Christmas tree next to a menorah and a sign proclaiming "liberty" did not), *abrogated on other grounds Town of Greece v. Galloway*, 572 U.S. 565 (2014); *cf. Lynch v. Donnelly*, 465 U.S. 668, 670, 683-87 (1984) (holding that government-sponsored display of crèche did not violate Establishment Clause because it was surrounded by various secular symbols as part of holiday display) ; *Federal Workplace Guidelines*, *supra* note 119 at Section D (example (b)).  For a discussion of both Title VII and Establishment Clause claims arising from holiday decorations in federal government employment context, *see, e.g.*, *Spohn v. West*, No. 00 CIV. 0735 AJP, 2000 WL 1459981, at *4-5 (S.D.N.Y. Oct. 2, 2000).  In the private sector, Establishment Clause constraints would not apply.

[**314**]   An employer may accommodate the employee's religious belief by substituting an alternative technique or method that does not conflict with the employee's religious belief or by excusing the employee from that part of the training program that poses a conflict, if doing so would not pose an undue hardship.

[**315**] Many employers have policies that require employees to treat each other

with "courtesy, dignity and respect."  This terminology fits within the ambit of treating others "professionally" as used in the example.  *See Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606-08 (9th Cir. 2004) (holding that it would have constituted undue hardship for employer to accommodate employee by eliminating portions of its diversity program to which employee raised religious objections; to do so would have "infringed upon the company's right to promote diversity and encourage tolerance and good will among its workforce").  If training conflicts with an employee's religious beliefs, the content of the training materials may be determinative in deciding whether it would pose an undue hardship to accommodate an employee by excusing him or her from the training or a portion thereof.  If the training required or encouraged employees to affirmatively support or agree with conduct that conflicts with the employee's religious beliefs, or signal their support of certain values that conflict with the employee's religious beliefs, it would be more difficult for an employer to establish that it would pose an undue hardship to accommodate an employee who objects to participating on religious grounds. *See Buonanno v. AT&T Broadband, LLC*, 313 F. Supp. 2d 1069, 1081-83 (D. Colo. 2004) (holding that a company could require and instruct employees to treat coworkers with respect in accordance with corporate diversity policy, but that a violation of Title VII occurred where the company did not accommodate

violation of Title VII occurred where the company did not accommodate employee's refusal on religious grounds to sign diversity policy asking him to "value the differences among all of us," which he believed required him to ascribe worth to a certain behaviors or beliefs he believed were repudiated by Scripture rather than simply agree to treat his coworkers appropriately).

[**316**]  *See Commission Guidelines*, 29 C.F.R. § 1605.2(c).

[**317**]  *See EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 401-02 (5th Cir. 2007) (holding that evidence was sufficient for employee to proceed to trial on claim that he was subjected to hostile work environment harassment based on both religion and national origin where harassment was motivated both by his being a practicing Muslim and by his having been born in India); *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 515 (7th Cir. 1996) (holding that Catholic Filipino employee made out a prima facie case of national origin and religious discrimination).

[**318**]  *See Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1196 (9th Cir. 2003) (denying employer's summary judgment motion on Lebanese Muslim substitute school teacher's discrimination claim because a reasonable jury could conclude that preconceptions about her religion and national origin caused school officials to misinterpret her comment that she was angry but did not want to "blow up"); *Tolani v. Upper Southampton Twp.*, 158 F. Supp. 2d 593, 596-97 (E.D. Pa. 2001) (ruling that employee from India who was Asian stated a claim of discriminatory discharge based on race, religion, and national origin sufficient to survive summary judgment because employer mocked the way Indian people worship).

[**319**]  42 U.S.C. § 2000e-3(a); *see also Burlington N. v. Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

[**320**]  42 U.S.C. § 2000e-3(a); *see, e.g., Magden v. Easterday Farms*, No. 2:16-CV-00068-JLQ, 2017 WL 1731705, at *8 (E.D. Wash. May 3, 2017) (holding plaintiff could proceed with retaliatory termination claim when he was fired for alleged poor performance two days after he complained to management about supervisor's proselytizing, management took no steps to investigate, and supervisor confronted him about complaint).

[**321**]  *See* EEOC, Enforcement Guidance on Retaliation & Related Issues II.A.2(e) (Aug. 25, 2016), **https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues (https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues)** .  In a related context, most courts have assumed or held that requests for disability accommodation are protected activity.  *See Solomon v. Vilsack*, 763 F.3d 1, 15 n.6 (D.C. Cir. 2014) (collecting cases); *see also* 9 Lex K. Larson, Employment Discrimination § 154.10, at 154-105 & n.25 (2d ed. 2014) ("In addition to the activities specifically protected by the statute, courts have found that requesting reasonable accommodation is a protected activity.").  One circuit has held that requesting a religious accommodation, in contrast to opposing

Section 12: Religious Discrimination - U.S. Equal Employment Opportunity Commission    Case 8:23-cv-02026-FWS-DFM    Document 159-2    Filed 08/15/25    Page 142 of 142    8/14/25, 11:53 PM

Page ID #:3277

the denial of such a request, is not a protected activity under 42 U.S.C. § 2000e-3(a), and thus that a claim that a prospective employer had wrongfully denied a Seventh-day Adventist's request not to work during her Sabbath (Friday

sundown to Saturday sundown) should have been brought as a disparate treatment claim under 42 U.S.C. § 2000e-2(a) instead. *See EEOC v. N. Mem'l Health Care*, 908 F.3d 1098, 1102–04 (8th Cir. 2019). The Commission disagrees with that decision and believes the better interpretation of Title VII's antiretaliation provision is that requests for religious accommodations are protected activity under that provision as well.

[**322**]  *Burlington N.*, 548 U.S. at 68 (quotations omitted).

[**323**]  Executive Order 13609 is inapplicable because the interpretive guidelines are nonbinding and have no impact on international regulatory cooperation or on interactions with other countries.

[**324**]  Although **www.regulations.gov (http://www.regulations.gov)** numbers comments received as 74, the numbering excludes one and ten, and document number 54 is a duplicate. Therefore, there were 71 unique comments.